UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

KENNETH JONES,                    )
                                  )
            Plaintiff,            )
                                  )
       v.                         )        No. 1:20-cv-00383-JAW
                                  )
JASPER WYMAN & SON,               )
                                  )
            Defendant.            )
                                  )

**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

A former employee of a Maine blueberry producer brings suit under theories of breach of contract, quantum meruit for breach of quasi-contract, unjust enrichment, for violation of his right to make and enforce contracts on equal terms with white employees guaranteed by 42 U.S.C. § 1981, and for retaliation for his opposition to unequal treatment, also in violation of 42 U.S.C. § 1981. The defendant employer moves for summary judgment. The Court grants in part and denies in part the motion because genuine issues of material fact preclude summary judgment as to most of the employee's claims.

**I.    PROCEDURAL HISTORY**

On March 13, 2020, Kenneth Jones filed a three-count complaint in Washington County Superior Court in Machias, Maine, against his former employer, Jasper Wyman & Son (Wyman) alleging breach of contract, breach of quasi-contract in quantum merit, and unjust enrichment. *Decl. of Elizabeth T. Johnson in Supp. of Notice of Removal* (ECF No. 3) (*State Ct. R.*), Attach. 2, *Compl.*; *id.*, Attach. 1, *Docket*

*R.* at 1 (*Docket R.*).  On October 14, 2020, Mr. Jones amended his state court complaint to allege racial discrimination in contracting and add a claim that Wyman retaliated against him for opposing unequal treatment, both in violation of 42 U.S.C. § 1981. *Id.*, Attach. 6, *Am. Compl*; *Docket R.* at 2.  On October 16, 2020, Wyman removed this case to federal court and answered the complaint.  *Def. Jasper Wyman & Son's Notice of Removal* (ECF No. 1); *Def. Jasper Wyman & Son's First Am. Answer and Affirmative Defenses to Pl.'s First Am. Compl.* (ECF No. 4).

On April 7, 2021, following discovery, Mr. Jones filed a motion for leave to amend his complaint to add an additional factual basis of pay discrimination.  *Pl.'s Mot. for Leave to File Second Am. Compl. and Amendment of the Scheduling Order* (ECF No. 15).  On April 23, 2021, the Magistrate Judge granted the motion and Mr. Jones filed his second amended complaint.  *Order* (ECF No. 17); *Pl.'s Second Am. Compl.* (ECF No. 18) (*Compl.*).  On May 7, 2021, Wyman answered the second amended complaint.  *Def. Jasper Wyman & Son's Answer and Affirmative Defenses to Pl.'s Second Am. Compl.* (ECF No. 21).

On July 1, 2021, Wyman notified the Court that it intended to move for summary judgment and requested that the Court schedule a Local Rule 56(h) prefiling conference.  *Def. Jasper Wyman & Son's Local Rule 56(h) Notice of Intent to Move for Summ. J. and Need for Pre-Filing Conference* (ECF No. 28).  On July 15, 2021, Wyman filed its Local Rule 56(h) memorandum.  *Def. Jasper Wyman & Son's Local Rule 56(h) Pre-Filing Conference Filing Mem. as to Def.'s Mot. for Summ. J.* (ECF No. 34).  On July 22, 2021, Mr. Jones submitted his Local Rule 56(h)

memorandum. *Pl.'s L.R.56(h) Pre-Conference Mem.* (ECF No. 35). On July 29, 2021, the Court held the Local Rule 56(h) conference. *Min. Entry* (ECF No. 36).

On September 9, 2021, Wyman filed the Local Rule 56(h) stipulated record. *Stipulated R. for Purposes of Summ. J.* (ECF No. 39); *id.*, Attachs. 1-15; *Stipulation of Facts for Purposes of Summ. J.* (ECF No. 40) (*R.*). On September 21, 2021, Wyman filed its motion for summary judgment and statement of material facts. *Def. Jasper Wyman & Son's Mot. for Summ. J.* (ECF No. 44) (*Def.'s Mot.*); *Def. Jasper Wyman & Son's Statement of Material Facts* (ECF No. 44) (DSMF).

On October 22, 2021, Mr. Jones responded in opposition to Wyman's motion for summary judgment. *Pl. Kenneth Jones' Opp'n to Def.'s Mot. for Summ. J.* (ECF No. 49) (*Pl.'s Opp'n*). That same day, he also filed his response to Wyman's statement of material fact and his statement of additional material facts. *Pl.'s Opposing Statement of Material Facts and Statement of Additional Facts* (ECF No. 50) ((*Pl.s Opp'n to DSMF*) pages 1-33, paragraphs 1-100 (PRDSMF); (*Pl.'s Statement of Additional Material Facts*) pages 34-64, paragraphs 1-154 (PSAMF)). On November 5, 2021, Wyman replied to Mr. Jones' opposition to its motion for summary judgment and to his statement of additional material facts. *Def. Jasper Wyman & Son's Reply in Supp. of Def.'s Mot. for Summ. J.* (ECF No. 51) (*Def.'s Reply*); *Def.'s Reply to Pl.'s Opposing Statement of Material Facts and Statement of Additional Material Facts.* (ECF No. 52) (DRPSAMF). On November 19, 2021, the Court granted Mr. Jones' unopposed request for oral argument on Wyman's motion for summary judgment. *Pl's Mot. for Oral Arg. on Def.'s Mot. for Summ. J.* (ECF No. 53); *Order* (ECF No. 54). On July 8,

2022, the Court held an oral argument on the pending motion. *Min. Entry* (ECF No. 57).

## II.   FACTUAL BACKGROUND[1]

### A.   The Parties

Jasper Wyman & Son (Wyman) is a Maine corporation with its principal place of business at 280 Main Street, Milbridge, Maine, and with operations in Prince Edward Island (PEI), Canada. *Compl.* ¶ 3.   Kenneth Jones is a Black, African American man who worked for Wyman from November 2013 until September 2018. *R.* ¶¶ 12, 1, 37.

### B.   2013: Wyman Hires Kenneth Jones as a Document Control Specialist

On November 13, 2013, Mr. Jones began employment at Wyman as a Document Control Specialist. *R.* ¶ 1.  Between 2014 and 2018, Mr. Jones lived on Key Street in Eastport, Maine, and his primary workplace was at Wyman's Cherryfield, Maine, facility (Cherryfield), located at 178 Main Street. *R.* ¶¶ 17-18. The driving distance from Mr. Jones' home to Cherryfield was 70.2 miles. *R.* ¶ 19. At all times during Mr. Jones' employment at Wyman, Mr. Jones reported directly to Shannon Fickett, Wyman's Cherryfield Quality Assurance Director from 2013 to present. *R.* ¶ 8.

---

[1]     In keeping with "the conventional summary judgment praxis," the Court "recount[s] the facts in the light most hospitable to [Mr. Jones'] theory of the case, consistent with record support." *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 17 (1st Cir. 2002) (citation omitted).

Mr. Fickett created the Document Control Specialist position and hired Mr. Jones for that role. DSMF ¶¶ 1, 2; PRDSMF ¶¶ 1, 2. After Mr. Jones rejected Mr. Fickett's initial $16.00 an hour job offer, emails reflect that Mr. Fickett advocated for Mr. Jones to be offered more money at the time of hire so that he would be interested in working at Wyman, which Wyman management agreed to in order to upgrade their talent pool.[2] DSMF ¶ 4; PRDSMF ¶ 4; PSAMF ¶ 97; DRPSAMF ¶ 97. Mr. Jones does not recall signing an employment agreement or contract with Wyman. DSMF ¶ 5; PRDSMF ¶ 5.

Mr. Jones and Mr. Fickett had a good working professional relationship, but Mr. Jones testified that Mr. Fickett was "manipulative."[3] DSMF ¶ 10; PRDSMF ¶ 10; PSAMF ¶ 50; DRPSAMF ¶ 50. As Mr. Fickett's direct report, Mr. Jones felt he "owed him the professional courtesy," but he "kept a distance, kept it professional" and said Mr. Fickett "was not a friend of [his]." DSMF ¶ 10; PRDSMF ¶ 10; PSAMF ¶ 50; DRPSAMF ¶ 50. Mr. Jones and Mr. Fickett communicated with each other regularly

---

[2]    The Court has incorporated Mr. Jones' qualification, which is essentially the same as Wyman's fact, to DSMF ¶ 4 that "Fickett asked Wyman management for approval to offer additional money because Jones had rejected the $16.00 an hour Fickett initially offered." PRDSMF ¶ 4. Wyman's HR director wrote in an email to Wyman upper management that "Ken was unable to accept due to the pay rate ($16.00)." JR 1439. Wyman attempts to qualify PSAMF ¶ 97 because "the cited authority does not establish that Fickett determined the initial pay rate offered." DRPSAMF ¶ 97. The record supports Mr. Jones' fact as written, which asserts that Mr. Fickett "initially offered" $16 an hour, not that Mr. Fickett necessarily set that hourly rate himself. PSAMF ¶ 97; *see also* JR 1439.

[3]    Mr. Jones denies Wyman's fact that "Plaintiff and Fickett had a good working relationship and got along well" as not supported by the record cited. PRDSMF ¶ 10. In Wyman's cited deposition testimony, Mr. Jones testified that Mr. Ficket "was an adequate supervisor; however, he was manipulative in my estimation." JR 10. Mr. Jones went on to say that they had a "good working professional relationship" but "he wasn't a friend of mine." *Id.* Viewing the record in the light most favorable to Mr. Jones, the Court removes "got along well" from DSMF ¶ 10 as unsupported by the cited testimony and instead includes Mr. Jones exact language when describing his relationship with Mr. Fickett to provide context for his statement that they had a "good working professional relationship." *See id.*

during Mr. Jones' employment, including about personal matters.  DSMF ¶ 11;
PRDSMF ¶ 11.

### C.    2015: Wyman Promotes Kenneth Jones

#### 1.    The Food/Workplace Document Control Specialist Role

Effective June 1, 2015, Wyman promoted Mr. Jones to Food/Workplace Safety
& Document Specialist.  DSMF ¶ 8; PRDSMF ¶ 8; PSAMF ¶ 48; DRPSAMF ¶ 48.  Mr.
Fickett created the position, gave Mr. Jones the job description, and was the person
who decided to promote Mr. Jones.  DSMF ¶¶ 8-9; PRDSMF ¶¶ 8-9; PSAMF ¶ 49;
DRPSAMF ¶ 49.  Mr. Fickett worked with Wyman Human Resources (HR) director
April Norton to draft the Food/Workplace Safety & Document Specialist job
description, which added duties related to workplace safety and environmental
compliance and assisting with food safety internal audits at Wyman's facility in PEI.[4]

---

[4]      Mr. Jones' ¶ 44 states:
         In June 2015, Wyman changed Jones' job title to Food/Workplace Safety & Document
         Specialist, and added duties of working on workplace safety and environmental
         compliance and assisting with food quality internal audits at its facility in PEI.
PSAMF ¶ 44 (citing JR 130, *Norton Dep.* 107-24-109-20).
         Mr. Jones' ¶ 45 states:
         Fickett worked with Norton and drafted the Food/Workplace Safety & Document
         Specialist job description.
PSAMF ¶ 45 (citing JR 616-17, *Fickett Dep.* 105:18-109:3; JR 882-84, Exs. 15-16 to *Fickett Dep.*).
         Wyman denies that "'working on workplace safety and environmental compliance and
assisting with food quality internal audits at its facility in PEI' were job duties assigned" to Mr. Jones.
DRPSAMF ¶ 44.  Wyman says the cited authority does not detail Mr. Jones' specific duties and instead
quotes "the applicable job description" enumerating Mr. Jones' duties of "[e]nsuring compliance to
Safety and Environmental laws and regulations (PEI only)" and "[a]ssist[ing] in performing internal
audits regarding compliance to food safety policies and procedures."  DRPSAMF ¶ 44 (quoting JR 41).
         The Court overrules Wyman's objection to ¶ 44.  Mr. Jones' citation is to the deposition
transcript of April Norton, the Wyman Human Resources Director.  In her deposition, Ms. Norton
agreed that "Shannon Fickett wanted to add duties for Ken of ensuring compliance with safety and
environmental compliance in PEI and assisting in internal audits."  *Norton Dep.* 108:2-7.  This
testimony is sufficient, when the evidence is viewed in the light most favorable to Mr. Jones, to support
his ¶ 44.  If Wyman wished to add detail on this point, it was free to do so.
         In addition, the Court overrules Wyman's objection to ¶ 45.  In the cited portions of Mr.
Fickett's deposition, he confirms that he worked with Ms. Norton and that he drafted the
Food/Workplace Safety & Document Specialist job description.

PSAMF ¶¶ 44, 45; DRPSAMF ¶ 44, 45; DSMF ¶ 8; PRDSMF ¶ 8. Mr. Fickett worked with Ms. Norton and Mr. Fickett drafted the new Food/Workplace Safety & Document Specialist job description. PSAMF ¶ 45; DRPSAMF ¶ 45. Ms. Norton and Mr. Fickett approved the job description, which expressly stated: "Travel will be expected and compensated for." PSAMF ¶¶ 46-48; DRPSAMF ¶¶ 46-48.

### 2. The Food/Workplace Safety & Document Specialist Duties

Mr. Jones' duties as Food/Workplace Safety & Document Specialist included ensuring compliance with Safety and Environmental regulations at Wyman's PEI facility, conducting internal audits to determine compliance with food safety policies and procedures, assessing processes to determine if additional procedures or instructions were needed, and managing the Quality Assurance (QA) documents for Wyman's Maine facility. PSAMF ¶ 84; DRPSAMF ¶ 84. No one else at Wyman performed exactly the same set of duties as Mr. Jones or was titled a Document Control Specialist or Food/Workplace Safety & Document Specialist.[5] DSMF ¶¶ 3, 92; PRDSMF ¶¶ 3, 92.

### D. Wyman Employees With Similar Duties

---

[5]   Mr. Jones admits "that no one held the same job titles as Kenneth Jones of Document Control Specialist or Food/ Workplace Safety & Document Control Specialist during his employ," PRDSMF ¶ 3, and no other employee "had the identical set of duties," PRDSMF ¶ 92, but disputes that "[n]o one else at Wyman performed the same duties as Plaintiff." PRDSMF ¶ 3. Mr. Jones notes that "[m]any employees, including Wyman's Quality Assurance ("QA") Managers, Wayne Alley and Heidi McDonald, performed some of the same duties as Kenneth Jones in his work on Quality Assurance and Workplace Safety matters, including working on internal food safety audits, training employees, and other employees, including Gordon Proud, Engineer, and Rebecca Ortiz, performed duties related to workplace safety procedures and compliance." PRDSMF ¶¶ 3, 92. The record supports Mr. Jones' qualification, and, viewing the record in the light most favorable to Mr. Jones, the Court adjusts Wyman's fact to reflect that although no one else performed exactly the same set of duties as Mr. Jones, there was some overlap.

Mr. Jones was one of Mr. Fickett's two direct reports.  DSMF ¶ 6; PRDSMF ¶ 6.  Wayne Alley, a white, Caucasian male, also reported directly to Mr. Fickett at Wyman's Cherryfield facility.  *R.* ¶¶ 9, 13.  Heidi MacDonald is a woman of Filipino descent who reported indirectly to Mr. Fickett and directly to Wade Dover, Wyman's General Manager at the PEI facility.  *R.* ¶¶ 7, 11, 14.

Mr. Alley was a QA Supervisor at Wyman's Cherryfield facility until October 29, 2014, when he was promoted to Quality Assurance Manager.  *R.* ¶ 10.  As Quality Assurance Manager, Mr. Alley's duties included managing and maintaining QA programs and activities to ensure compliance with food safety regulations and Wyman policies, reviewing audit results and making decisions on how to address findings, reviewing daily QA records, backup for some testing, and inspections of carton and bag lines, and coaching employees on product grading, testing and inspection.[6]  PSAMF ¶ 83; DRPSAMF ¶ 83.

Many Wyman employees, including QA Managers Alley and McDonald, performed some of the same duties as Mr. Jones in his QA work and Workplace Safety matters, including working on internal food safety audits and training employees, while other employees, including Wyman engineer Gordon Proud and Rebecca Ortiz, performed duties related to workplace safety procedures and compliance.[7]  PSAMF ¶

---

[6]     Wyman correctly points out that PSAMF ¶ 83 does not set out "an exclusive list of the QA Manager's duties."   DRPSAMF ¶ 83.  The Court accepts Wyman's qualification and accordingly changes the word "entailed" to "included."

[7]     Wyman attempts to qualify Mr. Jones' fact by citing his testimony in which he acknowledged that he did not know exactly what Mr. Alley did in his job, that Ms. MacDonald's role was different from his in that he lacked lab responsibilities, and that he did not review others' job descriptions. DRPSAMF ¶ 82.  Wyman also points out that Mr. Jones "had numerous duties that were specific to him versus a QA manager."  DRPSAMF ¶ 82.

82; DRPSAMF ¶ 82.  For example, QA Practitioner McDonald, who was employed at Wyman's Canadian corporate facility, performed internal audits and, as of June 2018, QA Manager Alley had been trained to perform Safe Quality Foods (SQF) internal audits.  *R.* ¶ 11; PSAMF ¶ 82; DRPSAMF ¶ 82.

Mr. Jones and Mr. Alley both participated in employee training: Mr. Alley was responsible for developing training materials and training new or existing employees, while Mr. Jones provided training on safety matters for his food and workplace roles, and coordinated and conducted the "majority of the harvest training" for the PEI facility in 2016.[8]  PSAMF ¶ 85; DRPSAMF ¶ 85.  Mr. Alley, who had worked at Wyman longer than Mr. Jones, had managerial and supervisory responsibilities, as he supervised one full-time QA monitor employee and shared supervisory responsibilities for about 45 other employees while they performed QA functions. DSMF ¶ 91; PRDSMF ¶ 91; PSAMF ¶ 86; DRPSAMF ¶ 86.  Mr. Alley did not supervise Mr. Jones.  PSAMF ¶ 86; DRPSAMF ¶ 86.  Mr. Jones did not know the quality of Mr. Alley's performance at Wyman and did not know Mr. Alley's exact

---

The Court rejects these qualifications as beyond the scope of the specific assertion in PSAMF ¶ 82.  The record cited reflects that there was overlap in duties, even if Mr. Jones had some unique duties and job attributes.  For example, Mr. Jones and Ms. MacDonald "both did internal audits."  *See* JR 1032.  Wyman relies on Mr. Jones' testimony saying that he "didn't know exactly what [Mr. Alley] did," JR 1031, and that he did not review Alley's or anyone else's job description while at Wyman, but this does not refute that there was some overlap or that Mr. Jones was otherwise aware of other Wyman employees' roles after years of working there.  *See* DRPSAMF ¶ 82.

[8]    Wyman attempts to qualify Mr. Jones' fact because his "job description did not specifically refer to any training duties."  DRPSMF ¶ 85.  Viewed in light most favorable to the non-moving party, the record supports Mr. Jones' assertion that his duties included training, even if not explicitly mentioned in his initial written job description.  Mr. Jones testified that his general job duties included training, and his 2016 performance review mentions "training materials."  *See* JR 41, 81.  Moreover, a jury could reasonably infer that an employee may have additional job responsibilities that fall outside their initial written job description.  The Court admits PSAMF ¶ 85, which speaks to the duties Mr. Jones and Mr. Alley actually engaged in, not what their initial job descriptions said on paper.

duties.[9]   DSMF ¶¶ 93-94; PRDSMF ¶¶ 93-94.   Mr. Jones never reviewed other Wyman employees' job descriptions, except for one he was asked to write himself; he never reviewed Mr. Alley's job description.  DSMF ¶ 93; PRDSMF ¶ 93.

### E.   Wyman's Policies and Decision Makers

#### 1.   Wyman's Upper Management

At all times while Mr. Jones was employed at Wyman, Mr. Fickett reported directly to Wyman's CEO/President, who, between 2013 and May 31, 2017, was Edward Flanagan, and, as of June 1, 2017, is Tony Shurman.  R. ¶¶ 15, 2.

Michelle Park was employed as Wyman's Senior Director of HR from 2013 through January 31, 2015.  R. ¶ 3.  On February 1, 2015 April Norton began working at Wyman as the Director of HR and Workplace Safety and is currently Wyman's Senior Director of HR.  R. ¶ 4.  Since 2013, Robert Mancini has been Wyman's Chief Financial Officer, and Homer Woodward has been its Vice President of Operations. R. ¶¶ 5-6.  Since 2014, Wade Dover has been General Manager at Wyman's Canadian facility in Morell, PEI.  R. ¶ 7.

#### 2.   Wyman's Employee Manual

---

[9]     Mr. Jones denies Wyman's ¶ 93, which reads "Plaintiff did not know what Alley's job duties or others' job duties were," as unsupported by the record citation.  PRDSMF ¶ 93.  Wyman maintains that the Court should admit its ¶ 93 because Mr. Jones "did not provide authority or a record citation to support [his] request to strike this statement."  DRPSMF ¶ 93 (citing D. ME. LOC. R. 56(e)).  Wyman says the cited authority supports its ¶ 93 because it shows that Mr. Jones "did not know what Alley's duties were or job description said, never reviewed Alley's job description, and never reviewed others' job descriptions except for one he was asked to write, supporting the conclusion that he did not know what their duties were."  DRPSMF ¶ 93.  Viewed in the light most favorable to Mr. Jones, the record supports that even if "Jones did not know exactly what Alley's duties were," which Mr. Jones admits, he was at least somewhat familiar with Mr. Alley's duties because they both reported to Mr. Fickett and shared duties in similar safety/QA areas.  PRDSMF ¶ 93.  The Court includes additional context from Mr. Jones' cited testimony because he never reviewed others' job descriptions, even if he was familiar with Alley's duties from working with him at Wyman.

Between 2013 and 2018 Wyman annually published an Employee Manual applicable to all permanent, full-time employees.  PSAMF ¶¶ 5-6; DRPSAMF ¶¶ 5-6. During that same period, a separate manual, the "Employee Orientation Manual for Seasonal/Summer/Temporary Employees," covered non-full-time, non-permanent employees; that manual had no policy provision for payment of mileage reimbursement.  PSAMF ¶ 7; DRPSAMF ¶ 7.

Each Employee Manual covered a broad range of subjects, including food safety, facility access, equal employment opportunity and non-discrimination policies, immigration compliance, employee categories, employee benefits, employee compensation, time off, vacation pay and sick leave, attendance, social media, personal vehicle use, company vehicle use, safety policies, discipline, termination of employment, and electronic communication system policy.  PSAMF ¶ 8; DRPSAMF ¶ 8.  Section 1.04 of the 2013-2018 Employee Manuals, which covered Wyman's "Food Safety Commitment," included the following:

> This Employee Manual has been designed to provide you with a better understanding of the terms and conditions of your employment at Jasper Wyman & Son.  It is important for you to understand how the company operates and what is expected of you.  The policies contained in this manual are designed to help create a working environment that leads to productivity and personal job satisfaction.  In addition, this manual will provide a framework within which you, as an employee, can help with the objectives of Jasper Wyman & Son. We depend upon you to be productive and to work harmoniously with your fellow employees. We request that you thoroughly familiarize yourself with the policies described in this manual.

> This manual is prepared for informational purposes only, and does not constitute a contract between Jasper Wyman & Son and its employees, and it should not be construed as such. The policies contained in this manual may be changed or amended at any time. To the extent practical,

we will attempt to notify you of these changes; however, notice is not required for any changes to become effective. At Jasper Wyman & Son, your employment is at-will. This means you are free to terminate your employment at any time, for any reason, and Jasper Wyman & Son retains the same rights. No amendment or exception to our at-will employment policy can be made at any time, for any reason, unless it is in writing, directed to you personally, and signed by me [Wyman's CEO].

The interpretation, application and administration of all Jasper Wyman & Son's policies, including those in the Employee Manual, rest exclusively with Jasper Wyman & Son. Any amendment to any part of this Employee Manual obligating or imposing changes on Jasper Wyman & Son must be in writing and issued by Edward Flanagan, President & CEO." [The 2017 and 2018 Manuals named Tony Shurman as President and CEO.]

PSAMF ¶ 9; DRPSAMF ¶ 9. At the end of the 2013-2018 Employee Manuals, Wyman included an "Employee Acknowledgement Form" that stated:

I have received a copy of the Jasper Wyman & Son Company Employee Manual, will read it, and will become familiar with the information and work rules contained in it. If there is anything I do not understand, I will request an explanation from Human Resources. I understand that the purpose of this Manual is to inform me about the Company's policies and rules, and that I am responsible for learning and complying with the policies and rules contained in this Handbook and that violation of company policies may result in discipline up to and including termination of employment. I also understand that this manual supersedes any previous oral or written policies, statements, understandings or agreements concerning the terms and conditions of employment at Jasper Wyman & Son.

I understand that my employment with Jasper Wyman & Son is "at will" and that I have the right to terminate my employment at any time, for any reason, with or without cause and with or without notice, and that Jasper Wyman & Son retains the same rights.

I also understand that the policies, programs, and procedures set forth in the Jasper Wyman & Son Employee Manual and other communications distributed to me by the company, whether written or verbal, do not constitute or supplement a binding employment contract. They are subject to change at any time, with or without notice, at the sole discretion of the company or in order to comply with changes in

12

Federal or State law.[10]  If policy conflicts with Federal or State law then legislation will prevail.    I understand that the interpretation, application, and administration of all company policies, including those in the Employee Manual, rest exclusively with the company.

I further understand that Jasper Wyman and Son reserves the right at its sole discretion to amend the contents of this Employee Manual at any time.  No agent, employee, or representative of Jasper Wyman & Son has the authority to make any promise or agreement contrary to the Employee Manual, unless it is in writing and signed by the President of the Company.[11]  Finally, I understand that no amendment or exception to Jasper Wyman & Son's at-will employment policy can be made at any time, for any reason, unless it is in writing, directed to me personally, and signed by the President of the Company.

_____

Employee Name (printed)

_____    _____

Employee Signature                          Date

PSAMF ¶¶ 10, 15; DRPSAMF ¶¶ 10, 15; DSMF ¶ 99; PRDSMF ¶ 99.  The Employee Manuals from 2013 to 2018 contain express statements that the Manuals are not, and should not be construed as, contracts between Wyman and its employees and all provide that Wyman may change or amend the policies in the Manuals at any time without notifying its employees.  DSMF ¶¶ 97, 98; PRDSMF ¶¶ 97, 98.

---

[10]     Wyman's proposed ¶ 99 states: "The employee acknowledgement forms in the Wyman Employee Manuals from 2013-2018 state that the Manual does not constitute a binding employment contract and that Wyman reserves the right to change policies with or without notice."  DSMF ¶ 99.  Mr. Jones denies this statement as "not an accurate summary of the contents of the Form" and unsupported by the record cited, and proceeds to offer his interpretation of the Form.  PRDSMF ¶ 99.  The Court includes the text of the Employee Acknowledgement form in its entirety, rather than the parties' opposing legal conclusions as to how it should be interpreted.

[11]     Mr. Jones' ¶ 15 reads "Defendant's policies from 2013 to 2018 prohibited its representatives and agents from making 'any promise or agreement contrary to the terms of the Employee Manual, unless it was in writing and signed by the President of the Company.'"  PSAMF ¶ 15.  Wyman denies that the Employee Manual from 2013-2018 contained "a 'prohibition' as stated" by Mr. Jones.  DRPSAMF ¶ 15.  Instead of resolving the parties' different characterizations of the policy language here, the Court has included the full policy as written in the cited Employee Manual.

When Mr. Jones became a full-time employee on January 12, 2014, Michelle Park, Wyman's HR Director at the time, informed him that "[a]s a full-time employee you will be eligible for a number of benefits, and you are scheduled to meet with me on February 5, 2014 at 1:00 to review those benefits." PSAMF ¶ 1; DRPSAMF ¶ 1. Wyman HR handled reviewing the Employee Manual with Mr. Jones and informing him of the benefits he was entitled to as a full-time employee. PSAMF ¶ 2; DRPSAMF ¶ 2. Mr. Jones reviewed the Employee Manual when he received it but did not recall signing the employee acknowledgment at the end of the manual. PSAMF ¶ 3; DRPSAMF ¶ 3.

### 3. Wyman's Vehicle Policies

Wyman provides company vehicles for employees to use for business-related travel. DSMF ¶ 15; PRDSMF ¶ 15. Section 6.07 of the Employee Manual stated Wyman's "Vehicle Use Policy" for Company owned vehicles:

> Employees driving on company business are required to have a current driver's license, obey the safety belt law, adhere to posted speed limits and all other traffic laws and be a courteous driver. Under no circumstances will Wymans reimburse an employee for the cost of traffic citations received while driving on company business.

> Employees driving company owned or personally owned vehicles for company business are subject to Maine State Motor Vehicle Record checks.

> Any employee driving on company business that is involved in a motor vehicle accident, traffic violation or loss of license must report this to their supervisor immediately. This includes incidents that occur on or off the job, within or outside the State, and in either a company or personal vehicle.

> If at any time you are using prescription drugs that can impair judgment or the ability to drive safely, please report this to your supervisor.

PSAMF ¶ 14; DRPSAMF ¶ 14.

Wyman policy did not require the use of company vehicles, or the exhaustion of the company vehicle option, before an employee would be entitled to payment of mileage reimbursement for use of a personal vehicle, but the company prefers that employees use company vehicles for business-related travel.[12]  DSMF ¶ 16; PRDSMF ¶ 16; PSAMF ¶¶ 17-18; DRPSAMF ¶¶ 17-18.  Use of a personal vehicle with mileage reimbursement was an alternative for approved business travel.  DSMF ¶ 16; PRDSMF ¶ 16; PSAMF ¶ 18; DRPSAMF ¶ 18.

From 2014 to 2018, the Wyman Employee Manual (the Employee Manual) applicable to full-time employees contained a Section 6.08 titled "Use of Personal Vehicles for Company Business, which provided:

> Employees using a personal vehicle on company business will provide Wyman's with proof of insurance, a valid driver's license, and a current registration and inspection sticker.
>
> The company will provide mileage reimbursement to employees who use personal vehicles for approved company business.  In order to be eligible to receive such reimbursement, you must submit to the accounting department an expense account form or other documentation signed by your supervisor indicating his or her approval of the trip, the date, the purpose of the trip and the total miles driven.  Please see your supervisor for the current rate of mileage reimbursement.

---

[12]   The Court accepts and includes Wyman's fact that it "prefers that employees use company vehicles for business-related travel" versus using a personal vehicle.  DSMF ¶ 16; *see* DRPSAMF ¶ 18. CEO Sherman testified that "[d]ifferent managers made different decisions on how they were handling that" but that company vehicles at the Cherryfield location were the "default and preferred option." JR 1590, 1484-85.

Mr. Jones qualifies Wyman's fact to note that "Wyman policy did not require the use of company vehicles, or the exhaustion of the company vehicle option, instead use of a personal vehicle with mileage reimbursement was an alternative for approved business travel."  PRDSMF ¶ 16.  The record supports the qualification.  In explaining Wyman's preference, CEO Shurman admitted there is no exhaustion policy/requirement in employee manual and the vehicle use policy sets out the reimbursement alternative.  *See* JR 285-86.

*R.* ¶ 16; PSAMF ¶ 13; DRPSAMF ¶ 13.  Wyman's mileage reimbursement policy in the Employee Manual said nothing about deducting the length of an employee's commute from mileage compensable for mileage reimbursement, had no provision allowing reduction of mileage reimbursement because of an employee's personal relationship with another person, and had no provision allowing denial of mileage reimbursement because of the activities an employee engaged in during non-work hours.  PSAMF ¶¶ 19-21; DRPSAMF ¶¶ 19-21.

At the beginning of each calendar year between 2014 and 2018, Wyman's HR Director sent an email to employees informing them of the annual mileage reimbursement rates for approved business travel, which were the IRS rates of $0.56 per mile for 2014; $0.575 for 2015; $0.54 for 2016; $0.535 for 2017; and $0.545 for 2018.  PSAMF ¶ 22; DRPSAMF ¶ 22.  Mr. Jones understood from his review of the Employee Manual that, among other matters, Wyman stated it would reimburse mileage for approved business travel.  PSAMF ¶ 4; DRPSAMF ¶ 4.

## F. Equal Employment Opportunity at Wyman

### 1. Wyman's Anti-Discrimination Policies

Wyman's 2013 to 2018 Employee Manuals contained an Equal Employment Opportunity Non-Discrimination policy, which in relevant part stated:

> Jasper Wyman & Son recognizes the essential rights of all individuals, and provides equal employment and advancement opportunities to all employees without regard to race, color, [and other protected statuses]. This company is committed to the principles of equal opportunity in all aspects of the employment relationship including, but not limited to, recruitment, hiring, promotion, wage and salary administration, and termination.

16

PSAMF ¶ 11; DRPSAMF ¶ 11.

The 2013 – 2018 Employee Manuals further contained a Statement of Equal Opportunity and Affirmative Action Policies by Wyman's President & CEO, which stated in relevant part:

> It is, has been, and will continue to be the policy of Jasper Wyman & Son to provide equal employment opportunity without regard to race, color, [and other protected statuses]. Further, it is the policy of Jasper Wyman & Son to undertake affirmative action in compliance with all federal, state and local requirements. I wish to take this opportunity to issue a formal reaffirmation of this policy and to assure each applicant, employee and party with whom we do business of the Company's commitment to our equal opportunity and affirmative action objectives.
>
> Our continued success depends heavily on the full and effective utilization of qualified persons. I will continue to direct our employment practices towards ensuring equal opportunity for all. Jasper Wyman & Son intends that all matters related to recruiting, hiring, training, compensation, benefits, promotions, transfers, terminations, and layoffs, as well as all company-sponsored social and recreational programs and treatment on the job, be free of unlawful discriminatory practices.
>
> As President and Chief Executive Officer, I retain the overall responsibility for Jasper Wyman & Son's commitment to Equal Employment Opportunity and Affirmative Action. The administration and implementation of these important programs for women, minorities, [and others] is the responsibility of the Company's Human Resources department. I ask that each manager and supervisor join me in full support of the principles of equal opportunity and affirmative action.

PSAMF ¶ 12; DRPSAMF ¶ 12.

## 2.   Wyman's Enforcement of Anti-Discrimination Laws

Beginning in 2013, Wyman delegated implementation of its anti-discrimination programs to its HR department.  PSAMF ¶ 149; DRPSAMF ¶ 149.[13] From 2013 on, Mr. Fickett was aware that federal law guarantees equal rights, prohibits discrimination on the basis of race and color, and prohibits retaliation for opposing discriminatory treatment.  PSAMF ¶ 150; DRPSAMF ¶ 150.  As HR Director, Ms. Norton was aware of the requirements of federal laws prohibiting discrimination on the basis of race, and retaliation, including from her trainings, and was aware of her responsibility to implement Wyman's equal employment and antidiscrimination policies.  PSAMF ¶ 151; DRPSAMF ¶ 151.  As of 2017, Wyman's new CEO Tony Shurman was also aware that federal law prohibited discrimination on the basis of race, required equal treatment of all persons with white citizens in contractual relationships, and that retaliation against persons standing up for equal treatment is prohibited.  PSAMF ¶ 152; DRPSAMF ¶ 152.  Wyman's HR Director, Ms. Norton, made no systematic review of manager's decisions regarding Equal Employment Opportunity compliance but engaged in "day-to-day" monitoring that included answering questions and providing guidance to managers. [14]  PSAMF ¶ 153.

### 3.   Racial Diversity at Wyman

---

[13]    Wyman's qualification that "Wyman's supervisors and managers were also tasked with implementing equal opportunity principles," DRPSAMF ¶ 149 (citing JR 1742), is already reflected in the above Manual excerpt.

[14]    Wyman qualifies Mr. Jones' statement, asserting that "Norton testified that to implement Wyman's EEO and antidiscrimination policies, she engaged in 'day-to-day monitoring' that included answering questions and providing guidance to managers, and managers engaged in the annual review process."  DRPSAMF ¶ 153 (quoting JR 121).  The Court accepts Wyman's qualification as supported by the record and clarifies Mr. Jones' fact.

According to Wyman's 2014-2017 Equal Employment Opportunity Commission (EEO) reports, Mr. Jones was the only, or one of very few (usually two), Black/African Americans employed by Wyman as full-time employees. PSAMF ¶ 23; DRPSAMF ¶ 23.[15] The vast majority of Wyman's seasonal workforce are persons of color. PSAMF ¶ 24; DRPSAMF ¶ 24.

As of July 20-26, 2014, Wyman employed 139 employees, 32 of whom were Black/African Americans, and 14 of whom were Hispanic/Latino. PSAMF ¶ 26; DRPSAMF ¶ 26. The remaining employees were white. PSAMF ¶ 26; DRPSAMF ¶ 26. Of the 32 Black/African Americans, 30 were employed at Wyman's Deblois facility, which is one of multiple "harvest centers", and 1 (Jones), was employed in Wyman's Cherryfield plant and of the 14 Hispanic/Latino employees, 12 of them were operatives or laborers.[16] PSAMF ¶ 27; DRPSAMF ¶ 27.

As of July 5-11, 2015, Wyman employed 176 employees, 2 of whom were Black/African American, 27 of whom were Hispanic/Latino, and 147 of whom were White. PSAMF ¶ 28; DRPSAMF ¶ 28. Of the Black/African American employees, 1 was employed as a technician (Jones), and 1 in sales. PSAMF ¶ 28; DRPSAMF ¶ 28. Of the 27 Hispanic/ Latino employees, 26 were employed as operatives or laborers. PSAMF ¶ 28; DRPSAMF ¶ 28.

---

[15]    Wyman qualifies Mr. Jones' statement that "Plaintiff was the only or one of the only full-time employees as Wyman as indicated in the 2014-2017 EEO reports cited." DRPSAMF ¶ 23. The Court accepts Wyman's qualification and alters Mr. Jones' ¶ 23.

[16]    The Court accepts Wyman's qualification specifying that the report cited, *see* JR 1570, "shows that 30 black employees were employed at Wyman's Deblois facility, which was one of multiple 'harvest centers.'" DRPSAMF ¶ 30.

As of December 23-29, 2018, Wyman employed 180 persons, none of whom were Black/African American; 29 of whom were Hispanic/Latino, 1 of whom was Asian, and 150 of whom were White.   PSAMF ¶ 31; DRPSAMF ¶ 31.   Of the 29 Hispanic/Latino employees, 28 were operatives or laborers, as was the 1 Asian employee.   PSAMF ¶ 31; DRPSAMF ¶ 31.

As of July 5-11, 2016, Wyman employed 179 employees: 1 Black/African American, (Jones), 32 Hispanic/Latino (thirty-one of whom were employed as operatives or laborers), 2 Native Hawaiian/Pacific Islanders employed as laborers, and the remaining 142 employees were white.[17]  PSAMF ¶ 29; DRPSAMF ¶ 29.

As of December 17-23, 2017, Wyman employed 158 employees, 1 of whom was Black/African American (Jones); 14 of whom were Hispanic/Latino (all who were employed as operatives or laborers); one Native Hawaiian/Pacific Islander employed, who was a laborer; two employees that identified as "two or more races," and the remaining 140 employees were white.[18]  PSAMF ¶ 30; DRPSAMF ¶ 30.

Wyman says that the racial diversity among Wyman's office or nonharvest workforce was reflective of the environment where Wyman operates and was consistent with the diversity of its applicant pool.[19]  DSMF ¶ 100; PRDSMF ¶ 100.

---

[17]   The Court accepts Wyman's denial "that 144 employees were white," because as it points out, "on the 2016 consolidated report, two employees identified as "two or more races." DRPSAMF ¶ 29. The Court adjusted Mr. Jones ¶ 29 to reflect that Wyman had 142 white employees in 2016.

[18]   The Court accepts Wyman's qualification that the 2017 consolidated report, JR 1614, states that two employees identified as "two or more races." DRPSAMF ¶ 30.

[19]   Mr. Jones denies Wyman's assertion that "[t]he racial diversity among Wyman's workforce was reflective of the environment where Wyman operates and was consistent with the diversity of its applicant pool." DSMF ¶ 100. He says "[c]ontrary to defendant's claim about the lack of diversity in the environment in which Wyman's operates, the vast majority of Wyman's seasonal workforce are persons of color. Wyman's Annual EEO Reports, capturing demographic information from various dates, show that Wyman's workforce is racially mixed as well as stratified, with white employees holding higher level nonharvest work positions, and most minorities holding laborer and operative

The vast majority of Wyman's seasonal workforce are persons of color.  PRDSMF ¶ 100.  Wyman's Annual EEO Reports, capturing demographic information from various dates, show that Wyman's workforce is racially mixed as well as stratified, with white employees holding higher level nonharvest work positions, and most minorities holding laborer and operative positions.[20]  PRDSMF ¶ 100; PSAMF ¶ 25; DRPSAMF ¶ 25.

### G.    Kenneth Jones' Claim for Mileage Reimbursement

#### 1.    Kenneth Jones' Work for Wyman in Canada

Soon after Mr. Jones began working at Wyman, he and Mr. Fickett discussed him working at Wyman's facility in PEI.  DSMF ¶ 12; PRDSMF ¶ 12.  Mr. Fickett understood that Mr. Jones had expressed an interest, desire, and preference to work more in the PEI facility than in Cherryfield.  DSMF ¶ 13; PRDSMF ¶ 13.

Between 2014 and 2018, on multiple occasions, Mr. Jones was assigned to work at Wyman's facility located at 41 North Macewen Road, Morell, PEI, Canada.  *R.* ¶ 20.  Mr. Fickett rearranged his and Mr. Jones' schedules to provide additional

---

(generally comprising grader, machine operator, food processor positions) positions."  PRDSMF ¶ 100.  Mr. Jones goes on to cite extensive EEOC statistics that support his assertion of racial stratification at Wyman.  PRDSMF ¶ 100.  Viewing the record in the light most favorable to Mr. Jones, the Court accepts his denial as a qualification and adjusts Wyman's ¶ 100 to reflect Mr. Jones' clarification regarding diversity among different types of workers at Wyman.

[20]    Mr. Jones defines "operative" workers as "generally comprising grader, machine operator, and food processor positions."  Wyman denies this definition as unsupported by appropriate cited authority.  DRPSAMF ¶ 25.  Mr. Jones cites an EEO Job Classification guide and Ms. Norton's testimony that operative classification is "really based on [] a skill set for the position, so it's not just like a general laborer or helper. It's above that."  PSAMF ¶ 25 (citing JR 1570).  The Court accepts Wyman's denial, and omits Mr. Jones' definition of "operative" as lacking record support.

Wyman also qualifies Mr. Jones' assertion that its workforce is stratified, explaining that "the diversity of Wyman's employees is reflective of the applicant pool in the area in which they operate."  This qualification does not specifically controvert Mr. Jones' fact and is unnecessary as the Court has included Wyman's characterization of its applicant pool elsewhere in the statement of facts.

opportunities for Mr. Jones to travel to PEI because Mr. Fickett considered Mr. Jones a very good employee and wanted to accommodate what he understood to be Mr. Jones' preference to work more in PEI.  DSMF ¶ 14; PRDSMF ¶ 14.  Mr. Jones preferred to use his personal vehicle for travel to PEI because Wyman company vehicles were based in Cherryfield and he lived over 70 miles away in Eastport, Maine.  DSMF ¶ 18; PRDSMF ¶ 18.  Mr. Fickett let Mr. Jones use his personal vehicle for the travel to PEI to accommodate Mr. Jones' preference and to allow him to incur less mileage than his normal daily commute.[21]  DSMF ¶19; PRDSMF ¶ 19.

Mr. Fickett could have required Mr. Jones to use a company vehicle for business-related travel to PEI.  DSMF ¶ 17; PRDSMF ¶ 17.  Mr. Fickett used a company vehicle most of the time when he traveled to PEI; however, there were occasions where he would take his own vehicle and receive mileage reimbursement.[22]  DSMF ¶ 20; PRDSMF ¶ 20.  When Mr. Jones traveled to PEI on behalf of Wyman, the company paid for Mr. Jones' lodging, parking, and tolls.  *R.* ¶ 22.  Wyman provided

---

[21]    Mr. Jones denies Wyman's ¶ 19, saying "Fickett and Jones discussed the inconvenience to Jones and Wyman from Jones using a company vehicle, however Jones did not agree not to be paid mileage reimbursement."  PRDSMF ¶ 19 (citing JR 14).  Mr. Jones further explains that "Mr. Fickett informed [him] that he did not 'qualify' for mileage reimbursement for his travel by personal vehicle to PEI for Wyman because of the length of his regular commute from Eastport to Cherryfield."  PRDSMF ¶ 19 (citing JR 17).  The Court rejects the denial as argumentative and non-responsive to Wyman's asserted ¶ 19.  Mr. Jones' denial goes beyond the scope of the fact presented by Wyman and DSMF ¶ 19 is therefore not properly controverted under Rule 56(f).  *See* D. ME. LOC. R. 56(f).  Wyman's fact is admitted.

[22]    Wyman's ¶ 20 states that "Fickett used a company vehicle for business travel."  DSMF ¶ 20.  Mr. Jones qualifies Wyman's fact "as not supported by the record cited."  PRDSMF ¶ 20.  The Court accepts Mr. Jones' denial and adjusts Wyman's ¶ 20 to more accurately reflect Mr. Fickett's deposition testimony that "[m]ost of the time I would use a company vehicle.  There were occasions where I would take my personal vehicle if a company vehicle wasn't available."  JR 615-16.  In these circumstances Mr. Fickett confirmed that he  would receive mileage reimbursement.  JR 616.

lodging for some employees travelling to PEI, including Mr. Jones, at a hotel located at 150 Euston Street, Charlottetown, PEI, Canada. *R.* ¶ 21.

Throughout his employment at Wyman, Mr. Jones had a personal relationship with Susan Belford, his girlfriend and/or fiancée since 2012, who lived in Halifax, Nova Scotia, Canada. *R.* ¶ 38; DSMF ¶ 40; PRDSMF ¶ 40. Mr. Jones visited Ms. Belford at her residence in Halifax on weekends after traveling to PEI to work for Wyman. DSMF ¶ 41; PRDSMF ¶ 41. Ms. Belford owned a barbecue sauce manufacturing company, Flameworks, and from approximately March 2017, while working at Wyman, Mr. Jones was its vice president.[23] DSMF ¶ 42; PRDSMF ¶ 42; PSAMF ¶ 148; DRPSAMF ¶ 148. While working at Wyman, Mr. Jones made deliveries for Flameworks in PEI and Halifax after his shifts at Wyman and on weekends after working at Wyman in Canada that week. DSMF ¶ 43; PRDSMF ¶ 43; DRPSAMF ¶ 148.

## 2.    Shannon Fickett and Kenneth Jones' 2014 Mileage Discussions

Mr. Jones believes that he first discussed mileage reimbursement for Wyman-related travel to and from PEI after his second PEI trip for Wyman in 2014, when he turned in an expense report to Mr. Fickett which included a statement of mileage for

---

[23]    Wyman states that Plaintiff was vice president of Flameworks from "approximately 2015 or 2016 to 2018," DSMF ¶ 42, which Mr. Jones qualifies with the assertion that "Flamework Elixirs was first incorporated in March 2017." PRDSMF ¶ 42. Furthermore, in response to Mr. Jones' statement as to Flameworks' date of incorporation, PSAMF ¶ 148, Wyman contends that Mr. Jones "stated in his deposition that he owned a business called Flameworks, [and] did marketing work for the company from 2015-2016." DRPSAMF ¶148. Viewing the record in the light most favorable to Mr. Jones, the Court accepts his assertion that Flamework Elixirs was not incorporated until March 2017.

reimbursement.[24]  PSAMF ¶ 32; DRPSAMF ¶ 32.  Mr. Fickett rejected the expense form, sent it back to Mr. Jones, told him that he did not qualify for mileage reimbursement,  directed him to redo the expense form without the request for mileage reimbursement.[25]  PSAMF ¶ 33; DRPSAMF ¶ 33.  Mr. Jones spoke with Mr. Fickett about mileage reimbursement for his travel to Wyman's PEI facility, and Mr. Fickett told Mr. Jones he did not "qualify" for mileage reimbursement because his weekly commute from Eastport to Cherryfield exceeded the mileage Mr. Jones would travel to PEI.[26]  PSAMF ¶ 34; DRPSAMF ¶ 34.

Mr. Jones thought Mr. Fickett's position was illogical and an excuse not to pay him mileage reimbursement, which made Mr. Jones suspicious.[27]  PSAMF ¶ 35;

---

[24]     Wyman denies that "this discussion occurred in May 2014" because Mr. Jones "stated in his deposition testimony that he believed this conversation occurred around the time of the November 13, 2014, emails between Jones and Fickett where they discussed mileage for travel to PEI."  DRPSAMF ¶ 32.  The deposition testimony cited reflects that the discussion "may have been after the second or so trip to PEI [when Mr. Jones] filled out a form with the mileage and [Mr. Fickett gave it back to him and] . . . gave [him] an explanation why [he] didn't qualify" and told him to redo it.  JR 17.  The Court partially accepts Wyman's denial because Mr. Jones' ¶ 32 does not assert a specific date for the conversation, just that it was after his second trip to PEI, but the record cited does not say that trip occurred in May 2014.

[25]     Wyman denies that Mr. Fickett told Mr. Jones he did not qualify for mileage reimbursement, citing Mr. Fickett's deposition testimony which directly contradicts Mr. Jones' testimony that Mr. Fickett expressly told him that he did not qualify for mileage.  DRPSAMF ¶ 33; see JR 624; JR 17.  Mr. Jones and Mr. Fickett's testimony on this point directly conflicts; viewing the record in the light most favorable to Mr. Jones, the Court accepts his ¶ 33, which is supported by his cited testimony.  See JR 17.

[26]     Wyman denies PSAMF ¶ 34 for the same reasons it asserted regarding PSAMF ¶ 33.  Although Mr. Fickett insists in his testimony that he never said Mr. Jones did not qualify, Mr. Jones' cited testimony supports his fact.  Wyman goes on to assert that "Jones's email to Fickett on November 13, 2014, reflects that Jones understood the basis for the arrangement regarding mileage reimbursement for PEI travel."  DRPSAMF ¶ 34.  This denial goes beyond the scope of Mr. Jones' fact and the Court has included the November 13, 2014 email exchange elsewhere in the facts.  Wyman admits that Mr. Jones and Mr. Fickett spoke about mileage reimbursement for Mr. Jones' travel to Wyman's PEI facility.  DRPSAMF ¶ 34.

[27]     Wyman qualifies Mr. Jones' fact stating that "Jones's email to Fickett on November 13, 2014, reflects that Jones understood the basis for the arrangement regarding mileage reimbursement for PEI travel."  DRPSAMF ¶ 35.  The Court rejects this qualification, as Wyman asserts additional information and does not controvert Mr. Jones' fact regarding his impression of Fickett's position,

DRPSAMF ¶ 35.  Mr. Jones told Mr. Fickett the denial of mileage reimbursement did not make sense, that his commute was immaterial, and that his travel to PEI was approved business travel; however, Mr. Fickett was insistent that Mr. Jones did not qualify for mileage reimbursement because of his commute.[28]  PSAMF ¶ 36; DRPSAMF ¶ 36.  Mr. Fickett and Mr. Jones discussed the inconvenience to Mr. Jones and Wyman from Mr. Jones using a company vehicle; however, Mr. Jones did not agree to not be paid mileage reimbursement.[29]  PSAMF ¶ 37; DRPSAMF ¶ 37.  Mr. Jones expected, based on section 6.08 of Wyman's Employee Manual, that if he used his own vehicle for approved business travel, Wyman would reimburse him.[30] PSAMF ¶ 38; DRPSAMF ¶ 38.

---

which is supported by the testimony cited.  DRPSAMF ¶ 35; PSAMF ¶ 35.  The details of the November 13, 2014, email exchange is included elsewhere in the statement of facts.

[28]   Wyman denies this fact, citing what it contends is Mr. Fickett's conflicting testimony. DRPSAMF ¶ 36.  In the light most favorable to Mr. Jones and for the same reasons explained in the previous footnotes, the Court admits Mr. Jones' ¶ 36 as supported by the record cited.

[29]   Wyman denies "that Jones and Fickett discussed whether it would be inconvenient to Wyman for Jones to use a company vehicle" because "the cited authority only supports that Fickett and Jones actually discussed the inconvenience to Jones, and that it was Jones's understanding or perception that there would be an inconvenience to Wyman."  DRPSMF ¶ 37.  Wyman asserts "it was not inconvenient, because company vehicles are provided specifically for the purpose of employee business travel."  DRPSAMF ¶ 37 (citing JR 612-13).  Viewing the record in the light most favorable to Mr. Jones, the cited testimony supports his asserted fact.  There is a conflict between Mr. Jones' deposition testimony, Mr. Fickett's deposition testimony, and other Wyman managers' characterization of the November 13, 2014, email; however, the cited record supports the assertion that Mr. Jones and Mr. Fickett discussed a mutual inconvenience.  The Court admits PSAMF ¶ 37.

The Court rejects Wyman's argumentative qualification of Mr. Jones' statement that he did not agree not to be paid mileage reimbursement because the November 13, 2014, email exchange that Wyman says "reflects that Jones understood the basis for the arrangement regarding mileage reimbursement for PEI travel" is included elsewhere in the statement of facts.  Wyman admits that "Fickett and Jones discussed the inconvenience to Jones of Jones using a company vehicle for travel to PEI."  DRPSAMF ¶ 37.

[30]   Wyman qualifies PSAMF ¶ 38 with the assertion that "Jones's email to Fickett on November 13, 2014, reflects that Jones understood that he would not receive mileage reimbursement for travel to PEI."  DRPSAMF ¶ 38.  The Court accepts Mr. Jones' fact as supported by his cited deposition testimony which states that "according to 6.08 in the employee manual, it says that if [he] use[d his] own vehicle for approved business travel, [he would] get reimbursed for it and that's what [he] reasonably expected."  JR 17.  The Court included the full text of Section 6.08 of the Employee Manual and the November 13, 2014, emails elsewhere in this statement of facts.

On November 13, 2014, Mr. Fickett emailed Mr. Jones: "Since you'll be using your own car back and forth from the facility, keep track of your mileage. I like to use Mapquest, and address locations, to show the mileage. If the mileage is more than your normal commute, then we can expense the difference." DSMF ¶ 21; PRDSMF ¶ 21. Mr. Jones replied: "Thanks. I will keep track of all driving and expenses. I doubt that the driving will be more than the 140 miles per day I commute back and forth to this facility though." DSMF ¶ 22; PRDSMF ¶ 22.

### 3.    Kenneth Jones' Unreimbursed Business Travel

Wyman did not reimburse Mr. Jones for mileage for use of his personal vehicle on approved business travel for Wyman between Maine and PEI, Canada, between February 2014 and March 17, 2017. PSAMF ¶ 51; DRPSAMF ¶ 51. The round-trip mileage from Mr. Jones' residence in Eastport, Maine, to Wyman's facility in PEI was between 630 and 644 miles.[31] PSAMF ¶ 52; DRPSAMF ¶ 52. Mr. Jones' trips to PEI

---

[31]    Mr. Jones cites his own deposition testimony in support of his assertion that the "round-trip mileage from Jones' residence in Eastport, Maine to Wyman's facility in Morell, PEI, Canada was 644 miles," without explaining how he arrived at that number. PSAMF ¶ 52.

Wyman urges the Court to instead take judicial notice of the internet map distance between Mr. Jones' Maine residential address (39 Key Street, Eastport, Maine) and Wyman's PEI address (41 Mcewen Rd N, Morell, PE C0A 1S0, Canada). DRPSAMF ¶ 52. According to Google Maps, the distance between Mr. Jones' residence in Eastport, Maine, and Wyman's facility in PEI is 630 miles. *See* http://maps.google.com/maps [last checked January 10, 2022]; FED. R. EVID. R. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned"). "Courts commonly use internet mapping tools to take judicial notice of distance and geography." *Rindfleisch v. Gentiva Health Sys., Inc.*, 752 F. Supp. 2d 246, 259 n.13 (E.D.N.Y. 2010) (collecting cases).

It does not matter. To rule on this dispositive motion, it is not necessary to resolve the dispute about the exact mileage between Eastport, Maine and Morell, PEI. The fourteen-mile difference between Mr. Jones' and Wyman's calculations in a trip over 600 miles is relatively trivial, a seven-mile difference in a long one-way trip. If necessary, a jury will have to resolve this factual dispute. The point is that Wyman did not pay Mr. Jones the mileage, whatever the precise mileage may be. Instead of engaging in the parties' dispute, the Court inserted a distance range for a roundtrip mileage between 630 to 644 miles.

were usually for multiple days at a time and, some years, he stayed for the entire summer.  DSMF ¶ 23; PRDSMF ¶ 23.

In 2014, Mr. Jones travelled in his personal vehicle between Eastport and PEI on approved Wyman business travel on five trips in the following periods: February 18-21; May 5-9; July 14-18; September 2-5; and November 17-21.[32]  PSAMF ¶ 55; DRPSAMF ¶ 55.

In 2015, Mr. Jones travelled in his personal vehicle between Eastport (unless otherwise indicated,) and PEI on approved business travel to work for Wyman on approximately 18 trips in the following periods: January 20-22; February 18-19; February 23-26; March 2-6; May 4-8; June 15-19; July 27-31; August 24-30; August 31-September 4 (with travel to Halifax); September 7-11; September 29-October 1; October 6-9 (with travel to Halifax); October 13-16; November 30-December 4 (with

---

[32]    Wyman qualifies Mr. Jones' fact by pointing out that his cited expense reports denote certain travel time periods but "do not contain information regarding Plaintiff's point of origin."  DRPSAMF ¶ 55.  Wyman is correct that the expense reports do not specify a starting location for business travel, *see* JR 2249-70, and that it is unclear from the records cited whether Mr. Jones "travelled from Halifax, not Eastport, to PEI and PEI to Halifax, instead of Eastport, after working in PEI, and it is unclear whether he did so on the cited trips."  DRPSAMF ¶ 55.  Mr. Jones testified that he took weekend trips to Halifax "after every PEI trip," JR 12, unless he "was working there during the harvest, [when he] stayed in their facility they provided me, seven days a week."  JR 1027.

The Court rejects Wyman's qualification because Wyman does not contest that Mr. Jones was in PEI during those identified periods of time in February, May, July, September, and November; the remainder of the qualification is beyond the scope of the stated fact.  To the extent that Wyman attempts to add additional information about Mr. Jones' point of origin during each of those trips, the record is silent on that issue and thus not properly before the Court for resolution on summary judgment.

There is not enough information in the record to resolve this dispute and it is not necessary to do so to decide the dispositive motion.  If this factual issue lingers, it will have to be resolved by a jury because there is not enough information on the summary judgment  record to determine which trips included travel to Halifax.

Finally, Wyman points out that the time period denoted in JR 2252, cited by Mr. Jones to support his May 2014 PEI trip, is "May 5-9, 2014."  The Court adjusted the date in Mr. Jones' ¶ 55 to accurately reflect the record.

travel to Halifax); December 7-11; December 14-17 (with travel to Halifax), and December 22-23.[33]  PSAMF ¶ 56; DRPSAMF ¶ 56.

In 2016, Mr. Jones travelled in his personal vehicle between Eastport (unless otherwise indicated) and PEI on approved business travel to work for Wyman on at least ten trips during the following periods: January 21; February 1-4; March 7-11; April 18-22 (travel to Halifax); April 25-29 (travel to Halifax), May 2-6; May 16-20; October 17-21 (travel to Halifax); October 24-28; and December 2.[34]  PSAMF ¶ 57; DRPSAMF ¶ 57; JR 2148-49, 2262-69.

Between 2014 and March 2017, Mr. Jones made an estimated 28 trips between Eastport and PEI of 644 miles, and an estimated 7 trips between PEI and Halifax, Nova Scotia of an estimated 454 miles.  Mr. Jones estimates that his unpaid mileage reimbursement equals $11,941.37, which he says is the amount Wyman owes him.[35]

---

[33]    Wyman offers the same qualification to PSAMF ¶ 56 that it used to dispute PSAMF ¶ 55, namely that Mr. Jones' record citations do not specify his travel point of origin and that it is unclear whether he always went to Halifax before and after working in PEI.  DRPSAMF ¶ 56.  The Court rejects the qualification for the same reasons discussed in the previous footnote.
     Wyman also contends that that Mr. Jones has no record support for an alleged August 11-17 trip.  DRPSAMF ¶ 56.  The Court accepts this qualification and omits this portion of Mr. Jones' fact, but admits the rest of Mr. Jones' ¶ 56.
     Finally, in its recitation of facts, the Court has noted that these figures are the amounts that Mr. Jones claims, even as the Court understands that Wyman contends that the roundtrip from Eastport to PEI is slightly less.

[34]    Again, Wyman offers the same qualification that Mr. Jones' record citations do not specify his travel point of origin and that it is unclear whether he always went to Halifax before and after working in PEI.  DRPSAMF ¶ 57.  Wyman admits the remainder of PSAMF ¶ 57, except "for the alleged February 10-16 or February 16-19 trips" which Wyman contends lack record support.  Again, this dispute is immaterial to the Court's resolution of the dispositive motion.  Nevertheless, the Court omits Mr. Jones' reference to PEI travel between February 10-16 and February 16-19 and admits the rest of PSAMF ¶ 57.  To reflect this change, the Court similarly updates Mr. Jones' reference to "at least 11 trips" to instead read "at least 10 trips."

[35]    Wyman contests Mr. Jones' calculation of the total milage between Eastport and PEI as incorrect based on a round trip distance of 644 miles, as opposed to 630 miles according to Google Maps.  See DRPSAMF ¶ 52.  Wyman also denies Mr. Jones' estimation of his total mileage from driving between PEI and Halifax, Nova Scotia.  See DRPSAMF ¶¶ 55-57.  As discussed above, the Court accepted each figure as establishing a range of actual mileage and, for purposes of this motion, the Court cannot and need not resolve this factual dispute.  To the extent that Wyman references its

PSAMF ¶ 53; DRPSAMF ¶ 53.  On May 8, 2017, the day before he reached out to Wyman HR regarding reimbursement, Mr. Jones emailed his PEI co-worker Gordon Proud complaining of car troubles and having to go to the auto shop, saying "[t]his is where I get pissed at Wyman's for not paying me for mileage!"[36]  JR 64.  Mr. Jones testified that, without reimbursement, he did not have the money to pay for routine maintenance of his car, causing car breakdowns and disruption of his work.  PSAMF ¶ 54.

Mr. Jones travelled to PEI using a personal vehicle more frequently than other employees at the Cherryfield facility.  DSMF ¶ 24; PRDSMF ¶ 24.  During Mr. Jones' employment at Wyman, Mr. Fickett never told him anything that suggested race or color was a factor in the mileage reimbursement arrangement.  DSMF ¶ 25; PRDSMF ¶ 25.

### 4.    Kenneth Jones' Mileage-Related Complaints

Mr. Jones spoke to Mr. Woodward about being denied mileage reimbursement for Wyman-related travel to and from PEI, and Mr. Woodward said he would speak

---

objections to PSAMF ¶¶ 55-57, the Court rejects its qualification for the same reasons discussed in the previous footnotes.

[36]    Mr. Jones ¶ 54 originally read "[t]he denial of mileage reimbursement was a significant denial of benefits to Jones because he did not have the money to pay for routine maintenance of his car, causing car breakdowns and disruption of work."  PSAMF ¶ 54.  Wyman denies this fact because "[t]he cited record shows Defendant had complained to his coworker about car issues, but there is nothing in the cited record to support that these issues were causally related to nonpayment of mileage reimbursement."  DRPSAMF ¶ 54.  Wyman also denies this was "a significant denial of benefits to Jones" as "merely an argumentative statement."  Wyman reasons that Mr. Jones "would have been incurring similar mileage on his daily commute had he not been traveling to PEI."  DRPSAMF ¶ 54 (citing JR 36).  The record supports Mr. Jones' fact regarding his frustration, which he attributed to Wyman denying him mileage, about having to pay for car maintenance; however the Court has omitted his legal conclusion that this constituted a significant denial of benefits and clarified that it comes from Mr. Jones' perspective.  PSAMF ¶ 54.

to Mr. Fickett but never got back to Mr. Jones.[37]  PSAMF ¶ 40; DRPSAMF ¶ 40.  Mr. Jones also complained to Wyman managers in Canada, General Manager Wade Dover, Plant Manager Ralph Young, and Head Engineer Gordon "Gordie" Proud, about being denied mileage reimbursement for his Wyman-related business travel to and from PEI and told an HR person that he was not getting paid expenses which he believed was not fair.[38]  PSAMF ¶ 41; DRPSAMF ¶ 41.

### 5.   Other Employees' Vehicle Use and Reimbursement

Between 2013 and 2017, Wyman paid mileage reimbursement for use of a personal vehicle for travel between the US and PEI for white employees, including John Hedberg, IT manager, April Norton, HR Director, Shannon Fickett, QA Director, Ralph Young, PEI Plant Manager, and Heidi McDonald, PEI QA manager (who is of Filipino ancestry).  PSAMF ¶ 60; DRPSAMF ¶ 60.  Between 2013 and 2017, Wyman provided company vehicles (and/or paid auto allowances) to the following

---

[37]      Wyman denies Mr. Jones' fact, citing Homer Woodward's testimony that he "does not recall having a discussion with anyone, including [Mr. Jones], about [Mr. Jones'] mileage reimbursement prior to September 2018."  DRPSAMF ¶ 41.  Mr. Jones' testified that, after speaking with Mr. Fickett and exchanging emails about mileage reimbursement, he "spoke to Homer Woodward and Homer said -- I didn't hear anything, but Homer said he would speak to [Mr. Fickett], and [he] didn't hear anything after that," and that this took place "shortly after [he] was told [he] didn't qualify [for mileage reimbursement] and [he] was confused."  JR 19.  Homer Woodward testified that he could not recall this conversation with Mr. Jones, JR 1893, but viewing the record in the light most favorable to Mr. Jones, the Court admits PSAMF ¶ 41 as supported by the record cited.

[38]      Wyman denies that Mr. Jones complained to Wade Dover because "Dover testified at his deposition that he had no information about Jones complaining to anyone about mileage reimbursement."  DRPSAMF ¶ 41 (citing JR 933).  Viewing the record in the light most favorable to Mr. Jones, the Court admits Mr. Jones' fact as supported by his testimony that he "also spoke to other people in management and PEI, Wade Dover and Ralph, Gordie" and to the HR person.  JR 19.  The Court accepts Wyman's qualification that "the authority cited by Plaintiff does not support the contention that he complained to each of the named individuals 'his belief that it was not fair'—only the 'HR person.'"  DRPSAMF ¶ 41.  Mr. Jones testified that he "spoke to the HR person . . . . She said that -- when [he] told her, you know, I'm not getting paid for expenses, and she said that's not fair. [He] said, I know.  It's not good.  It's not fair."  JR 19.  The Court alters PSAMF ¶ 41 to specify that Mr. Jones discussed fairness with the Wyman HR person, not necessarily with Wyman's managers.

white employees for travel between the US and PEI: John Hedberg, IT Manager, April Norton, HR Director, Shannon Fickett, QA Director, Robert Stanley, Engineering Director, Bruce Hall, Agronomist, Homer Woodward, Vice President of Operations, Robert Mancini, CFO, Tony Shurman, CEO, Tom Gardner, Vice President of Sales, Tom Hugill, Director of Food Service Sales, Angela Marker, Senior Sales Manager, Peter Lewis, Vice President of Marketing, and Ed Flanagan, CEO. [39] PSAMF ¶ 61; DRPSAMF ¶ 61. Wyman provided a vehicle rental and paid an auto allowance to Karl Baer, Director of Sales, who is African American/Black, who drove Wyman customers from the US to PEI. [40] PSAMF ¶ 62; DRPSAMF ¶ 62. Mr. Baer's travel was approved by Tom Gardner, VP of Sales, who was based out of Wyman's office in Massachusetts. PSAMF ¶ 62; DRPSAMF ¶ 62.

Mr. Fickett approved mileage reimbursement for Wayne Alley for round-trip mileage of 18 miles between Wyman's Cherryfield plant, and Wyman's C & D facility in Deblois in 2011 and 2012 with no offset. PSAMF ¶ 63; DRPSAMF ¶ 63. Mr. Fickett used a company vehicle most of the time when he travelled to PEI, Canada, between 2014 and 2017; on other occasions he used his personal vehicle and was paid mileage reimbursement. PSAMF ¶ 59; DRPSAMF ¶ 59. Mr. Fickett did not reduce his requests for mileage reimbursement by the mileage of his regular home to work

---

[39]     The Court accepts Wyman's qualification that "its response to the cited Interrogatory [that Mr. Jones uses to support his ¶ 61] did not just include white employees" and includes Karl Baer in the list of employees who were provided company vehicles and/or auto allowances. DRPSAMF ¶ 61. The Court accepts Wyman's qualification that Karl Baer also received an auto allowance and includes this fact elsewhere in the statement of facts. *See* DRPSAMF ¶ 62.

[40]     The Court rejects Wyman's qualification that "there is not record support for [Mr. Jones'] assertion that Tom Gardner is 'based in Wyman's office in Massachusetts'" as Wyman's interrogatory responses give a Concord, Massachusetts address for Tom Gardner. JR 547.

commute.  PSAMF ¶ 64; DRPSAMF ¶ 64.  Mr. Jones was the only Wyman employee for whom Wyman reduced the mileage reimbursement for travel to and from Canada by deducting his  regular home-to-work commute.  PSAMF ¶ 65; DRPSAMF ¶ 65.  Mr. Jones was the only Wyman employee who travelled to PEI on approved business travel, to whom Wyman did not pay mileage reimbursement for that travel.  PSAMF ¶ 66; DRPSAMF ¶ 66.  Mr. Jones was not aware of any other employee at Wyman with a commute of 50 miles or more.  DSMF ¶ 95; PRDSMF ¶ 95.

Wyman asserts that between 2013 and 2017 none of its employees entered into an agreement with Wyman not to be paid mileage reimbursement for approved business travel.  PSAMF ¶ 67; DRPSAMF ¶ 67.  Wyman also asserts that between 2013 and 2017, it had no employees for whom it reduced paid mileage reimbursement for business travel because of the employee's activities when not working.  PSAMF ¶ 68; DRPSAMF ¶ 68.

### 6.   May 2017: Wyman Starts Reimbursing Kenneth Jones

In 2017 Mr. Jones received a document sent to all Wyman employees showing that someone he knew, who was a white employee, received mileage reimbursement.  PSAMF ¶ 70; DRPSAMF ¶ 70.   It did not sit well with Mr. Jones that, as the only Black employee, he was not getting mileage reimbursement for business travel.  PSAMF ¶ 70; DRPSAMF ¶ 70.  Mr. Jones began asking other employees, who were white, whether they were paid mileage reimbursement.  PSAMF ¶ 39; DRPSAMF ¶ 39.  Mr. Jones decided to take the issue to Ms. Norton, Wyman's new HR Director.  PSAMF ¶ 71; DRPSAMF ¶ 71.  On May 9, 2017, Mr. Jones emailed Ms. Norton

asking, "is there a reason why I do not qualify for milage [sic] when traveling to PEI?" *R.* ¶ 35 (*Kenneth Jones Email to April Norton*); DSMF ¶ 26; PRDSMF ¶ 26; PSAMF ¶ 72; DRPSAMF ¶ 72.  Mr. Jones did not limit his inquiry to payment of mileage reimbursement prospectively. [41]   PSAMF ¶ 72; DRPSAMF ¶ 72.

May 2017 was the first time Mr. Jones contacted Wyman HR regarding mileage reimbursement.  DSMF ¶ 27; PRDSMF ¶ 27.  Prior to receiving Mr. Jones' email, Ms. Norton was unaware that he was not receiving mileage reimbursement for travel to and from PEI.  *R.* ¶ 36.  After receiving Mr. Jones' May 9, 2017, email, Ms. Norton called Mr. Jones and told him it was only fair that he be reimbursed mileage for business travel.[42] PSAMF ¶ 73; DPRSAMF ¶ 73.  Ms. Norton never said anything during discussions with Mr. Jones that suggested his race or color was a factor in why he was not being paid mileage reimbursement.  DSMF ¶ 30; PRDSMF ¶ 30.

When Ms. Norton contacted him about it, Mr. Fickett "was blindsided" by Mr. Jones' complaint about mileage.   DSMF ¶ 31; PRDSMF ¶ 31; PSAMF ¶ 74; DRPSAMF ¶ 74.  Mr. Fickett explained to Ms. Norton the arrangement he and Mr. Jones had regarding mileage, as he understood it, including that Mr. Jones wished to

---

[41]     Wyman argues that "the narrative regarding whether Jones limited his inquiry to payment of mileage reimbursement prospectively is argumentative and not supported by the cited authority." DRPSAMF ¶ 72.  Viewing the record in the light most favorable to the non-movant, a jury could find that Mr. Jones was not only requesting future reimbursement, but also payment for past trips, as he goes on to say in the same email to April Norton that he has "been doing it for years, and ha[s] never been paid for the travel."  JR 70.  The Court rejects Wyman's qualification and admits Mr. Jones' fact.

[42]     Wyman denies "that Norton told Jones that it was only fair that he be reimbursed mileage for business travel." DRPSAMF ¶ 73 (citing JR 133).  Mr. Jones' record citation supports his fact.  Viewing the record in the light most favorable to Mr. Jones, a reasonable jury could find that Ms. Norton told him reimbursement was only fair when she called him after receiving his May 9, 2017, email.  *See* JR 22.  His deposition testimony directly contradicts Ms. Norton's, who outright denies making the "only fair" comment.  JR 133.

use his personal vehicle for the travel to PEI.[43]  DSMF ¶ 29; PRDSMF ¶ 29.  Ms. Norton testified that during these initial discussions with Mr. Fickett the issue of paying Mr. Jones back mileage "never came up at that time" and that she did not "remember having a conversation at that time."[44]  JR 135; PSAMF ¶ 77; DRPSAMF ¶ 77.

On May 9, 2017, after discussing Mr. Jones' request with Ms. Norton and Mr. Mancini, Wyman's CFO, Mr. Fickett proposed paying Mr. Jones mileage reimbursement going forward. [45]  PSAMF ¶ 78; DRPSAMF ¶ 78; DSMF ¶ 32; PRDSMF ¶ 32.  Mr. Fickett says that he agreed to what he felt was a new request

---

[43]    Mr. Jones admits that "Fickett claimed that he had an arrangement with Jones" but denies "that Jones agreed to an arrangement not to be paid mileage reimbursement."  PRDSMF ¶ 29 (citing Jones Dep. 62:4-63:25).  The Court accepts Mr. Jones' qualification and adjusts Wyman's fact to accurately reflect the context of the record cited, namely that Mr. Fickett explained the "arrangement" to Ms. Norton as he understood it from his perspective.  Specifically, Ms. Norton testified that Mr. Fickett explained his understanding of the arrangement that he and Mr. Jones had regarding mileage, including that Mr. Jones preferred to use his personal vehicle for the travel to PEI because it would be a lot further for him to pick up a company car first in Cherryfield.  See JR 134-135.

[44]    Mr. Jones' proposed ¶ 77 reads: "Norton testified that in her discussions with Fickett the subject of Wyman paying back mileage never came up."  PSAMF ¶ 77.  Wyman qualifies this fact because  "[t]he statement partial summarizes the cited authority," reasoning that "Norton did not recall having a discussion with *anyone* about why Wyman did not pay back mileage to Ken Jones." DRPSAMF ¶ 77 (emphasis in original).  The Court accepts Wyman's qualification and updates Mr. Jones' statement to reflect Ms. Norton's exact wording, rather than Mr. Jones' summary in PSAMF ¶ 77.  See JR 135.

[45]    DSMF ¶ 32 reads: "Mr. Fickett made the decision to pay Mr. Jones for mileage for PEI travel going forward."  Mr. Jones denies Wyman's fact, recounting that "[a]fter discussing Jones' request with Norton and Robert Mancini, Wyman CFO, first, on May 9, 2017, Fickett proposed to pay Jones mileage going forward, then on June 12, 2017, Fickett proposed to Norton to revert to the prior practice of reducing Jones' mileage reimbursement by deduction of the mileage of his 'normal' Eastport to Cherryfield commute."  PRDSMF ¶ 32.  Mr. Jones notes that "Norton rejected Fickett's June 12 proposal, stating '[t]o keep this question fair and consistent, we would reimburse from Ken's home to the plant round-trip mileage . . . .'"  PRDSMF ¶ 32 (citing JR 570).  The record supports Wyman's fact, DSMF ¶ 32, which is substantially the same as Mr. Jones' ¶ 78, however in reciting the facts in the light most favorable to the non-movant, the Court adopts Mr. Jones' phrasing, which accurately reflects that Mr. Fickett initially proposed to pay mileage going forward but then wanted to revert to Wyman's former practice.  The Court included Mr. Jones' additional context elsewhere in its recitation of the facts.

because he valued Mr. Jones as an employee and wanted to accommodate his request.[46]  DSMF ¶ 33; PRDSMF ¶ 33.  In May 2017, Mr. Fickett voiced a concern to Mr. Jones that paying Mr. Jones mileage would result in him making fewer trips to PEI, because "it was not required in the budget."  PSAMF ¶ 81; DRPSAMF ¶ 81.

Although Mr. Jones did not expressly request retroactive payments for mileage travelled up to May 2017, he did not limit his request for mileage reimbursement to prospective payment.[47]  DSMF ¶ 28; PRDSMF ¶ 28.  Furthermore, Ms. Norton, Mr. Mancini, and Mr. Fickett discussed whether to pay him retroactively for travel prior to May of 2017 in resolving the issue.[48]  DSMF ¶ 28, 76; PRDSMF ¶ 28, 76.  Mr.

---

[46]    Mr. Jones denies this fact because "Norton, not Fickett, decided that Jones would be paid mileage going forward when she rejected Fickett's proposal to revert to the practice of reducing Jones' mileage reimbursement by offset of his commute on June 12, 2017."  PRDSMF ¶ 33 (citing JR 629).  He submits that "Fickett's motivation is a disputed fact, as refuted by circumstantial evidence." PRDSMF ¶ 33 (citing PSAMF ¶¶ 1-154).  He cites *Osher v. University of Maine System*, 2010 WL 11545686 at * 11 (D. Me. March 29, 2010), and *Stanley v. Hancock County Commissioners*, 2004 ME 157, ¶ 21, 864 A.2d 169, 176, for the proposition that "an employee can generate a genuine issue of material fact by relying on circumstantial evidence to rebut the employer's explanation for its adverse action."  PSAMF ¶ 33.
        In light of Mr. Jones' objection, the Court amended Wyman's ¶ 33 to reflect that this is what Mr. Fickett claims was his motivation as opposed to what in fact was his motivation, which is disputed.
[47]    Wyman's ¶ 28 asserts that "[i]n May 2017, Plaintiff did not request any retroactive payments for mileage travelled up to that date."  DSMF ¶ 28.  Mr. Jones denied this assertion, noting that he had asked generally why he did not qualify for mileage reimbursement for his trips to PEI.  PRDSMF ¶ 28.  In reviewing the cited record, the Court has fashioned a statement that includes both assertions: that Mr. Jones did not expressly request retroactive payment and that his inquiry about mileage reimbursement was not limited to prospective payments.
[48]    In denying Wyman's ¶ 28, Mr. Jones points to Mr. Fickett's testimony "that he, Norton and Mancini discussed whether to pay Jones the mileage for travel prior to May of 2017, and Fickett felt that "the retro wasn't warranted because [Jones] was already getting the better of the deal."  PRDSMF ¶ 28 (citing JR 626).  Mr. Jones also submits that "Norton testified that in her discussions with Fickett, the subject of Wyman paying back mileage never came up."  PRDSMF ¶ 28 (citing JR 135).
        The Court accepts Mr. Jones qualification as to the assertion in Wyman's ¶ 28 that Ms. Norton, Mr. Mancini, and Mr. Fickett discussed retroactively paying Mr. Jones for mileage, and adjusts Wyman's fact accordingly.  Ms. Norton testified that "the request for back travel wasn't [expressly] brought up when the agreement was changed in May of '17, JR 142, but Mr. Fickett testified that there was a discussion with Norton and Mancini in May of 2017 as to whether to pay the back mileage, but that he "felt that the retro wasn't warranted because [Mr. Jones] was already getting the better of the deal."  JR 626.

Fickett opposed paying Jones the retroactive mileage reimbursement, and felt that "the retro wasn't warranted because [Mr. Jones] was already getting the better of the deal" as Mr. Jones had been benefitting from the arrangement by driving less mileage than he would have on his regular commute and because they had arranged work in PEI as Mr. Jones preferred.[49]  DSMF ¶ 34; PRDSMF ¶ 34; PSAMF ¶ 75; DRPSAMF ¶ 75.

Mr. Fickett communicated to Mr. Jones by email that he would be paid for mileage for travel to PEI going forward and proposed paying mileage from Eastport to Charlottetown even if he stayed in Halifax on weekends, which was a shorter drive. DSMF ¶ 35; PRDSMF ¶ 35.  In an email responding to Mr. Fickett about the new arrangement, Mr. Jones said Mr. Fickett's estimated mileage reimbursement figures seemed high, proposed a smaller reimbursement when he travelled to Halifax versus Eastport, and said he would not "charge" mileage at all if he was taking his motorcycle to PEI.  DSMF ¶ 36; PRDSMF ¶ 36.

Then, on June 12, 2017, Mr. Fickett proposed to Ms. Norton to revert to the prior practice of reducing Mr. Jones' mileage reimbursement by deduction of the mileage of his "normal" Eastport to Cherryfield commute.  PSAMF ¶ 78; DRPSAMF ¶ 78.  Mr. Fickett wrote to Ms. Norton, "I wanted to check my thinking with you to see if it's fair as I don't want to short change anybody, and want to ensure we are treating all employees the same."  DRPSAMF ¶ 78; JR 570.  Ms. Norton rejected this

---

[49]    Mr. Jones similarly denies Wyman's fact "as to Fickett's motivation" as a disputed fact, citing his entire PSAMF ¶¶1-154 as record support.  PRDSMF ¶ 34.  The Court accepted Mr. Fickett's statement of his motivation, not as an established fact, but as Mr. Fickett's own explanation for his position.

proposal, saying "[t]o keep this question fair and consistent, we would reimburse from Ken's home to the plant round-trip mileage . . .."[50]  PSAMF ¶ 79; DRPSAMF ¶ 79. Ms. Norton, not Mr. Fickett, decided that Wyman would pay Mr. Jones mileage going forward, starting June 12, 2017, when she rejected Mr. Fickett's proposal to revert to the practice of reducing Mr. Jones' mileage reimbursement by offsetting his commute.[51]  PSAMF ¶ 80; DRPSAMF ¶ 80.

Beginning on May 9, 2017, through the end of his employment, Mr. Jones was reimbursed for all mileage for use of his personal vehicle on Wyman business travel to PEI.  *R.* ¶ 23.  Mr. Jones travelled in his personal vehicle between Eastport and PEI on approved Wyman business travel on one trip on March 12-17, 2017, for which he was not paid mileage reimbursement.  PSAMF ¶ 58; DRPSAMF ¶ 58.

### H.   Kenneth Jones' Discrimination in Compensation Claims

#### 1.   Wyman's Employee Compensation Policies

Wyman did not have a formal system or rating system for conducting evaluations or evaluating what an employee's raise should be.  DSMF ¶ 64; PRDSMF ¶ 64.  Bonuses are discretionary and are based on factors including an employee's salary, the pool of money allotted for bonuses each year, the company's profitability, an employee's performance, and unique situations such as incentivizing an employee

---

[50]      The Court partially rejects Wyman's qualification, citing its response to PSAMF ¶ 78, as overbroad and unnecessary.  The Court accepts Mr. Jones' ¶ 79 but has included the language from Mr. Fickett's June 12 email as quoted by Wyman.  *See* DRPSAMF ¶ 79.

[51]      The Court rejects Wyman's qualification, DRPSAMF ¶ 80, citing its response to PSAMF ¶ 78, as overbroad and unnecessary.  The Court accepts Mr. Jones' fact because, viewed in the light most favorable to him, the record supports that it was Ms. Norton's decision to continue to reimburse Mr. Jones for the standard home-to-PEI facility trip after she found Mr. Fickett's proposal was not in line with Wyman policy.  *See* JR 570.  A reasonable jury could conclude that Mr. Jones was reimbursed for mileage from then on because Ms. Norton turned down Mr. Fickett's suggestion.

to stay at the company.  DSMF ¶ 69; PRDSMF ¶ 69.  Wyman managers do not have discretion to determine the standard employment benefits that came with full-time employment status.[52]  PSAMF ¶ 16; DRPSAMF ¶ 16.

### a.    Annual Employee Compensation Increases

Each year, Wyman's Chief Financial Officer (CFO) reviews factors including Wyman's performance, trends at other companies, and the consumer price index to make a recommendation of a percentage merit increase to be used in determining employee compensation increases.[53]  DSMF ¶ 47; PRDSMF ¶ 47.  The CFO discusses the recommended proposed merit increase percentage with the CEO, and they present the proposal to the Wyman Board of Directors (the Board), which sign offs on the proposed recommendation if approved.[54]  DSMF ¶ 48; PRDSMF ¶ 48.

Some employees at Wyman refer to the merit increase recommendation as a "pool."  DSMF ¶ 49; PRDSMF ¶ 49.  Between 2014 and 2017, Wyman's managers referred to the merit increase recommendation and annual compensation percentage

---

[52]    Wyman offers a qualification that the "cited authority refers to managers not having discretion over 'standard employment benefits' like health insurance; managers have discretion as to some practices."  DRPSAMF ¶ 16.  The Court rejects the qualification as beyond the scope of Mr. Jones' fact, which is supported by Ms. Norton's testimony that Wyman managers "do have discretion in some practices, but not about the standard employment benefits that would come as a full-time employee."  JR 122.  The Court recites PSAMF ¶ 16 as offered.

[53]    Mr. Jones qualifies Wyman's ¶ 47, adding that "[i]n announcing the increase in Wyman's Fiscal Years ending May 31, 2017, 2018, and 2019, Wyman CFO Mancini referred to the annual increase percentage as a 'COLA' which he stated means a 'cost of living adjustment,' (and did not use the term 'percentage merit increase')."  PRDSMF ¶ 47.  This qualification goes beyond the scope of Wyman's fact, as Wyman does not contest that the CFO evaluates certain factors each year in determining compensation increases.  The Court includes Mr. Jones' fact regarding the "COLA" terminology elsewhere in this section.  *See* PSAMF ¶¶ 87, 89.

[54]    Mr. Jones offers the same qualification as to DSMF ¶ 48, which the Court treats the same way it addressed ¶ 47.  PRDSMF ¶ 48.

increase as the "COLA," as in "cost-of-living-increase."[55]  PSAMF ¶ 89; DRPSAMF ¶ 89; DSMF ¶ 50; PRDSMF ¶ 50.  In announcing the increase in Wyman's fiscal years ending in May of 2017, 2018, and 2019, Wyman CFO Mr. Mancini referred to the annual increase percentage not as a "percentage merit increase" but as a "COLA," which he stated means a "cost of living adjustment," PSAMF ¶ 87; DRPSAMF ¶ 87.  Mr. Mancini explained, however, that Wyman's use of the term, COLA, is "just a misnomer" for what is actually a merit percentage increase, and the Wyman Board understood "what [the increase] was referred to retrospectively for a number of years."[56]  PRDSMF ¶¶ 47-48; PSAMF ¶ 87; DRPSAMF ¶ 87; JR 1057-58.  Mr. Mancini testified that "when we make the recommendation, it's an overall percent increase versus compensation and it's presented as a merit increase," which "takes into consideration a number of different factors of which the Consumer Price Index is one."  PSAMF ¶ 87; DRPSAMF ¶ 87; JR 1057-58.  Despite referring to it as a "COLA," Mr. Woodward and Mr. Fickett testified that the merit increase percentage for each employee is awarded based on individual employee performance.[57]  DSMF ¶ 51; PRDSMF ¶ 51.

---

[55]  The Court accepts Mr. Jones' qualification that "[b]etween 2014 and 2017, Wyman's managers referred to the annual compensation percentage increase as the 'COLA'" as supported by his record citations.  PSAMF ¶ 50.

[56]  The Court accepts Wyman's qualification that "Mancini testified that the acronym 'COLA' means cost of living adjustment, but he explained that the term was used incorrectly at Wyman and was a misnomer; what the Board signed off on was actually a merit pool percentage recommendation or merit percentage increase" and has included an excerpt of the quoted testimony to contextualize Wyman upper management's use and understanding of the term "COLA."  DRPSAMF ¶ 87; JR 1057-58.

[57]  Mr. Jones offers the following qualification: "The annual compensation percentage increase was allocated by Fickett in Wyman's annual performance review templates, from 2016 forward between a 'standard' increase and a 'performance' increase."  PRDSMF ¶ 51.  The Court includes this additional context elsewhere in this facts section.

Mr. Fickett used the terms "COLA" and "pool" interchangeably to refer to the total amount he believed he had to work with in deciding pay increases, unless he obtained upper-level management approval for a compensation percentage increase higher than the "pool"/"COLA" percentage.  PSAMF ¶ 88; DRPSAMF ¶ 88.

### b.   Wyman's Performance Review Forms

According to Wyman's annual performance review documents used by Mr. Fickett and other Wyman managers from 2016 to 2020, Wyman's annual wage increases are supposed to be based in part on performance and in part on standard amounts.[58]  PSAMF ¶ 91; DRPSAMF ¶ 91; DSMF ¶ 56; PRDSMF ¶ 56.  Supervisors at Wyman have discretion to award an employee a wage increase below, at, or above

---

[58]      Wyman denies PSAMF ¶ 91, arguing that "[t]he performance review documents provide no authoritative guidance as to whether a compensation increase is based on an employee's performance or some other basis; rather, the forms provide spaces for a manager to write a designation or an allocation as they prefer to use those spaces."  DRPSAMF ¶ 91.  Although the cited performance review forms do not explicitly instruct managers how to determine their percentages in filling out the form, viewing the record in the light most favorable to Mr. Jones, the fact that the forms prompt the manager to provide a standard increase percentage, a performance increase percentage, and then calculate a combined total increase percentage, supports his fact that wage increases are based on both factors.  PSAMF ¶ 91; *see* JR 620-22, 894-95.  In its denial, Wyman cites Mr. Fickett's testimony that Wyman upper management "never really talked about that breakdown of the standard versus performance.  That was kind of new."  JR 622.  This testimony does not controvert Mr. Jones' assertion in PSAMF ¶ 91.

For this reason, viewing the record in the light most favorable to Mr. Jones, the Court rejects Wyman's ¶ 56, which asserts that "[w]age increases at Wyman are performance-based."  As Mr. Jones points out in his denial, Wyman's annual performance review forms expressly provide for a "standard increase" component to the total increase, which Mr. Fickett followed in breaking down Mr. Jones and Mr. Alley's percent increase between performance and standard increases.  *See* JR 620-22, 894-95.  Moreover, as Mr. Jones points out, Wyman's PEI General Manager Wade Dover testified that he "had the freedom to determine which percentage would be standard versus performance" and would take "the amount [he] was given and [he'd] set a standard.  That would be the standard for the year" that he would apply across the board in determining total percentage increases for the people he supervised.  JR 926-27; *see* PRDSMF ¶ 56.  Mr. Dover's testimony, combined with Wyman's own forms, supports Mr. Jones' contention that wage increases are about more than performance.  Other managers at Wyman used the same evaluation form as Mr. Fickett, including Mr. Dover, who gave an across the board "standard" annual increase for his supervisees and set "performance" percentages based on employee performance, as he did with Heidi McDonald's annual Performance Reviews from 2012 to 2018.  JR 926-27.

the merit increase recommendation based on the quality of their performance.[59] DSMF ¶ 52; PRDSMF ¶ 52. Wyman delegated to supervisors the discretion to allocate the pool percentage between employees and "to reward one person over another if they saw fit."[60] PSAMF ¶ 93; DRPSAMF ¶ 93; PRDSMF ¶ 52. Wyman allowed managers to give employees unequal "standard" compensation increases.[61] PSAMF ¶ 94; DRPSAMF ¶ 94.

Wyman's Annual Performance Review forms used by Mr. Fickett (and others) showed total annual compensation increases with lines breaking out the "Standard Increase %" and "Performance Increase %," but managers have discretion as to whether or how to use those lines to communicate with their reports. PSAMF ¶ 95; DRPSAMF ¶ 95; DSMF ¶ 55; PRDSMF ¶ 55.

PEI General Manager Wade Dover set an amount for "standard" percentage increases, which he applied to all employees, and varied the "performance" percentages based on employee performance, as he did with Heidi McDonald's annual Performance Reviews from 2012 to 2018. PSAMF ¶ 96; DRPSAMF ¶ 96. Mr.

---

[59]     The Court includes Mr. Jones' qualifications to DSMF ¶ 52 that "[i]f a manager wanted to give a compensation increase in excess of the Board approved annual percentage increase, executive director approval was required" and "Wyman delegated the authority to supervisors the discretion to allocate the pool percentage between employees and 'to reward one person over another if they saw fit'" elsewhere in its recitation of the facts. PRDSMF ¶ 52.

[60]     Wyman offers a qualification to Mr. Jones' fact, citing its response to PSAMF ¶ 92, and asserting that "[s]upervisors needed approval from a manager to award a compensation increase in excess of the Board-approved annual percentage increase." DRPSAMF ¶ 93. The Court rejects this qualification as non-responsive to PSAMF ¶ 93, which is supported by Mr. Fickett's testimony that Wyman gave supervisors discretion in allocating their "relevant pool of dollars." JR 1750.

[61]     Wyman offers a qualification that "[c]ompensation increases were based on performance, and managers had discretion as to what compensation increase to provide an employee and how they relayed that information using the 'standard' and 'performance' lines on the performance review form." DRPSAMF ¶ 94. The Court accepts Mr. Jones' fact as supported by the record and rejects Wyman's qualification, which goes beyond the scope of PSAMF ¶ 94.

Woodward testified that "[i]f I go over and above [the amount of money that the board has authorized for merit increases for that year], I have to get authorization from the CEO" but also agreed that the "standard practice . . . [is] to go to upper management for approval to dip into that additional budgeted" money for performance increases in excess of the amount set by the board for the COLA.[62]   JR 1900; PSAMF ¶ 92; DRPSAMF ¶ 92; PRDSMF ¶ 52.

### c.   Mr. Fickett's Performance Reviews and Compensation Recommendations

Mr. Fickett prepared performance reviews for Mr. Jones and Mr. Alley and recommended the wage increases for Mr. Jones and Mr. Alley between 2014-2018.  *R.* ¶¶ 24-25.  Mr. Fickett considered Mr. Alley's and Mr. Jones's individual performance in their respective positions when determining what percentage wage increase to award to each of them.[63]  DSMF ¶ 62; PRDSMF ¶ 62.  In making decisions about pay

---

[62]     Wyman denies Mr. Jones' PSAMF ¶ 92, which originally read: "If a manager wanted to give a compensation increase in excess of the Board approved annual percentage increase, executive director approval was required."  PSAMF ¶ 92.  Wyman says that a "manager would need approval from a manager/supervisor, not an executive director."  DRPSAMF ¶ 92.  The Court partially accepts Wyman's denial.  Mr. Woodward testified that "If I go over and above [the amount of money that the board has authorized for merit increases for that year], I have to get authorization from the CEO" but also agreed that the "standard practice . . . [is] to go to upper management for approval to dip into that additional budgeted amount of" money for performance increases, in excess of the amount set by the board for the COLA.  JR 1900.  Mr. Mancini testified that "if there is a recommendation that . . . exceeds the total overall percentage approval then typically that needs to be approved by that manager's supervisor."  JR 1062.  The Court has revised PSAMF ¶ 92 to reflect this somewhat conflicting testimony.

[63]     Mr. Jones denies Wyman's fact because "Fickett's thought processes in deciding Jones' compensation are disputed and rebutted by circumstantial evidence" and because "Fickett set Jones' percentage increases for compensation at lower rates than he did for Alley even when he ranked their performance as equal."  PRDSMF ¶ 56.  The Court accepts Wyman's fact, which is supported by the record cited and does not assert that Fickett exclusively considered performance.  The Court has included the annual comparison between Mr. Jones and Mr. Alley's compensation in the facts, with details from their related performance reviews.  In its pretext analysis, the Court addresses the disputed issue of Mr. Fickett's motivation and considers Mr. Jones' argument that Mr. Fickett also considered "Jones' race and Jones' 2017 complaint that he was being denied mileage reimbursement in deciding Jones' compensation increases."  PRDSMF ¶ 56.

increases and bonus recommendations for Mr. Jones and Mr. Alley, Mr. Fickett considered the performance of Mr. Jones and Mr. Alley and their individual job duties and expectations.[64]  DSMF ¶ 76; PRDSMF ¶ 76.  According to Mr. Fickett, differences in Mr. Jones' and Mr. Alley's individual job duties, expectations, and performance led Mr. Fickett to recommend different pay increases and bonus amounts for them each year.[65]  DSMF ¶ 76; PRDSMF ¶ 76.

The annual compensation percentage increase was allocated by Mr. Fickett in Wyman's annual performance review forms, from 2016 forward between a "standard" increase and a "performance" increase, added together for a final total on a separate line, which he says was to communicate to the employee that the annual increase is performance based and that they would not have gotten the full percent if they did not meet expectations.  PSAMF ¶ 90; DRPSAMF ¶ 90; PRDSMF ¶ 51.  In considering what amount of a raise to give his supervisees, Mr. Fickett considered their performance rating, namely whether the individual met or exceeded expectations over the prior year; if the individual met expectations, they would be paid the COLA amount, they would receive less than the COLA if they performed below expectations,

---

[64]    Mr. Jones denies Wyman's fact, asserting that "Fickett's considerations in deciding Jones' compensation are disputed and rebutted by circumstantial evidence."  PRDSMF ¶ 76.  He cites his PSMF ¶¶ 1-154, as "supporting an inference that Fickett considered Jones' race and Jones' 2017 complaint that he was being denied mileage reimbursement in deciding Jones' compensation increases and bonus recommendations."  The deposition testimony cited supports Wyman's fact, and the Court rejects Mr. Jones' denial as lacking a specific record citation and beyond the scope of Wyman's fact. DSMF ¶76 is therefore not properly controverted under Rule 56(f).  D. ME. LOC. R. 56(f).  Again, the Court considers arguments as to whether Mr. Fickett was solely motivated by performance, duties, and expectations in determining compensation later in this Order.

[65]    Mr. Jones denies Wyman's ¶ 77 for the same reasons discussed in the preceding footnote. Although the Court rejects his denial for the same reasons, viewing the record in the light most favorable to Mr. Jones, the Court adjusted ¶ 77 to reflect that it represents Mr. Fickett's characterization of his motivation.  The parties dispute whether Mr. Fickett made his ultimate compensation decisions solely on the basis of his supervisees' duties, expectations, and performance.

and if the individual exceeded expectations, they would receive more than the COLA amount.[66]  DSMF ¶ 58; PRDSMF ¶ 58.  Mr. Fickett also took into account various levels of employees underperforming or overperforming when deciding what raise to give employees, considering whether employees marginally exceeded expectations or greatly exceeded expectations.  DSMF ¶ 59; PRDSMF ¶ 59.  Mr. Fickett has always taken these factors into account in preparing performance reviews for employees.  DSMF ¶ 60; PRDSMF ¶ 60.  Some of the factors Mr. Fickett considers when determining wage increases for his supervisees are described in their performance reviews.  DSMF ¶ 61; PRDSMF ¶ 61.

### 2.    Kenneth Jones' and Wayne Alley's Annual Compensation

Up until June 5, 2014, Mr. Jones was earning $20.25 per hour and Mr. Alley, Mr. Fickett's other direct report, was earning $20.14.[67]  DSMF ¶ 7; PRDSMF ¶ 7.  In conjunction with his 2014 performance review, Mr. Jones received a 3.5% increase to his hourly rate from Mr. Fickett, who stated his work performance was "above average," raising his hourly pay rate from $20.25 per hour to $20.96 per hour.[68]  *R.*

---

[66]    Mr. Jones denies Wyman's ¶¶ 58-61 with a broad assertion that "Fickett's thought processes in deciding Jones' compensation are disputed and rebutted by circumstantial evidence."  He cites his own PSAMF ¶¶ 1-154 for "an inference that Fickett considered Jones' race and Jones' 2017 complaint about being denied mileage reimbursement in deciding Jones' annual compensation changes."  PRDSMF ¶¶ 58-61. Wyman's cited deposition testimony supports DSMF ¶¶ 58-61; however, the Court added the qualifier "Some of" to Wyman's ¶ 61, to accurately contextualize Mr. Fickett's affirmative response to the question "do you describe some of those factors in the performance review that's prepared?"  Wyman's ¶¶ 58-61 do not explicitly allege that Mr. Fickett's final determination was exclusively based on these enumerated assessment factors, and the Court considers the contested issue of Mr. Fickett's motivation and evidence of pretext elsewhere in this Order.

[67]    Wyman's ¶ 7 reads: "By June 2014, Plaintiff was earning $20.25 per hour, which was more than Fickett's other direct report, Wayne Alley."  The Court accepts and has included Mr. Jones' clarification that both Mr. Jones and Alley's salaries changed on June 5, 2014.  PRDSMF ¶ 7; *see* JR 798, 800.

[68]    The Court rejects Wyman's qualification that "Fickett completed a performance evaluation of Plaintiff that contained a full assessment of the strengths, areas for improvement, and conclusions

¶ 26; PSAMF ¶ 98; DRPSAMF ¶ 98; PSAMF ¶ 100; DRPSAMF ¶ 100.  In June 2014, Mr. Fickett decided that Mr. Alley would receive a 4.5% compensation increase, from $20.14 to $21.05 an hour, stating that his performance was "above-average."[69]  *R.* ¶ 31; PSAMF ¶ 99; DRPSAMF ¶ 99; PSAMF ¶ 101; DRPSAMF ¶ 101.

On June 9, 2015, Wyman notified Mr. Jones of his change in job description, increased Mr. Jones' job duties, stated an average of 5 hours per week of overtime work was expected, and changed his pay from an hourly rate of $20.96 to an annual salary of $47,956.48 (with no overtime pay in his new exempt salary position) but with bonus eligibility instead.[70]  PSAMF ¶ 104; DRPSAMF ¶ 104; PRDSMF ¶ 53; *see Pl.'s Opposing Statement of Material Facts and Statement of Additional Facts* (ECF No. 50), Attach. 1, *Decl. of Kenneth Jones* ¶ 9 (*Jones Decl.*).  Effective June 1, 2015, and in conjunction with his new position, Wyman paid Mr. Jones on a salaried basis

---

regarding Plaintiff's performance, which included a comment that Plaintiff's performance thus far was 'above-average,'" as unresponsive and argumentative, and accepts Mr. Jones' PSAMF ¶ 100. DRPSAMF ¶ 100.

[69]     Wyman offers the same qualification asserted in DRPSAMF ¶ 100, which the Court rejects for the same reason.  The Court admits PSAMF ¶ 101.

[70]     Mr. Jones' fact originally read: "In lieu of a performance review, on June 9, 2015, Fickett notified Jones of his change in job description, increased Jones' job duties, stated an average of 5 hours per week of overtime work was expected, and changed his pay from hourly rate of $20.96 to an annual salary of $47,956.48, (with no overtime pay)."  PSAMF ¶ 104.  The Court revised PSAMF ¶ 104 to incorporate Wyman's qualifications that Mr. Fickett testified that he could not locate a 2015 performance review for Mr. Jones, not that one was not performed, and that Mr. Jones was exempt in his new position and that is why he was not eligible for overtime pay.  DRPSAMF ¶ 104.  *See* JR 618 ("he's not eligible for overtime, he's now eligible for a bonus").

In his declaration filed with his opposition to the motion for summary judgment, Mr. Jones asserts that "[i]n June 2015, when [his] job duties were increased, [his] actual compensation decreased" because "[b]ased on the expected 45 hours a week of work, [his] average hourly compensation was decreased from $20.96 per hour with overtime compensation, to $20.49 per hour, with no overtime compensation."  Jones Decl. ¶ 9.  The Court rejects this conclusion, which ignores the distinction between hourly and salaried jobs otherwise indicated in the record, and cites no support or basis for the calculation to turn his new annual salary into a theoretical hourly rate (even though his compensation was no longer tied to hours worked after June 2015).  Mr. Jones does not explain why he adopted a 45 hour per week estimation and this assertion ignores the fundamental difference between a salaried job and an hourly wage.

and because he had been changed to a salaried employee, he did not receive an annual percentage wage increase in June 2015. *R.* ¶ 27; PSAMF ¶ 102; DRPSAMF ¶ 102; PRDSMF ¶ 53. Although this promotion nominally came with a 10% increase in pay, Mr. Jones' workweek increased from 40 to 45 hours, and, as he was in an exempt position, he did not receive overtime pay for the 5 hours over 40 hours.[71] PSAMF ¶¶ 104-05; DRPSAMF ¶¶ 104-05. When the full 45 hours of work per week was applied to his salary, the result of the promotion was a reduction in his hourly rate from $20.96 to $20.49 with no overtime compensation.[72] PSAMF ¶ 105; DRPSAMF ¶ 105.

Mr. Fickett has no record of conducting an annual performance review of Mr. Jones in June 2015.[73] PSAMF ¶ 102; DRPSAMF ¶ 102. In June 2015, the vast majority of Wyman employees, including Wayne Alley, received a 3% compensation increase.[74] PSAMF ¶ 103; DRPSAMF ¶ 103.

---

[71] Wyman interposed a qualified response, noting that as Mr. Jones had been promoted to an exempt position, he was not entitled to overtime pay. DRPSAMF ¶ 104. The Court noted Wyman's point that the reason Mr. Jones did not receive overtime pay was that he had been promoted to an exempt salaried position.

[72] Wyman denied ¶ 105 on the ground that Mr. Jones had admitted in his deposition that he received a 10% increase and there are no grounds for him to change his testimony. DRPSAMF ¶ 105. The Court rejects Wyman's denial. The fact that Mr. Jones received a 10% increase in salary does not contradict his statement that, with his increase in hours from 40 to 45 and no overtime pay, his hourly compensation decreased.

Wyman also objected on the ground that Mr. Jones did not explain his calculations. Viewing the evidence in the light most favorable to Mr. Jones, the Court accepts Mr. Jones' math for purposes of this motion and overrules Wyman's objection.

[73] Mr. Jones' fact originally read: "In June 2015, Kenneth Jones did not receive an annual percentage compensation increases, nor did Fickett conduct an annual performance review of him." PSAMF ¶ 102. Wyman denies the second assertion, noting that "Fickett testified that he could not locate a 2015 performance review for Jones, not that one was not performed." DRPSAMF ¶ 102. Mr Fickett testified that "I don't have any record of it" but maintained that Mr. Jones' job change was not in lieu of a performance review. JR 619. The Court partially accepts Wyman's denial and adjusts PSAMF ¶ 102 to accurately reflect Mr. Fickett's testimony.

[74] Wyman broadly cites its previous qualification to PSAMF ¶ 102 that in June 2015 Mr. Jones did not receive an annual compensation increase because he was promoted to a salaried position. DRPSAMF ¶ 103. The Court rejects Wyman's qualification and accepts PSAMF ¶ 103, which is about what other employees, not Mr. Jones, received in June of 2015.

In 2016, Mr. Fickett decided that Mr. Jones should receive a 1.5% standard increase and a 1.0% performance increase, stating he had "met expectations" for a total salary increase of 2.5%.[75]  *R.* ¶ 28; PSAMF ¶ 106; DRPSAMF ¶ 106.  In 2016, Mr. Fickett decided to give Wayne Alley a 2.5% standard increase, and a 2.5% performance increase, stating that he had "exceeded expectations" for a total salary increase of 5%.[76]  *R.* ¶ 32; PSAMF ¶ 107; DRPSAMF ¶ 107.  Mr. Fickett's decision to give Mr. Alley a 2.5% increase "above 2.5% COLA" was approved by Mr. Woodward and Ms. Norton.  PSAMF ¶ 107; DRPSAMF ¶ 107.  In 2017, Mr. Fickett decided that Mr. Jones and Mr. Alley would both only receive "standard" percentage increases of 2.7%.[77]  *R.* ¶¶ 29,33; PSAMF ¶ 108; DRPSAMF ¶ 108.

In 2018, Mr. Fickett emailed Tony Shurman, Wyman's CEO, about how to award a higher raise to Mr. Alley without it impacting Mr. Jones' raise, stating:

Hi Tony,

I have a question for you, regarding the performance reviews and pay rates. I understand that the family approved an increase of 3.25%.

I have 2 direct reports.

[75]     The Court rejects Wyman's unnecessary qualification that "Plaintiff received a total compensation increase of 2.5% that was relayed to him on the performance review form as a 1.5% standard increase and 1% performance increase; Fickett completed a performance evaluation of Plaintiff that contained a full assessment of the strengths, areas for improvement, and conclusions regarding Plaintiff's performance, which included a comment that Plaintiff's performance 'met expectations,'" DRPSAMF ¶ 106, as argumentative and immaterial, as the Court previously included Mr. Fickett's explanation of how he says he approached compensation decisions and performance evaluations.  The Court considers the parties' dispute over whether compensation was solely performance based and whether managers could choose how to "relay" compensation decisions later in this order.  The Court admits PSAMF ¶106.
[76]     Wyman offers the same qualification it asserted regarding Mr. Jones' compensation increase in DRPSAMF ¶ 106.  The Court rejects it for the same reason.
[77]     Wyman offers a similar qualification that "Both Plaintiff and Alley received a total compensation increase of 2.7%, which was relayed as a 'standard' increase on the performance review form."  DRPSAMF ¶ 108.  Again, the Court accepts Mr. Jones' fact as supported by the record cited and will consider Wyman's characterization of its performance review forms elsewhere in this Order.

47

Ken Jones has met expectations, and I wanted to give him the 3.25%. Wayne has met expectations, and exceeded in a couple of areas. He is nearing the end of his career, with possibly a few more years left (3). He understands the new responsibilities that I've taken on, and he supports me in my absence when I'm traveling (PEI, Lineage, AFFI). Since this travel has increased, and will continue to increase, I rely on Wayne for many things which he has risen to the occasion. I'd like to offer him more than the 3.25%, and was considering 5.0%. However, I didn't want to take from Ken, in order to recognize Wayne. Who/How do I get approval for this increase above the 3.25% for one person?

Shannon

DSMF ¶ 63; PRDSMF ¶ 63.

In 2018, Mr. Fickett granted Mr. Jones a total salary increase of 3.25%, with a "Standard Increase" of 2% and "Performance Increase" of 1.25% and said, in addition to other assessments on his review form, that "Ken is a valued resource" and his performance "met expectations."[78] *R.* ¶ 30; PSAMF ¶ 109; DRPSAMF ¶ 109. In 2018, Mr. Fickett granted Mr. Alley a 5% compensation increase, with a "Standard Increase of 2%, and a "Performance Increase" of 3%, and said, in addition to other assessments on his review form, that Mr. Alley is a "role model" and "valued Wyman's employee." *R.* ¶ 34; PSAMF ¶ 110; DRPSAMF ¶ 110.

---

[78]    Wyman qualifies PSAMF ¶¶ 109 and 110 by asserting that "Fickett completed a performance evaluation of [Mr. Jones and Mr. Alley] that contained a full assessment of the strengths, areas for improvement, and conclusions regarding [Mr. Jones and Mr. Alley's] performance, which included but was not limited to the comments cited in the statement." DRPSAMF ¶¶ 109-10. As previously noted, the Court already included Mr. Fickett's explanation of how he says he evaluated his supervisees. The Court admits PSAMF ¶¶ 109 and 110 as supported by the records cited but adjusted them to accurately reflect that the performance review forms included more than just the quoted language. *See* JR 907-08.

Mr. Jones received a wage increase at the level of or above the merit increase recommendation every year that he received a wage increase.[79]   DSMF ¶ 53; PRDSMF ¶ 53.  Mr. Jones' wage increase was the same as most other employees at Wyman, including white employees.[80]   DSMF ¶ 54; PRDSMF ¶ 54.

### 3.   Kenneth Jones' and Wayne Alley's Annual Bonuses

Exempt, salaried employees at Wyman are eligible for bonuses.  DSMF ¶ 71; PRDSMF ¶ 71.  Bonuses are awarded based on the previous fiscal year that runs from June to May.  DSMF ¶ 72; PRDSMF ¶ 72.  Mr. Jones became bonus-eligible in June 2015 and was therefore ineligible for bonuses awarded in August 2015 because he had not been bonus-eligible during the fiscal year ending in May 2015.  DSMF ¶ 73;

---

[79]   Mr. Jones' qualification in PRDSMF ¶ 53 asserts that "[i]n 2015, Kenneth Jones did not receive an annual percentage compensation increase, nor did Fickett conduct an annual performance review of him."  PRDSMF ¶ 53 (citing JR 619).

> In lieu of a performance review, on June 9, []2015, Wyman notified Jones of his change in job description, increased Jones' job duties, stated an average of 5 hours per week of overtime work was expected, and changed his pay from hourly rate of $20.96 to an annual salary of 47,956.48, (with no overtime pay).  Although Fickett informed Jones that he was receiving a 10% hourly wage increase, it was actually a decrease in pay.  Based on the expected 45 hours of week of work, Jones' average hourly compensation was decreased from $20.96 per hour with overtime compensation, to $20.49 per hour, with no overtime compensation.

PRDSMF ¶ 53.

> The Court has not included Mr. Jones' qualification because the way it is phrased is unsupported.  Mr. Jones acknowledges that he received a 10% increase in pay.  He has made the point, which the Court has included, that his actual hourly rate decreased because he was no longer receiving overtime pay for work over 40 hours.  Even if the hourly rate went down, it remains true that Mr. Jones received more annually after his promotion.  The Court declines to include ¶ 53 because it is not supported by the record or by common sense.  The Court has included the specific details of Mr. Jones' 2015 change to salary employee in this section, and his total annual compensation before and after the change.

[80]   Mr. Jones denies Wyman's ¶ 54, because Mr. Fickett gave Mr. Alley a higher percent compensation increase than what he gave Mr. Jones in 2014, 2016, and 2018, and because "[i]n June 2015, Jones receiv[ed] no annual percentage increase in compensation, and was moved to salary, while the vast majority of employees, including Wayne Alley, received a 3% compensation increase."  PRDSMF ¶ 54.  The Court accepts Wyman's fact, which does not assert that Mr. Jones' wage increase was the same as *all* employees at Wyman, or the same as what Mr. Alley received, and thus PRDSMF ¶ 54 does not properly controvert it.  The Court has included the comparison in annual percentage compensation increases between Fickett's two direct reports elsewhere in this fact section.

PRDSMF ¶ 73.  Mr. Fickett made recommendations as to bonus adjustments for Mr. Jones and Mr. Alley each year they were eligible for bonuses.  DSMF ¶ 70; PRDSMF ¶ 70.

In August 2016, with Wyman approval, Mr. Fickett decided to give Mr. Jones a $4000 bonus, and Mr. Alley a $5000 bonus.  DSMF ¶ 74; PRDSMF ¶ 74; PSAMF ¶ 111; DRPSAMF ¶ 111.  In August 2017, Mr. Fickett decided to give Mr. Jones a $4000 bonus, approximately 8% of his salary, and Mr. Alley a $7000 bonus, approximately 12% of his salary.[81]  PSAMF ¶ 112; DRPSAMF ¶ 112; DSMF ¶ 75; PRDSMF ¶ 75.

## I.   Kenneth Jones' Communications with Wyman Management

### 1.   Communications Regarding Compensation

Mr. Jones and Mr. Fickett sat down together and talked about comments and ratings on Mr. Jones' performance reviews.  DSMF ¶ 65; PRDSMF ¶ 65.  Mr. Jones never wrote a rebuttal or comment expressing disagreement with any comment or rating Mr. Fickett put in a review of him.  DSMF ¶ 66; PRDSMF ¶ 66.  Mr. Jones never told Mr. Fickett, HR, or any other manager that he disagreed with any rating or comment Mr. Fickett gave him on a performance review.  DSMF ¶ 67; PRDSMF ¶ 67.

Mr. Jones never told Mr. Fickett, anyone in HR, or any other Wyman manager that he thought his bonus amount was too low or unfair, or that he thought his race or national origin had anything to do with the amount of his bonus.  DSMF ¶¶ 78, 80;

---

[81]   The Court accepts Wyman's qualification that Mr. Jones' "figures of '8%' and '12%' are the percentages when rounded to the nearest whole number," and has adjusted PSAMF ¶ 112 accordingly to indicate that the figures are approximations.

PRDSMF ¶¶ 78, 80.  He never told Mr. Fickett he was dissatisfied with the amount of his bonus.  DSMF ¶ 79; PRDSMF ¶ 79.  Mr. Jones never told Mr. Fickett, Wyman HR, or any other Wyman manager that he thought his raise was too low or had anything to do with his race.  DSMF ¶ 68; PRDSMF ¶ 68.  Mr. Jones believed that Wyman provided a standard, across-the-board wage increase to all employees, but this belief was based solely on his experience with other employers.  DSMF ¶ 57; PRDSMF ¶ 57.

### 2.      Communications Regarding Mileage Reimbursement

Mr. Jones never had a conversation with Mr. Fickett where Mr. Fickett indicated he was upset with Mr. Jones about speaking to Ms. Norton about the mileage reimbursement arrangement.  DSMF ¶ 37; PRDSMF ¶ 37.  From 2014 to May 2017, Mr. Jones' expense reports did not contain requests for mileage reimbursement or indicate the mileage he travelled.  DSMF ¶ 38; PRDSMF ¶ 38.  Mr. Fickett never denied any of Mr. Jones' expense reports requesting reimbursement for food while travelling.  DSMF ¶ 39; PRDSMF ¶ 39.  Mr. Fickett never told Mr. Jones that he was being denied mileage reimbursement on the basis of his race or color.  DSMF ¶ 44; PRDSMF ¶ 44.  Mr. Jones is not aware of any instance when Mr. Fickett told someone that he was not being reimbursed mileage because of his race or color.  DSMF ¶ 45; PRDSMF ¶ 45.  Mr. Jones never told Ms. Norton or anyone at Wyman that he thought he was being discriminated against with regard to travel reimbursement on the basis of his race or color.  DSMF ¶ 46; PRDSMF ¶ 46.

### 3.      Communications Regarding Race

Mr. Jones never made a report to anyone at Wyman that he thought he was being retaliated against for reporting discriminatory acts including not being reimbursed for mileage.  DSMF ¶ 84; PRDSMF ¶ 84.  Mr. Jones never made a complaint to anyone in Wyman HR or management that he thought he was being functionally demoted.  DSMF ¶ 85; PRDSMF ¶ 85.

Mr. Jones never heard Mr. Fickett use a racial slur or make any derogatory comment based on race.  DSMF ¶ 96; PRDSMF ¶ 96.  In July 2014, Mr. Jones informed Mr. Fickett that two employees had made race-based comments in his presence, which he believed referred to him as a Black character in a television show, which he found very offensive.[82]  PSAMF ¶ 42; DRPSAMF ¶ 42.  Mr. Fickett asked Mr. Jones to write the issue up, and told him he would handle it, however, Mr. Fickett did not report Jones' complaint to HR.[83]  PSAMF ¶¶ 42, 43; DRPSAMF ¶¶ 42, 43.  Mr. Jones testified that he "didn't turn it over to HR" because "[Mr. Jones] told [him] he didn't feel harassed and it wasn't directly at him," and so Mr. Fickett decided to "just document it then, and if it turn[ed] into anything more than that, then [to] report it on up and take further action."  JR 610; PSAMF ¶ 43; DRPSAMF ¶ 43.

---

[82]    Wyman qualifies Mr. Jones' reference to "race-based comments" by specifying that "the comments Jones reported hearing were "ah, Lafayette," and, "uh huh, Lafayette."  DRPSAMF ¶ 42. Viewed in the light most favorable to Mr. Jones, a reasonable juror could conclude that the cited testimony supports his assertion that the references to this identifiable Black tv character were race-based.  The Court rejects Wyman's qualification and admits PSAMF ¶ 42.

[83]    Wyman qualifies Mr. Jones' fact with an assertion that "Fickett did not report the incident to HR because Jones told Fickett that Jones did not feel harassed, did not think that the comment was made directly at him, did not feel demeaned, and did not feel threatened; Fickett told Jones that if anything further happened, he would report it and take further action."  DRPSAMF ¶ 43 (citing JR 610).  The record supports PSAMF ¶ 43 as offered by Mr. Jones.  Mr. Fickett's testimony about his thought process in deciding what to do does not refute that he did not file a report about the incident with HR.  To contextualize Mr. Fickett's statement, the Court includes Mr. Fickett's testimony explaining why he says he did not report the incident to HR.  *See* JR 610.

### J.    2018: Kenneth Jones' Change in Duties & Issues with Wayne Alley

In the summer of 2018, Mr. Fickett informed Mr. Jones that his job responsibilities would be changing due to an increased need at the Cherryfield facility and also in part due to the increased capabilities of the staff in PEI.  DSMF ¶¶ 81, 83; PRDSMF ¶¶ 81, 83.  This change in duties was discussed in Mr. Jones' June 2018 performance review.  DSMF ¶ 82; PRDSMF ¶ 82.

In Mr. Jones' June 2018 Annual Performance Review, Mr. Fickett wrote that Mr. Jones will need to support the PEI Process Safety Management (PSM) process with minimal on-site visits and that he would like Mr. Jones to assist the staff in Maine with ammonia evacuation procedures.  PSAMF ¶ 116; DRPSAMF ¶ 116.  Mr. Fickett informed Mr. Jones that he would not be working in PEI, and instead would be assigned to duties on the processing "line" in the Cherryfield plant, which Mr. Jones believed was a functional demotion to janitor duties.[84]   PSAMF ¶ 115; DRPSAMF ¶ 115.  Mr. Jones believed that Mr. Fickett's reassignment from working in person on the PSM project (regarding anhydrous ammonia safety protocols) in PEI made it practically impossible for him to effectively work with the engineer, meet

---

[84]    Mr. Jones' ¶ 115 originally read "[i]n June 2018, Fickett informed Jones that he would not be working in PEI on safety duties, and instead would be assigned to cleaning duties on the processing 'line' in the Cherryfield plant, which Jones believed was a functional demotion to janitor duties."  PSAMF ¶ 115.

Wyman denies this fact, asserting that "there is no evidence supporting that Fickett told Jones he would no longer be working on 'safety duties' in PEI or that he would be assigned to cleaning duties on the line.  DRPSAMF ¶ 115.  In his cited deposition testimony, Mr. Jones did not specifically say that Mr. Fickett told him he would be responsible for cleaning; however, the record supports the rest of PSAMF ¶ 115, namely the nature of the transfer and Mr. Jones' perception that he had been functionally demoted to janitor duties.  The Court omits the portion of PSAMF ¶ 115 referring to "cleaning duties" but admits the remainder of the paragraph.

with regulators, and set up safety drills and trainings.  PSAMF ¶ 117; DRPSAMF ¶ 117.  As Mr. Jones explained: "That can't be done by emails or conference calls. It's not possible."[85]  PSAMF ¶ 117; DRPSAMF ¶ 117.  Mr. Jones talked with Mr. Fickett about the need to work in person on the PEI safety project; however, Mr. Fickett did not change his position and instead stated Mr. Jones was needed in Maine.  PSAMF ¶ 118; DRPSAMF ¶ 118.

After the change in duties, while Mr. Jones was cleaning on one line at the Cherryfield facility, Mr. Alley told him to come clean on a different line.  PSAMF ¶ 120; DRPSAMF ¶ 120.  Mr. Jones responded that he did not report to Mr. Alley, and Mr. Alley should speak to Mr. Fickett.  PSAMF ¶ 120; DRPSAMF ¶ 120.  Mr. Jones told Mr. Fickett about Mr. Alley attempting to direct his work without authority.  PSAMF ¶ 120; DRPSAMF ¶ 120.  Mr. Fickett responded that Mr. Jones should have listened to Mr. Alley.  PSAMF ¶ 120; DRPSAMF ¶ 120.  Mr. Jones felt Mr. Fickett was not happy with him to begin with, and that his response was retaliatory.  PSAMF ¶ 121; DRPSAMF ¶ 121.  In late August 2018, Mr. Jones complained to Mr. Fickett that Mr. Alley was talking down to him and others, making him clean areas repeatedly, without result.  PSAMF ¶ 122; DRPSAMF ¶ 122.

That same month, on August 29, 2018, Mr. Jones forwarded a response from an OSHA Director regarding a May 11 request for interpretation of OSHA's Storage and Handling of Anhydrous Ammonia standard and the revised Respiratory

---

[85]      As Wyman points out, the cited material reflects Mr. Jones' perception and Mr. Jones lacks record support to definitively resolve whether these activities were in fact possible or not possible.  The Court rephrases PSAMF ¶ 117 to indicate that the statement  presents Mr. Jones' perception.

Protection standard to Wyman's safety staff member Scott Wilson, asking "Do we meet this requirement?" [86]   PSAMF ¶ 119; DRPSAMF ¶ 119; JR 1545.  Mr. Jones included Mr. Fickett on the "cc" line of the email.  DRPSAMF ¶ 119; JR 1545.  Mr. Fickett responded to Mr. Jones, stating: "Curious-why the question, just asking.  I've seen the masks that they use and I believe they are in full compliance, but I will let Scot answer."  PSAMF ¶ 119; DRPSAMF ¶ 119.

### K.     Kenneth Jones' Resignation

Mr. Jones submitted his resignation from employment at Wyman on September 10, 2018.  *R.* ¶ 37.  At 9:23 am that day, several hours before Mr. Jones emailed his resignation to Ms. Norton at 1:31 pm, he forwarded copies of expense reports from up to three years earlier to Ms. Norton, Mr. Shurman, and Mr. Woodward with a message stating, in part:

> April, I have attached a copy of expense reports, i.e., travel to PEI where I was not paid travel.  Prior to my coming to you with the question as to why I was not paid travel, the same reasons that were given to you were given to me when I inquired.  Please review and if possible get back to me if there is a solution.

DSMF ¶ 86; PRDSMF ¶ 86; PSAMF ¶ 124.  Mr. Jones had decided to resign before sending the expense reports.  DSMF ¶ 87; PRDSMF ¶ 87.  When Mr. Jones sent his resignation letter to Ms. Norton, he did not refer to any alleged race or color discrimination or retaliation.  DSMF ¶ 89; PRDSMF ¶ 89.

When Mr. Jones spoke to Ms. Norton about the reason for his resignation, he expressed a displeasure for travelling less to PEI but did not mention being or feeling

---

[86]     The Court accepts Wyman's qualification to include the full context of this email exchange from Mr. Jones to Scott Wilson, cc'ing Mr. Fickett.  JR 1545; *see* DRPSAMF ¶ 119.

discriminated against based on his race or color.[87]  DSMF ¶¶ 89-90; PRDSMF ¶¶ 89-90.  Mr. Jones told Ms. Norton he "couldn't tolerate the toxic environment any more at the Cherryfield plant" and that "he could not understand why the people in Maine had such a problem with him," and, while not explicitly stating it was based on race or color, described what he perceived as hostile actions against himself by Mr. Fickett and others.[88]  DSMF ¶ 90; PRDSMF ¶ 90; PSAMF ¶ 125; DRPSAMF ¶ 125.

In his exit interview, Mr. Jones also informed Ms. Norton that in 2018, Mr. Fickett had questioned him for what he believed was his newly assigned duty of working on anhydrous ammonia safety in Maine.[89]  PSAMF ¶ 123; DRPSAMF ¶ 123.

On September 11, 2018, after speaking with Ms. Norton, Mr. Jones wrote her an email saying:

> I just remembered something that was told to me a bit back about the mileage.  I was told that due to the distance I drive into work, that would be used as the basis of the calculation.  That sounded strange to me in that Wyman's does not pay employees mileage from their home to work and back.  Also, we never had an agreement based on my girlfriend living in Nova Scotia.  Conversations were based on my commuting distance. All too strange.

---

[87]    Mr. Jones qualifies Wyman's fact, saying he "told Norton he 'couldn't tolerate the toxic environment any more at the Cherryfield plant' and that 'he could not understand why the people in Maine had such a problem with him,' and, while not explicitly stating it was based on race or color, described a series of hostile actions against himself by Fickett and others."  PRDSMF ¶ 90.  Viewing the record in the light most favorable to Mr. Jones, the Court accepts his qualification and has adjusted Wyman's fact to more precisely reflect how Mr. Jones articulated his "displeasure" with Wyman to Ms. Norton, by including the specific instances that he mentioned in his email.  See JR 578-80.

[88]    Wyman denies Mr. Jones' fact "to the extent Plaintiff asserts that there were any implicit complaints regarding hostile actions based on his race or color, as there is no reference to race or color in the cited authority."  DRPSAMF ¶ 125.  The Court admits Mr. Jones' fact, which is supported by the record cited and acknowledges that he made no explicit references to his race or color in his communications with Ms. Norton.  See PSAMF ¶125.

[89]    Mr. Jones' fact originally stated that "in 2018, Fickett had criticized Jones."  PSAMF ¶ 123.  In response to Wyman's denial that the record cited does not allege "criticism," the Court rephrases Mr. Jones' fact to align with the cited portion of Ms. Norton's report "describ[ing] a situation where [Mr. Jones] researched an opportunity we had within Safety. . . . and when he brought it up to Shannon he was questioned, 'Why are you doing this?'"  JR 578-79; see DRPSAMF ¶123.

PSAMF ¶ 126; DRPSAMF ¶ 126.

On September 11, 2018, Mr. Fickett wrote an email to Ms. Norton, that he forwarded to CEO Shurman on September 13, in which, among other things, he referenced mileage calculations and stated: "it appears that Ken benefited before mileage was being paid, and benefited very well after mileage was included." PSAMF ¶ 127; DRPSAMF ¶ 127.

On September 18, 2018, Ms. Norton discussed Mr. Jones' request with Mr. Fickett, who, among other things, stated that "he was getting questions from Homer [Woodward], April Norton and others as to why Ken wasn't being paid Business travel because [Mr. Jones] contacted them without him knowing." PSAMF ¶¶ 130; DRPSAMF ¶¶ 130; JR 579. Regarding Mr. Jones' May 2017 inquiry about mileage, Mr. Fickett told Ms. Norton "he 'caved' in the circumstances and started paying [mileage] from Eastport to Charlottetown but did not want to." [90] PSAMF ¶¶ 114, 130; DRPSAMF ¶¶ 114, 130; JR 579. Ms. Norton wrote that Mr. Fickett "felt Ken was already making out good with the current arrangement." PSAMF ¶ 130; DRPSAMF ¶ 130; JR 579.

After their conversation, Ms. Norton asked Mr. Fickett: "[c]ould you forward me scans of some correspondence between you and Ken that supports the travel

---

[90]     Mr. Jones' ¶ 114 originally read: "After Jones' complaint to Norton about mileage reimbursement in 2017, Fickett complained that Ken Jones 'contacted Homer Woodward, VP, and Norton, HR Director without him knowing,' and that he 'caved' in the circumstances and started paying from Eastport to Charlottetown but did not want to." PSAMF ¶ 114 (quoting JR 579).
        Wyman asserts that "there is no support in the record citation that Fickett made these statements in the context of a 'complain[t]'" and that "the quoted citation in this statement is also not an accurate quotation from the cited authority." PSAMF ¶ 114. Accepting this qualification, the Court includes the full quote from Ms. Norton's report.  JR 579.

reimbursement agreement? Hopefully you have something that supports his acknowledgement of the agreement and that you were accommodating his situation with location while he was working." PSAMF ¶ 142; DRPSAMF ¶ 142. Mr. Fickett responded by email with a list of ten emails between Mr. Fickett and Mr. Jones that "can be categorized as . . . [reflecting] travel reimbursement agreements/understandings . . . [and] Ken's preference/desire to work in PEI," including one email with Jones relating to mileage reimbursement from November 13, 2014, wherein Fickett wrote: "if the mileage is more than your regular commute, then we can expense the difference."[91] PSAMF ¶ 143; DRPSAMF ¶ 143; JR 584.

Ms. Norton directed the investigation and decision on Mr. Jones' request for payment, and Wyman's CEO Mr. Shurman decided whether to pay Mr. Jones the back mileage reimbursement. PSAMF ¶ 144; DRPSAMF ¶ 144. Ms. Norton discussed Mr. Jones' request for payment of back mileage with her supervisor, CFO Mancini, and later with CEO Shurman. PSAMF ¶ 131; DRPSAMF ¶ 131. Mr. Shurman reviewed the November 2014 emails with "the exchange [Fickett and Jones] had about the understandings, that was important to [him] as to how [to] proceed[]." PSAMF ¶ 145; DRPSAMF ¶ 145. After reviewing the documents from Mr. Fickett, Mr. Shurman and Ms. Norton discussed Mr. Jones' request for payment of mileage

---

[91] The Court accepts Wyman's qualification that Mr. Fickett identified more than one email in his response and has adjusted PSAMF ¶ 143 to reflect that Mr. Fickett identified the November 13 email among other communications.

reimbursement and their understanding of "the agreement."[92]   PSAMF ¶ 147; DRPSAMF ¶ 147.

Mr. Fickett and CEO Shurman discussed Mr. Jones' request for mileage on or before September 13, 2018.  PSAMF ¶ 128; DRPSAMF ¶ 128.  Ms. Norton testified that she did not inform Mr. Shurman at the time that Mr. Jones had informed her that he had been told by Mr. Fickett that he did not qualify for mileage reimbursement.[93]   PSAMF ¶ 134; DRPSAMF ¶ 134.  Mr. Shurman did not consider that Wyman's Employee Manual barred agreements contrary to the terms of the Manual unless they were signed off on by Wyman's president.  PSAMF ¶¶ 135, 137; DRPSAMF ¶¶ 135, 137.  Mr. Shurman was aware that Mr. Jones was not white, and was Black, African American.  PSAMF ¶ 129; DRPSAMF ¶ 129.  In deciding whether to compensate Mr. Jones, Mr. Shurman did not consider that by denying Mr. Jones payment, Wyman would be subjecting Jones to unequal treatment compared to white employees.[94]   PSAMF ¶ 138; DRPSAMF ¶ 138.

Mr. Shurman reviewed Section 6.08 of the Employee Manual, Wyman's mileage reimbursement policy, when deciding whether to pay Mr. Jones the

---

[92]   PSAMF ¶ 147 originally read: "After reviewing the documents from Fickett, Shurman and Norton ultimately concurred in the decision not to pay Jones the back mileage reimbursement."  The Court accepts Wyman's qualification that "[t]he decision was based on review of documents from Fickett, and Norton's and Shurman's conversation and understanding of the agreement between Fickett and Plaintiff."  DRPSAMF ¶ 147.  Ms. Norton testified that the decision came from "an agreement that Tony and I, in conversation and in reviewing the documents that Shannon had provided and understanding the situation of the agreement, that I believe it was on the level between Tony and myself."  JR 1594.

[93]   The Court accepts Wyman's qualification specifying that Ms. Norton "testified that she did not tell Shurman *at that time* that Jones had informed her that he had been told by Fickett that he did not qualify for mileage reimbursement."  DRPSAMF ¶ 134 (emphasis in original) (citing JR 142).

[94]   Wyman's qualification that "Jones had not made a complaint that he felt he was being treated differently from white employees in regard to mileage reimbursement," DRPSAMF ¶138 (citing JR 16), is already reflected elsewhere in this statement of facts.

requested back mileage reimbursement. PSAMF ¶ 139; DRPSAMF ¶ 139. Mr. Shurman agreed the mileage reimbursement policy said nothing about reducing mileage reimbursement by the mileage of an employee's home-to-work commute. PSAMF ¶ 140; DRPSAMF ¶ 140. Mr. Shurman also agreed the mileage reimbursement policy said nothing about reducing mileage reimbursement because of an employee's after work activities. PSAMF ¶ 141; DRPSAMF ¶ 141.

When Wyman management discussed the question of whether to pay Mr. Jones the mileage reimbursement from 2013 to 2017, no one raised any questions about disparate treatment of a minority.[95] PSAMF ¶ 154; DRPSAMF ¶ 154. Ms. Norton and Mr. Shurman did not discuss the issue that by denying Mr. Jones payment, they would be denying a Black employee equal treatment with white employees. PSAMF ¶ 136; DRPSAMF ¶ 136.

Mr. Shurman did not disagree with Ms. Norton's and Mr. Mancini's position that Wyman should not reimburse Jones for the unpaid back mileage. PSAMF ¶ 133; DRPSAMF ¶ 133. Despite Mr. Jones' objection to Ms. Norton as to why he did not "qualify" for mileage reimbursement in 2015, Ms. Norton, with Mr. Mancini's concurrence, recommended that Wyman not pay Mr. Jones the back mileage reimbursement, claiming there was an "agreement" between Mr. Fickett and Mr. Jones.[96] PSAMF ¶ 132; DRPSAMF ¶ 132; DSMF ¶ 88; PRDSMF ¶ 88.

---

[95] The Court updates Mr. Jones' fact in response to Wyman's qualification that his "cited authority refers to discussions about 'disparate treatment of a minority,' not 'equal treatment of a minority or discrimination.'" DRPSAMF ¶ 154.

[96] Mr. Jones denies Wyman's fact, asserting that "[t]he claimed thought processes and reasons for Norton, Mancini, and Shurman's decision to not pay Jones the back mileage are pretextual, and rebutted by circumstantial evidence set out in [PSAMF] ¶¶ 1-154." Mr. Jones fails to offer specific record citations to properly controvert Wyman's fact as required by Local Rule 56(f), and the cited

## III.   THE PARTIES' POSITIONS

### A.   Wyman's Motion for Summary Judgment

Wyman moves for summary judgment, arguing that Mr. Jones' claims are based on "unsupported allegations and subjective speculation." *Def.'s Mot.* at 22.  In its motion, Wyman contends that (1) Mr. Jones' breach of contract claim fails because "Wyman did not have a contract with [him] regarding reimbursement of mileage;" (2) Mr. Jones' quantum meruit claim fails because "the payments he is seeking are not in exchange for services rendered" and he "had no reasonable expectation of payment of mileage reimbursement . . . between 2014 and 2017"; and (3) it was not unjustly enriched because it did not benefit inequitably from Mr. Jones' work in PEI without mileage reimbursement.  *Id.* at 4, 7-8.  As to his § 1981 claims, Wyman asserts that "[b]ased on the undisputed facts, [Mr. Jones] cannot . . . establish that he was subjected to discrimination on the basis of his race in violation of Section 1981, nor can [he] satisfy his ultimate burden of persuasion by showing that Wyman's reasons for its actions taken were a pre-text for discrimination."  *Id.* at 9.  Finally, Wyman insists that because  Mr. Jones "cannot meet his burden of demonstrating by clear and convincing evidence that Wyman acted with malice or reckless indifference," it is entitled to judgment as a matter of law on his claim for punitive damages.  *Id.* at 22-23.

---

deposition testimony supports Wyman's ¶ 88.  Ms. Norton testified that there "was an agreement that Tony [Shurman] and I" reached not to pay back mileage based on their "conversation and [review of] the documents that Shannon [Fickett] had provided and understanding the situation of the agreement." JR 1594.  Moreover, Mr. Jones submitted essentially the exact same fact in PSAMF ¶ 132. The Court will consider Mr. Jones' theory that Wyman's stated reasons are pretextual later in this Order.

### 1.    Count I: Breach of Contract

Wyman first urges that it "did not have a contract with [Mr. Jones] regarding reimbursement of mileage, and therefore his breach of contract claim must fail." *Id.* at 4.  Wyman points to the circumstances of Mr. Jones' work travel to PEI, arguing that Mr. Fickett "believed that, both for personal and business reasons, Plaintiff had an interest, desire and preference to work more often at the PEI facility" and specifically "wanted to use his personal vehicle." *Id.* at 4-5.  Wyman submits that "[Mr.] Fickett accommodated Plaintiff's request . . . agreeing to reimburse him for any mileage beyond the travel [he] would have incurred if he was traveling over his daily commute (140 miles per day) if he reported to [Wyman's] Cherryfield facility." *Id.* at 4.

Wyman says summary judgment is proper because "the terms of Wyman's Employee Manual do not constitute binding contractual promises" as a matter of law. *Id.* at 7.  Wyman contends that any promises in the Manual were unsupported by consideration and illusory, and moreover disclaimed by "an express statement that the Manual is not, and should not be construed as, a contract." *Id.* at 6.  Wyman notes that "[t]he Manuals' employee acknowledgement forms reiterate that the Manual does not constitute a binding employment contract and that Wyman reserves the right to change policies with or without notice." *Id.*

### 2.    Count II: Quantum Meruit

Wyman also argues that the Court should enter summary judgment in its favor on Mr. Jones' quantum meruit theory that he is owed payment for services rendered

because his "belated claim that he expected compensation [for mileage reimbursement] was unreasonable." *Id.* at 7. Wyman emphasizes that although it paid Mr. Jones a salary for his work in PEI, he is now "seeking expense reimbursement, which is not payment for services rendered—a necessary element of a quantum meruit claim" under Maine law. *Id.* Wyman reasons that even if the Court deems expense reimbursement "equivalent to compensation for 'services rendered,'" Mr. Jones "cannot establish that it was reasonable for him to expect payment for mileage reimbursement for his trips to PEI based on the communications he had with [Mr.] Fickett concerning mileage reimbursement as evidenced by the November 13, 2014, email exchange." *Id.* at 7-8. As Wyman interprets those emails, "there is no dispute that the Plaintiff knew his supervisor had told him that he would not be reimbursed for mileage to PEI unless it was in excess of the cumulative mileage for his ordinary commute when travelling to and from his home and the Cherryfield facility." *Id.* at 8.

### 3.   Count III: Unjust Enrichment

Wyman insists that although it approved of and benefitted from Mr. Jones' travel to PEI, under the circumstances "[i]t was not inequitable for Wyman to withhold payment for mileage reimbursement and, therefore, Wyman was not unjustly enriched." *Id.* Wyman emphasizes that "[Mr.] Fickett could have required the Plaintiff to use a company car" and "was clear about how Plaintiff's travel would be reimbursed" in accommodating Mr. Jones' desire to use his personal car. *Id.* at 8-9. Wyman also reasons that its failure to reimburse Mr. Jones for mileage "was not

inequitable because Plaintiff was not disadvantaged." *Id.* at 9. Wyman submits that, "[t]o the contrary, it would be inequitable for the Plaintiff to accept the benefits of the arrangement" to use his personal vehicle for trips to PEI "and then, after having received those benefits, to claim he now wants to receive retroactive payments." *Id.* Wyman asserts that "[i]t is undisputed that Plaintiff was traveling to PEI in lieu of his very lengthy daily commute to and from the Cherryfield facility" which Wyman had "no obligation to pay for." *Id.*

According to Wyman, Mr. Jones and Mr. Fickett made an "arrangement . . . to make sure Plaintiff was no worse off in terms of mileage for multi-day PEI trips than if he continued his daily commute on those days." *Id.* Addressing its decision in 2017 to start reimbursing Mr. Jones for his mileage "[o]nce [he] made it known . . . three years later, that he was no longer happy with the arrangement," Wyman says that "[Mr.] Fickett agreed to make the change . . . to accommodate [Mr. Jones'] request since he was a valued employee," not because Mr. Fickett thought the arrangement was unfair. *Id.* at 9 n.3.

### 4.    Count IV: § 1981 Discrimination on the Basis of Race

Wyman argues that Mr. Jones cannot establish a prima facie case of racial discrimination for its failure to reimburse him for mileage from 2014-2017, or in how it set his compensation and bonuses. *Id.* at 10. Wyman further contends that Mr. Jones "cannot satisfy his ultimate burden of persuasion by showing that Wyman's reasons for the actions taken were a pre-text for race discrimination." *Id.* Wyman submits that Mr. Jones cannot meet the third or fourth prongs of the *McDonnell*

*Douglas Corporation v. Green*, 411 U.S. 792 (1973), burden-shifting framework that governs his § 1981 claims at summary judgment. *Id.* It insists Mr. Jones "did not suffer an adverse employment action given that the mileage reimbursement arrangement and pay raises [he] received were not 'employer actions that would have been materially adverse to a reasonable employee.'" *Id.* at 11 n.4 (quoting *Rivera-Rivera v. Medina & Medina*, Inc., 898 F.3d 77, 95 (1st Cir. 2018)).

Wyman urges that Mr. Jones cannot identify "any current or former employee at Wyman who was even remotely 'similarly situated,'" as Mr. Jones "was in a very unique situation because of (i) his extensive commute to Wyman's Cherryfield facility, (ii) his preference to use his personal vehicle instead of a company vehicle to travel on company business, (iii) the frequency with which it was being proposed he travel to PEI, and (iv) . . . the benefits he received by traveling to PEI for personal as well as professional reasons." *Id.* at 12. Wyman does "not dispute that some other employees have been, on occasion, allowed to use their personal vehicle and provided mileage reimbursement," but points to the November 2014 email exchange as "a reasonable compromise," establishing an appropriate arrangement for Mr. Jones' personal circumstances. *Id.* at 12.

Wyman emphasizes that "using a personal vehicle has been the exception to the general preference that employees use company vehicles when traveling on Company business." *Id.* at 12-13. Wyman contends that Mr. Jones "cannot identify any other Wyman employee with a similarly long daily commute" or with "similar travel responsibilities and similar personal reasons to want to travel to Canada." *Id.*

at 13.  Wyman concludes that Mr. Jones' "inability to show that another employee with circumstances remotely similar to his was treated more favorably means Plaintiff has failed to meet his" prima facie burden.  *Id.*

Turning to Mr. Jones' allegations that he was treated less favorably in compensation matters on the basis of race, Wyman again submits that Mr. Jones "failed to establish he was treated differently than a similarly situated employee." *Id.*  Wyman says that Mr. Jones claims that "his pay raises were set at a lower percentage than 'one or more similarly situated white employees,'" without demonstrating why the white employee is allegedly similarly situated.  *Id.* (quoting *Compl.* ¶ 28).  Assuming that Mr. Jones "is referring to Wayne Alley, who is Fickett's only other direct report," Wyman argues that "Alley is not an appropriate comparator . . . for many reasons."  *Id.* at 14.  It submits that Mr. Alley "had a different job title and performed different duties than [Mr. Jones]," worked at Wyman longer, had supervisory responsibilities, and "had different performance expectations, goals, and results."  *Id.*  Wyman concludes that Mr. Jones "has no idea how his duties compared to others" and "cannot produce any evidence to suggest there was another employee with similar job responsibilities who could serve as a comparator or that such other employee received higher pay increases than [him] despite comparable or lower job performance."  *Id.* at 14-15.

Even if Mr. Jones can meet his prima facie burden under § 1981, Wyman contends that "[t]he undisputed facts establish legitimate, non-discriminatory reasons for declining to pay [him] mileage reimbursement for travel to PEI from 2014-

2017 and for the pay raises provided to [him]." *Id.* at 15.  Wyman notes that Mr. Jones "retains the ultimate burden of persuasion and . . . must raise a genuine issue of material fact that [its] reasons . . . were a pretext for discrimination." *Id.* (quoting *Ray v. Ropes & Gray, LLC*, 799 F.3d 99, 113 (1st Cir. 2015)).  Wyman says there is no "evidence suggesting that [Mr.] Fickett's decisions, or any Wyman decision-maker's decisions, were motivated by anything other than legitimate, non-discriminatory business reasons." *Id.*

As to mileage reimbursement Wyman first points to the "documented understanding" in the November 2014 emails between Mr. Fickett and Mr. Jones as providing a "legitimate, non-discriminatory basis for why it did not reimburse his mileage from 2014-2017." *Id.* at 16.  Wyman submits that "[w]hether or not [Mr.] Jones] was happy with the arrangement," his work in PEI "benefited [him] personally as well as Wyman, while making sure there was no added travel cost to" him.  *Id.*  As Wyman sees it, the issue before the Court "is whether [Mr.] Fickett's reasoning for not reimbursing [Mr. Jones] mileage was based on [his] race or color as opposed to the legitimate, non-discriminatory reasons given by [Mr.] Fickett and as reflected in the November 2014 email exchange." *Id.*

Wyman insists "there are no facts, disputed or undisputed" of "any discriminatory animus . . . to suggest that had [Mr. Jones] not been black, [Mr.] Fickett would have negotiated a different arrangement" and that the record does not refute Wyman's explanation that lack of reimbursement was non-discriminatory and pursuant to mutual agreement.  *Id.*  Wyman submits that there is "no *genuine*

dispute" that Mr. Jones benefitted from being able to spends weekends in Canada with his own car, and that "there is a legitimate, non-discriminatory benefit to a company to have its employees use the company vehicles that it owns instead of having to reimburse employees for mileage." *Id.* at 17 (emphasis in original). Finally, it says that Mr. Jones "could not identify any act or evidence suggesting that [Mr.] Fickett or any Wyman manager[s] were acting based on racial animus," concluding that Mr. Jones' "claim that but for his race the new mileage reimbursement arrangement would have been made retroactive is based solely [on] his personal speculation." *Id.*

Regarding Mr. Jones' compensation, Wyman contends that "[t]here is no genuine dispute of fact that pay raises at Wyman are based on an individual employee's performance" and that Mr. Fickett adhered to this practice in setting compensation for his supervisees. *Id.* Wyman says differences in annual pay raise percentages between Mr. Alley and Mr. Jones are attributable to "their job duties, work expectations and performance evaluations." *Id.* at 17-18. Wyman argues that Mr. Jones "wrongly believ[ed] that Wyman provided a standard, across-the-board percentage increase in compensation . . . based on his experience with other employers." *Id.* at 18.

Wyman submits that, beyond "speculation about how pay raises at Wyman worked," Mr. Jones "has no basis to maintain that he deserved the same pay raise that Alley received." *Id.* It emphasizes that "each year, the percentage pay increases [Mr. Jones] received were equal to or greater than what was given to many other

Wyman employees, most of whom are white" and that Mr. Jones "never complained about his performance reviews or said that they were inaccurate in any way." *Id.* at 18-19. Wyman concludes that it is entitled to summary judgment "because there were legitimate, non-discriminatory reasons why [Mr. Jones'] pay raises varied from other employees." *Id.* at 19.

### 5. Count V: Section 1981 Retaliation

Wyman turns next to Mr. Jones' claim that Wyman retaliated against him for contacting its HR department in May 2017 regarding mileage reimbursement by (1) denying him a performance increase in pay that year, and (2) "functionally demoting him" in 2018 to work more in Maine. *Id.* Wyman asserts that "there is no evidence in the record that the Plaintiff made a complaint about race discrimination while employed at Wyman" to support his claim that he engaged in protected conduct. *Id.* Wyman reasons that Mr. Jones' 2017 HR "inquiry about why he did not qualify for mileage, without any reference to suspected racial bias, does not constitute protected conduct as a matter of law." *Id.* at 20. Wyman says it "cannot be held liable for retaliation in response to a complaint about race discrimination that Plaintiff admits he never made." *Id.*

As to the second element of Mr. Jones' retaliation claim, Wyman says that he cannot show that he experienced an adverse employment action "that would have been materially adverse to a reasonable employee." *Id.* at 21 (quoting *Rivera-Rivera*, 898 F.3d at 95 (citations and quotation marks omitted)). It submits that Mr. Jones lacks any objective basis for a retaliation claim where it is undisputed that "after

questioning his failure to receive mileage reimbursement in May of 2017, [he] received a positive performance evaluation, his pay raise was the same amount as nearly all Wyman employees, and the amount of his pay raise was the exact same as that received by Fickett's other direct report, Wayne Alley." *Id.* Regarding Mr. Fickett's 2018 decision to have Mr. Jones spend less time in Canada, Wyman notes that Mr. Jones "was assigned primarily to the Cherryfield [Maine] facility from the beginning of his employment," arguing that "[a] change in responsibilities consistent with the normal requirements of [his] position cannot constitute an adverse action." *Id.*

Wyman further insists that Mr. Jones cannot show pretext, as "[t]here is no evidence to suggest that Fickett or anyone else in management considered Plaintiff's request for mileage reimbursement in determining his pay raise during the following review cycle" or in adjusting his responsibilities in 2018. *Id.* at 22.

### 6. Punitive Damages

Finally, even if it is not entitled to summary judgment on all counts, Wyman urges the Court to dismiss Mr. Jones' claims for punitive damages, which are found as part of the damage claims in Mr. Jones' § 1981 counts IV and V. *Id.* at 22-23. Wyman argues that Mr. Jones "cannot meet his burden of demonstrating by clear and convincing evidence that Wyman acted with malice or reckless indifference." *Id.* at 22. Wyman reasons that "[b]ecause Plaintiff benefitted from the mileage reimbursement arrangement and remained an employee in good standing after he raised the issue about how his reimbursement was handled, there is no *genuine*

disputed material fact that would support the claim that Wyman acted with malice or reckless indifference." *Id.* at 23 (emphasis in original).

## B.    Kenneth Jones' Opposition

Mr. Jones insists that disputes of material fact preclude summary judgment, "including many centering on [Wyman's] motivation" in handling his work travel and compensation. *Pl.'s Opp'n.* at 1.

### 1.    Count I: Breach of Contract

First, Mr. Jones asserts that the terms of Wyman's Employee Manual created an enforceable unilateral contract for mileage reimbursement. *Id.* at 2. He notes that the Manual provided to him as a full-time employee "informed [him] of the terms and conditions of employment with Wyman," and included a "promise to pay mileage reimbursement for approved business travel, that [he] accepted by engaging in approved business travel for [Wyman]." *Id.* at 3. Mr. Jones submits that the Manual's "disclaimer clauses do not negate the existence of a contract because the Manuals provide conflicting statements." *Id.* at 4. He argues that any ambiguity in "whether the Manual states the terms and conditions of employment . . . should be construed against the drafter." *Id.* at 4.

Mr. Jones says the additional disclaimers and releases that "attempt[] to negate the existence of any contractual relationship" in Wyman's related Employee Acknowledgement forms, "are ineffective . . . because he never agreed to them." *Id.* at 5. He submits that such disclaimers purporting to release employers from

contractual obligations "are not determinative of the question of whether a contract exists." *Id.* (citing *Libby v. Calais Reg'l Hosp.*, 554 A.2d 1181, 1183 (Me. 1989)).

Mr. Jones argues that *Snow v. BE & K Construction Company*, 126 F. Supp. 2d 5 (D. Me. 2001), and *Canales v. University of Phoenix, Inc.*, 854 F. Supp. 2d 119, 122-123 (D. Me. 2012), in which this Court held that "a disclaimer clause giving the employer the right to amend the terms of employment renders the employer's promise illusory" and unenforceable, are distinguishable from the issue here which is "whether an employee can enforce a contractual provision offered by an employer once an employee by performance accepted the provision." *Id.* at 5-6. Mr. Jones maintains that "[b]y working for Wyman and engaging in approved business travel," he accepted Wyman's unilateral offer to pay mileage reimbursement, "forming a contract." *Id.* at 6. He asserts that any "the dispute of fact about the existence of a contract should proceed to trial." *Id.*

### 2. Count II: Quantum Meruit

Alternatively, Mr. Jones contends that he is entitled to "recovery pursuant to an implied contract," inferred from the conduct of the parties and "from [his] job description, the policy provisions of the [Employee Manual], and from the communications by Wyman about mileage rates." *Id.* at 6-7. He maintains that he was entitled to reimbursement, and that "[Mr.] Fickett's decision to deny him mileage reimbursement does not render [his] expectation of payment unreasonable." *Id.* at 7. Mr. Jones concludes that any "ambiguities as to whether an employment contract exists is a question of fact for resolution at trial." *Id.* at 7.

72

### 3.   Count III: Unjust Enrichment Claim

Noting that Wyman admits that it received and appreciated a benefit from Mr. Jones, thus satisfying the first two elements of his claim, Mr. Jones says his unjust enrichment claim "rests on disputed facts centering on the element of inequity." *Id.* at 8. Mr. Jones deems Wyman's claim that Mr. Fickett could have required him "to use a company vehicle . . . irrelevant speculation, because he never tried to do so," and Wyman lacked any "requirement to exhaust the company vehicle option." *Id.* He points to factual disputes over whether he "had any 'arrangement' with Fickett not to be paid" and whether he was "'disadvantaged by non-reimbursement of mileage' as the denial left [him] to shoulder the cost of thousands of miles of driving that was a business expense for Wyman." *Id.* (quoting PSAMF ¶¶ 33-37, 53). He says that Wyman's reliance on its perception that "he benefited by spending more time in Canada with his significant other is discriminatory, as that criterion was not imposed on any other employees." *Id.* Finally, Mr. Jones reasons that Wyman should have reimbursed him, "just as it did everyone else," asserting that he "did not agree to travel to work for Wyman in PEI 'in lieu of' commuting to Cherryfield." *Id.*

### 4.   Count IV: § 1981 Discrimination on the Basis of Race

Mr. Jones contends that his "employment with Wyman is a contractual relationship, under which he had rights" subject to the Civil Rights Act of 1866, and that he has met his burden to show a prima facie case of race-based discrimination. *Id.* at 9.

73

First, Mr. Jones submits that he "suffered adverse action by defendant's refusal to pay him mileage reimbursement and by denying him equal treatment in wage compensation." *Id.* Mr. Jones says that denial of mileage reimbursement constituted a "significant change in benefits" which inflicted direct economic harm "because he did not have the money to pay for routine maintenance of his car for the thousands of miles driven for Wyman, causing car breakdowns and disruption of his work." *Id.* at 9-10. Furthermore, "Wyman's decision not to pay [him] equal annual compensation increases qualif[ies] as adverse action" as "deprivation of earned compensation is "materially adverse." *Id.* (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 73 (2006)).

Mr. Jones goes on to address the evidence of a causal connection between his race and the adverse actions. He says that the Court does not need to assess whether similarly situated employees were treated differently at this stage because "comparative evidence is to be treated as part of the pretext analysis and not as part of the plaintiff's prima facie case." *Id.* at 10-11 (quoting *Kosereis v. Rhode Island*, 331 F.3d 207, 213 (1st Cir. 2003)). He contends that his initial burden is to present evidence indicating a "lack of neutrality" on Wyman's part, *id.* at 11 (quoting *Brennan v. GTE Gov't Sys. Corp.*, 150 F.3d 21, 289 (1st Cir. 1998)), and points to "employees outside of [his] protected class . . . who engaged [in] approved business travel" as relevant comparators who received preferential treatment. *Id.*

Mr. Jones links his race and Wyman's conduct by asserting that he "was the only employee . . . denied mileage reimbursement for approved business travel to PEI,

Canada, while Wyman paid mileage reimbursement to all white employees who used personal vehicles for business travel in the same time period." *Id.* at 11-12. He proffers that he was also the only employee whose mileage reimbursement was reduced based on the length of his commute to work from his home in Maine. *Id.* at 12. Mr. Jones reasons that "[Mr.] Fickett's disparate treatment of [him] and a white employee, as well as [Mr. Fickett] himself" in handling mileage reimbursement matters "support[s] an inference that [Mr.] Fickett used race-based standards" and "indicates 'a lack of neutrality' toward Jones as compared to white employees" so as to meet his "light prima facie burden for causation." *Id.* (quoting *Brennan*, 150 F.3d at 28).

Mr. Jones maintains that he has also shown a causal connection between his race and his allegations of adverse treatment in compensation, as evidenced by Mr. Fickett's differential treatment of Mr. Jones and Mr. Alley in pay decisions. *Id.* He points out that "in some years [Mr.] Fickett gave [him] and [Mr.] Alley unequal percentage increases for the annual 'standard increase' and in other years, gave them unequal percentage compensation increases for the same or similar performance rankings." *Id.* at 13. Mr. Jones also says that in 2014 and 2018 "[Mr.] Fickett set [his] 'performance increases' at a lower rate than he did for [Mr.] Alley, even when he ranked their performance as equal," and in 2015 he "did not receive an annual percentage increase while all other employees, including [Mr.] Alley did." *Id.* at 13-14. He contends that any differences between his role and Mr. Alley's role are "not dispositive of the question of whether the pay increases were discriminatory,"

reasoning that performance-based and standard compensation increases at Wyman were "based on factors other than job duties." *Id.* at 14. Mr. Jones concludes that "considering [his] status as a minority," along with the evidence that Mr. Fickett gave his white supervisee a higher percentage "standard" increase and higher percentage increases for the same or similar performance ratings, he has established a prima facie case precluding summary judgment on his claim of discrimination in compensation. *Id.*

Regarding mileage, Mr. Jones insists that Wyman's claimed justifications for refusing to pay him mileage reimbursement until May 2017 are "demonstrably pretextual." *Id.* at 15. He suggests that "Wyman deviated from multiple policies in denying Jones payment mileage reimbursement," which can suggest a pretext from which a reasonable jury could infer racial discrimination. *Id.*

Although Wyman maintains that it relied on Mr. Fickett's and Mr. Jones' "documented understanding" in their November 2014 email exchange Mr. Jones submits that "[a] factfinder could infer that Fickett's claimed ground for denying Jones payment, at odds with its mileage reimbursement policies, was pretext to conceal racial discrimination," particularly as "[Mr.] Fickett did no[t] impose the same claimed commute offset rule to himself and his white supervisee." *Id.* at 15-16. He argues that "Wyman's deviation from policies continued in the decision of HR Director Norton, CFO Mancini, and CEO Shurman to deny Jones payment of the back unpaid mileage reimbursement in 2018," maintaining that "[b]ased on Wyman's deviations from its mileage reimbursement and equal employment opportunity

policies, a jury could infer that the decision to single Jones out for denial of payment of mileage reimbursement was based on his race." *Id.* at 16.

Mr. Jones also alleges pretext in Wyman's "shifting and implausible explanations" for why he was denied mileage reimbursement. *Id.* at 17. First, he points out that although Wyman now cites the "personal and professional" benefits that he received from spending more time in Canada, Mr. Fickett made no reference to Mr. Jones' personal life in denying his reimbursement request in 2014. *Id.* He says Wyman's reliance on his preference "to use his own vehicle instead of a company vehicle, is at odds with Wyman's policies which allow mileage reimbursement, without any obligation to exhaust the company vehicle option first." *Id.* He also disputes Wyman's justification on the basis of "the frequency of his travel to PEI" as "recently coined, and illogical, as the economic hardship increased with the frequency of travel." *Id.*

Mr. Jones urges the Court to consider his disparate treatment claims "in light of his status as one of very few Black, African American full-time employees of Wyman" and "as the sole Black employee supervised by Fickett." *Id.* at 17, 22. Addressing Wyman's argument that he lacks appropriate comparators, Mr. Jones submits that his "comparison cases 'need not be perfect replicas,'" *id.* at 17 (quoting *Kosereis*, 331 F.3d at 214), and "[j]ob titles are not determinative of whether an employee is 'similarly situated.'" *Id.* (quoting *Kosereis*, 331 F.3d at 214-15). Mr. Jones argues that Wyman's reliance on his "claimed agreement" with Mr. Fickett, his personal reasons for wanting to spend time in Canada, and his long daily commute

lacks any "bearing on eligibility for mileage reimbursement under Wyman's policies, and was not a standard applied to any other Wyman employee, thus it is not a basis to determine other employees were not similarly situated." *Id.* at 19.

Mr. Jones further asserts that based on "Fickett's disparate treatment of [him] and a white employee" in handling their reimbursement requests, and in submitting his own, "a jury could reasonably infer that Fickett was acting on a biased belief that [he], as a Black [man], was entitled to lesser compensation than whites." *Id.* at 19-20. He references Mr. Fickett's comments that Mr. Jones "somehow was 'benefiting' or 'making out good'" with his mileage arrangements, particularly after Wyman began reimbursing him in 2017. *Id.* at 20.

Next, Mr. Jones argues that Wyman's justifications for any differences in his annual compensation are pretextual and based on dispute facts. *Id.* at 20. First, he disputes that "Wyman's annual compensation increases are totally based on an employee's performance." *Id.* He cites "Wyman's own documents [that] show that annual percentage pay increases [were] in part based on subjective evaluations of performance, and in part, on standard increases" to insist that compensation increases were not entirely performance based. *Id.* He submits that Mr. Alley does qualify as his similarly situated comparator, despite his different title and "limited supervisory responsibilities," because "an employee's title and performance of different job duties is not dispositive." *Id.* at 21.

After describing how his and Mr. Alley's roles overlapped, Mr. Jones compares the performance evaluations and pay increases they received each year, alleging a

"pattern of disparate treatment in compensation" in how Mr. Fickett set salary increases for his two supervisees. *Id.* at 21-22. He also points to how Mr. Fickett "obtained Wyman approval for bonus payments for Alley that were substantially larger than those for Jones." *Id.* at 22.

Mr. Jones concludes that summary judgment is inappropriate because "there [is] substantial evidence of pretext as to the defendant's claimed justifications" and "a jury could infer that Fickett subjected Jones to disparate treatment in decisions on compensation because of his race." *Id.* at 23.

###  5.   Count V: § 1981 Retaliation Claim

Mr. Jones next turns to his claim that Wyman retaliated against him for his opposition to discriminatory treatment. *Id.* at 23. He submits that the required showing of protected conduct "may take forms other than express statements of opposition" to unlawful activity, namely an employee's communication of "their views to their employer through 'purposive conduct.'" *Id.* (quoting *Pippin v. Boulevard Motel Corp.*, 835 F.3d 180, 185 (1st Cir. 2016)). Mr. Jones says that he "opposed unequal treatment in mileage reimbursement by purposive conduct when he raised the question with . . . Wyman's new HR Director, in May, 2017 of why he did not 'qualify' for mileage reimbursement," upon his reasonable belief "that he was entitled to mileage reimbursement based on Wyman's policies, and his job description." *Id.* at 23-24. He recounts his suspicion of Mr. Fickett's rejection of his initial request for reimbursement in 2014, saying "his questions of other white employees confirmed his suspicion that [Mr.] Fickett was wrongly singling him out for unfair treatment." *Id.*

79

at 24. He notes that he "complained to Homer Woodward, and Wyman Canada managers" first about his mileage reimbursement, concluding that his May 2017 HR inquiry qualifies as protected conduct, "even if it did not explicitly assert race-based discrimination." *Id.*

As to the second element of his retaliation claim, Mr. Jones submits that he "suffered material adverse action when Fickett removed his duties on working on workplace safety projects in PEI, and functionally demoted Jones by giving him assignments outside his job description." *Id.* He cites the First Circuit's decision that demotions and "disadvantageous transfers or assignments" can constitute adverse employment action. *Id.* (quoting *Rivera-Rivera*, 898 F.3d at 95). According to Mr. Jones, his "reassignment" from working in person in PEI "made it practically impossible for [him] to effectively work" with his Process Safety Management project team. *Id.* at 25. According to Mr. Jones, going from "a major assigned job duty of workplace safety in PEI" to "work as a cleaner on the processing line was a functional demotion," which a "reasonable employee in [his] position could likewise find . . . materially adverse." *Id.*

Mr. Jones goes on to assert circumstantial evidence of "[a] causal connection between [his] complaint about being denied mileage reimbursement and his changed job duties," namely Mr. Fickett's "statements reflecting his antipathy about Jones' complaint and his ensuing negative conduct." *Id.* Recounting how Mr. Fickett responded to his complaints, Mr. Jones submits that "[a] jury could reasonably infer . . . that he decided to change Jones['] job duties to disadvantage Jones because he

had complained about Fickett's denial of mileage," asserting that "[t]he timing of the retaliation coincided with the point at which Fickett had the opportunity to take adverse actions" upon Mr. Jones' 2018 annual review.  *Id.* at 26.  He concludes that a jury could also infer that Mr. Fickett's explanation that he "was needed in Maine and not . . . in Canada was unsupported and illogical, and pretext to conceal retaliatory animus." *Id.*

### 6.   Punitive Damages

Mr. Jones insists that he is entitled to punitive damages, arguing that the "clear and convincing standard" under Maine law does not apply to his federal § 1981 claims of intentional discrimination.  *Id.* at 27.  Thus, Mr. Jones says that summary judgment is inappropriate unless "there are no facts from which a reasonable jury could determine that Defendant[] acted with malice or reckless indifference" in discriminating against him.  *Id.* (quoting *Kendrick v. Me. Med. Ctr.*, No. 2:19-cv-00028-GZS, 2021 U.S. Dist. LEXIS 140120, at *16 (D. Me. June 30, 2021)).

As "Wyman managers . . . were all aware of the requirements of federal laws prohibiting discrimination . . . [Mr.] Fickett's decision to deny [Mr.] Jones mileage reimbursement, as well as to retaliate against him could be inferred to be made in defiance of his knowledge that such discrimination was unlawful."  *Id.* at 28.  Moreover, "[a] reasonable jury could infer that [Ms.] Norton, [Mr.] Shurman and [Mr.] Fickett's decisions to deny [Mr.] Jones['] request for payment of mileage reimbursement in 2018 were taken with malice or reckless disregard to Jones' rights to equal treatment in matters of contract, and with the knowledge that they were acting in violation of federal law." *Id.*

Pointing to factual disputes regarding Wyman managers' motivations, Mr. Jones urges the Court to deny Wyman's motion for summary judgment because "the aggregate proof presents a case that is sufficiently open-ended" that a jury could find in his favor. *Id.* (quoting *Taite v. Bridgewater State Univ., Bd. of Trs.*, 999 F.3d 86, 97 (1st Cir. 2021)). "Viewing the evidence in the light most favorable to" him, Mr. Jones contends "a triable issue exists as to whether [Wyman] discriminated against [him]because on his race, retaliated against him, and breached his rights in contract or equity." *Id.*

## C.   Wyman's Reply

According to Wyman, Mr. Jones "attempts to evade summary judgment on what is a factually straightforward case by setting forth myriad non-material facts, disregarding unfavorable—and indisputable—material facts relevant to his claims, and setting aside applicable precedent." *Def.'s Reply* at 1.

### 1.   Count I: Breach of Contract

Wyman says that Mr. Jones "ignores the required element of consideration" in characterizing its Employee Manual as a unilateral contract. *Id.* It insists that "at most the disclaimers in Wyman's Employee Manual establish that the Manual contained illusory promises, which are not consideration and cannot establish mutual assent under Maine law." *Id.* at 1-2 (citing *Canales*, 854 F.3d at 122-23).

Wyman goes on to argue that even if the Court finds the Manual to be a contract, its "mileage reimbursement policy plainly states that to be eligible for reimbursement, employees must submit an expense report indicating the total miles

82

driven." *Id.* at 2.  Because Mr. Jones did not include requests for reimbursement or indicate in his mileage expense reports from 2014 until May 2017, "he was not eligible for reimbursement under the alleged 'contract.'" *Id.*  According to Wyman, this also validated its "understanding that the mileage reimbursement arrangement reflected in the November 13, 2014, email exchange superseded whatever reimbursement [Mr. Jones] thought he was entitled to pursuant to the Manual." *Id.*  Wyman reasons that if the Court agrees with Mr. Jones that he is "not subject to the disclaimers in the Manual because he did not sign the Manual's acknowledgement, then, reciprocally, he is not subject to the mileage reimbursement policy, either." *Id.*  As the "language of the Manual's policies and disclaimers is not disputed," Wyman says there is no need for a trial as to its enforceability based on "inconsistencies or vagueness." *Id.*

### 2.    Count II: Quantum Meruit

Wyman focuses on the third prong of Mr. Jones' claim, insisting that he "could not have reasonably expected to be paid for the mileage he is now claiming when, before engaging in the travel, he was informed by his supervisor that he would not be paid mileage that was more than his normal commute and when he acknowledged the arrangement." *Id.* at 3.  It submits that "[w]hether or not [Mr. Jones] *agreed* with the arrangement is immaterial," given that he "acknowledged the arrangement was in effect . . . demonstrat[ing] that he did not expect reimbursement." *Id.* (emphasis in original).

Wyman argues that, "as with his contract claim," Mr. Jones cannot rely on the Manual's mileage reimbursement policy as establishing his reasonable expectation of payment and that his failure to submit requests for payment further renders his claimed expectation on a quantum meruit theory unreasonable. *Id.*

### 3.   Count III: Unjust Enrichment

As Wyman sees it, Mr. Jones' unjust enrichment allegations rely "on a highly selective view of the record," as he "admits [Mr.] Fickett could have required him to use a company vehicle" and "would have incurred similar—and non-compensable—mileage on his regular commute had he not been travelling to PEI for several days at a time." *Id.* at 3-4.   It points to Mr. Jones' use of his personal vehicle for travel to PEI as a "fundamental benefit to [him] that strongly weighs against a determination that the arrangement was inequitable." *Id.*

Wyman disagrees that its consideration of Mr. Jones' personal reasons for wanting to travel to Canada in his own car constitutes a "discriminatory 'criterion'" imposed upon him, but rather "is relevant to whether the mileage arrangement was inequitable to [him] under the circumstances." *Id.* at 4.   It concludes that Mr. Jones' November 2014 email "acknowledging that he would not be paid for mileage and [his] failure to request mileage reimbursement for nearly three years" supports Wyman's understanding that Mr. Jones agreed to a mutually beneficial arrangement, and undercuts any after-the-fact claim of unjust enrichment. *Id.*

### 4.   Count IV: § 1981 Discrimination on the Basis of Race

Wyman maintains that it applied the correct prima facie standard, under *Prescott v. Higgins*, 538 F. 3d 32, 41 (1st Cir. 2008), to Mr. Jones' § 1981 claim. *Id.*   However, even under Mr. Jones' proposed test, Wyman says he fails to meet his burden. *Id.*

Wyman argues that Mr. Jones failed to establish a causal connection between its handling of the mileage reimbursement issue and his race. *Id.* at 4-5.   It asserts that Mr. Jones lacks proper employee comparators who "closely resemble" his "relevant facts and

circumstances," *id.* (quoting *Kosereis*, 331 F.3d at 214), pointing to the unique "frequency of [Mr. Jones'] travel, the length of his regular commute and [his] preference to use his personal vehicle." *Id.* at 5.

Wyman disputes Mr. Jones' contention that it offered "shifting and 'recently coined' explanations" and argues that Mr. Jones "does not have any evidence to dispute that [Mr.] Fickett was trying to accommodate [his] preference to work in PEI." *Id.* Wyman submits that "deviation from policy . . . is by no means dispositive of pretext," because "anti-discrimination laws do not insure against inaccuracy or flawed business judgment." *Id.* It argues that without "evidence of discriminatory animus . . . [Mr. Jones] cannot establish pretext based on deviation from policy." *Id.*

Turning to Mr. Jones' discrimination in compensation claims, Wyman asserts "[i]t is not illegal for a manager to award employees different raises and bonuses based on an assessment of their performance." *Id.* at 6. It says that without "evidence suggesting [Mr.] Fickett considered race in his decision-making, or that [Mr. Jones] was assessed differently from [Mr.] Alley," Mr. Jones "relied on his own uninformed interpretations of his and [Mr.] Alley's performance reviews" but "cannot refute the record evidence establishing that each year his wage increases were the same as nearly every Wyman employee." *Id.*

Wyman points to the "inevitabl[e]" differences in duties and performance and Mr. Jones' unique circumstances[97] in arguing "there are no facts in the record to suggest that

---

[97]     In its reply in support of the motion for summary judgment, Wyman stated:

On July 27, 2021, a few days before this Court's pre-filing conference, Defendant filed a new lawsuit in Maine Superior Court alleging he is entitled to overtime wages under Maine wage laws on the basis that he was non-exempt (which, if true, means the Plaintiff was not eligible at Wyman to receive the bonuses he received). See Jones v.

the mileage reimbursement arrangement or the larger pay increases given by [Mr.] Fickett to his one other direct report were in any way motivated by race." *Id.* at 6. Wyman concludes that "[t]here is absolutely nothing to suggest that had Plaintiff been white, [Mr.] Fickett would have proposed a different reimbursement arrangement, compensation, or bonuses for [Mr. Jones]." *Id.* at 7.

Wyman next argues that Mr. Jones did not engage in protected conduct to support a §1981 retaliation claim because he "did not report . . . that he felt he was being treated differently on the basis of his race or color." *Id.* According to Wyman, accepting Mr. Jones' May 2017 mileage inquiry as protected conduct would credit his "unspoken thoughts and beliefs that he was being subjected to discriminatory treatment [to] create liability for retaliation" contrary to precedent. *Id.* (emphasis omitted). Moreover, "employers would be put in an impossible position where every comment, question, or complaint made by an employee could be the basis of a retaliation claim, because the employee could later allege, although never said, they were opposing what they thought was discriminatory treatment." *Id.*

Finally, Wyman maintains that Mr. Jones' claim for punitive damages must be dismissed as "there is simply no evidence in this record to establish that [Wyman]

---

Jasper Wyman & Son, No. CV-2021-13. Defendant learned of the State court action on October 4, 2021, when the Complaint was served by the Sherriff's office.

*Def.'s Reply* at 6 n.5. Wyman urges the Court to take judicial notice that, in his state court suit for overtime wages, Mr. Jones "has made allegations . . . claiming to be a non-exempt hourly employee and entitled to overtime compensation (and thus not bonus compensation) while arguing in this action essentially the opposite—that Plaintiff is similarly situated to [Mr.] Alley in part because his duties are comparable to [Mr.] Alley's exempt status duties and that [Wyman] committed racial discrimination by allegedly denying salary and bonuses [Mr. Jones] should have received as an exempt employee." *Id.*

The state court record is not before the Court as part of the summary judgment record, and the Court has not considered Wyman's argument, asserted for the first time in its reply brief.

committed any bad act, much less with malice or reckless indifference." *Id.* Because Mr. Jones did not tell "anyone at Wyman that he thought he was being treated unequally on the basis of race or color," Wyman "cannot be held liable for maliciously or recklessly failing to 'address issues of discrimination' that were never articulated." *Id.*

## IV. LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Genuine issues of fact are those that a factfinder could resolve in favor of the nonmovant, while material facts are those whose 'existence or nonexistence has the potential to change the outcome of the suit.'" *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1st Cir. 2014) (quoting *Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011)).

When the movant "has made a preliminary showing that there is no genuine issue of material fact, the nonmovant must 'produce specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy issue.'" *McCarthy v. City of Newburyport*, 252 F. App'x 328, 332 (1st Cir. 2007) (alteration in original) (quoting *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999)). The nonmoving party must provide "'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Bos.*, 985 F.2d 1113, 1116 (1st Cir. 1993)). Then, a "court views the facts and draws all reasonable inferences in favor of the nonmoving party," *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011), but disregards "[c]onclusory allegations,

improbable inferences, acrimonious invective, or rank speculation." *Mancini v. City of Providence ex rel. Lombardi*, 909 F.3d 32, 38 (1st Cir. 2018) (quoting *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010)).   "[T]he plain language of Rule 56(c) mandates entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## V.   DISCUSSION

Wyman moves for summary judgment on Mr. Jones' claims.   The Court denies the motion as to Mr. Jones' breach of contract, quantum meruit, unjust enrichment, Section 1981 discrimination, and punitive damages claims because genuine issues of material fact preclude summary judgment.   The Court grants the motion as to the alleged Section 1981 retaliation because Mr. Jones' claim fails as a matter of law.

### A.   The Breach of Contract, Quantum Meruit, and Unjust Enrichment Claims

#### 1.   Breach of Contract

Mr. Jones claims that Wyman breached its contract with him by failing to compensate him for approved business travel pursuant to its Employee Manual policies.   *Compl.* ¶¶ 41-43.   Wyman says it made no such contract with Mr. Jones, that any promises in the Manual were unsupported by consideration and illusory, and that the Manual's disclaimer and employee acknowledgement forms make explicit that it is not a binding contract, and its terms should not be construed as one. *Def.'s Mot.* at 4-6 .

### a.    Legal Standard

To determine whether the Employee Manual constitutes a binding contract, federal courts "should apply ordinary state-law principles that govern the formation of contracts." *Canales v. Univ. of Phoenix, Inc.*, 854 F. Supp. 2d 119, 122 (D. Me. 2012) (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).  Under Maine state law, an employee handbook containing workplace policies and rules may constitute a binding contract.  *Id.* at 122-23.  "To qualify as a contract under Maine law, the employee handbook 'requires consideration to support it, and any promise not supported by consideration is unenforceable.'"  *Id.* (quoting *Snow v. BE&K Constr. Co.*, 126 F. Supp. 2d 5, 13 (D. Me. 2001)).  "[A]n illusory promise is not consideration." *Id.* (alterations in *Canales*) (quoting *Snow*, 126 F. Supp. 2d at 15).  Under Maine law "terms and conditions presented in connection with an offer of employment may be enforceable as part of an employment contract."  *Fisk v. Mid Coast Presbyterian Church*, No. 2:16-cv-00490-JDL, 2017 U.S. Dist. LEXIS 68177, at *26 (D. Me. May 4, 2017) (citing *Whitney v. Wal-Mart Stores, Inc.*, 2004 U.S. Dist. LEXIS 24344, at *11 (D. Me. Dec. 3, 2004)).

In cases involving an arbitration clause in an employee manual, "where the employer reserves the right to make unilateral changes in an employee contract without giving the employee an opportunity to decide whether to accept those new terms by continuing employment, courts have generally concluded that the incorporated arbitration agreement is illusory and unenforceable."  *Canales*, 854 F. Supp. 2d at 124-25; *see also Carey v. 24 Hour Fitness, USA, Inc.*, 669 F.3d 202, 205-

06 (5th Cir. 2012) (refusing to enforce an arbitration clause in an employee handbook where an employer reserved the "right to revise, delete, and add to the employee handbook").

For example, in *Snow v. BE&K Construction Co.*, this District found an employee handbook containing an "illusory promise" to arbitrate was too indefinite to be enforceable as a unilateral contract. 126 F. Supp 2d at 14-16  The employee booklet at issue contained "a broad disclaimer stating that it is not an employee agreement and that [the employer] reserves the right to modify or discontinue the alternative dispute resolution program at any time." *Id.* at 10.  The *Snow* court observed that the employer was trying to "have its cake and eat it too" and concluded that it would be "fundamentally unfair" to hold the employee to the terms when the employer "retains its ability to evade the booklet's terms entirely." *Id.*  Moreover, the "employee never signed or otherwise affirmatively consented to the terms of the booklet" that was sent to her. *Canales*, 854 F. Supp. 2d at 123 (citing *Snow*, 126 F. Supp 2d at 15).  The *Snow* court was disturbed by the absence of evidence that the employee ever agreed to arbitrate her dispute, and thus refused to enforce the booklet's mandatory arbitration clause against the employee. *Snow*, 126 F. Supp 2d at 13-15 ("A manifestation of mutual assent, either express or implied, is not immediately apparent in this case").

Unlike in *Snow*, the employee plaintiff in *Canales v. University of Phoenix*, did "electronically sign[] the [employee] handbook acknowledgement" and the court found no lack of consent to its existing terms.  854 F. Supp. 2d at 123-24.  Still, the *Canales*

90

court similarly focused on the employer's "reservation of the right to unilaterally change or eliminate the terms of the Employee Handbook without any waiting period or notice to the employee" as "an unusual provision." *Id.* at 124. The *Canales* Court concluded, "[c]onsistent with *Snow*," that an arbitration agreement within an employee handbook was illusory and unenforceable against the employee where the alleged contract contained no notice requirement and the employer "retained the unfettered right to amend the terms." *Id.* at 124-26. In other words, the employee's signature acknowledging the employee handbook did not overcome the illusory nature of the handbook itself.

In *United States v. Consigli Construction Company*, 873 F. Supp. 2d 409 (D. Me. 2012), the court distinguished *Snow* as applying only to employee handbooks containing a  reservation clause allowing the employer "to change the handbooks' terms unilaterally and without notice." *Id.* at 414. Although the employee in *Consigli* argued that a "purported promise to arbitrate that does not actually require binding arbitration is illusory under Maine law," without language to give the employer the "contractual right to change its mind," the court deemed the promise to arbitrate valid and enforceable. *Id.*

### b.    Analysis

The 2013-2018 Wyman Employee Manual from 2013 to 2018 was detailed and comprehensive, covering compensation and benefits, immigration compliance, non-discrimination policies, safety policies, and discipline and termination procedures, among other important topics. PSAMF ¶ 8; DRPSAMF ¶ 8. The Employee Manual

Section 6.08 expressly promised that Wyman "will provide mileage reimbursement to employees who use personal vehicles for approved company business." *R.* ¶ 16. Mr. Jones understood from his review of the Employee Manual that Wyman would reimburse mileage for approved business travel. PSAMF ¶ 4; DRPSAMF ¶ 4. The record supports that Mr. Jones reviewed the Manual with HR but may not have signed the employee acknowledgement. PSAMF ¶ 3; DRPSAMF ¶3. The Manual also contained an express statement that the Manual is not, and should not be construed as, a contract between Wyman and its employees, DSMF ¶ 97; PRDSMF ¶ 97, and that Wyman may change or amend the policies in the manual at any time without prior notice to employees. DSMF ¶ 98; PRDSMF ¶ 98.

Wyman relies on its disclaimers to argue that, as a matter of law, Mr. Jones had no contract for mileage reimbursement. The Court is dubious. In *Snow* and *Canales*, the employer attempted to enforce an arbitration clause against an employee who had initiated a lawsuit against it. Courts are reluctant to favor employers by enforcing employee manual arbitration clauses (that the employer themselves drafted) where the employer reserves the right to alter the terms of the manual without notice to the employees, thus creating an illusory contract. Here, the attempted illusion was created by Wyman itself. In its Employee Manual, Wyman sets forth in detail the terms and conditions of employment while simultaneously disavowing the manual as containing binding promises to its employees, giving with one hand and taking away with the other.

One judge in this District has characterized Maine law as a "quagmire" regarding when an employee manual amounts to an enforceable employment contract. *Caudill v. Kennebec Cnty.*, No. 1:18-cv-00164-GZS, 2019 U.S. Dist. LEXIS 44502, at *21 (D. Me. Mar. 19, 2019); *Barrera v. Town of Brownville*, 139 F. Supp. 2d 136, 141 (D. Me. 2001). In *Barrera v. Town of Brownville*, faced with the question of whether an employee could enforce his employer's personnel policy as a contract, the District Court for the District of Maine acknowledged that the Law Court had held, when interpreting employee handbook termination provisions, "that various employee manuals were not contracts on the grounds that the restrictions on the employer's right to discharge were not clearly stated." *Barrera*, 139 F. Supp. 2d at 141 (citing *Taliento v. Portland W. Neighborhood Planning Council*, 1997 ME 194, ¶¶ 10-11, 705 A.2d 696; *Bard v. Bath Iron Works Corp.*, 590 A.2d 152, 155 (Me. 1991); *Libby v. Calais Reg'l Hosp.*, 554 A.2d 1181, 1183 (Me. 1989)).

The *Barrera* Court went on to conclude, based on the employee plaintiff's circumstances, that the policy "created a unilateral employment contract for an indefinite period of time under which [the employee] clearly could only be terminated for" good cause. *Id.* at 142 (citing *Snow*, 126 F. Supp. 2d at 13); *see Cummings v. S. Portland Hous. Auth.*, 985 F.2d 1 (1st Cir. 1993) (applying Maine law to find that an employee manual provision that required termination to be "based solely on merit, ability (performance), and justice" amounted to an enforceable limitation on the employer's ability to terminate at will).

Nevertheless, like the *Barrera* Court, this Court concludes that it is unnecessary "to wade into this quagmire." *Id.* at *11. This is because the Court finds solid ground in Maine law for its conclusion that the issue must be resolved by a jury. Even though Maine is "generally an at-will employment state," "express restrictions contained in a contract or an employee handbook that has been incorporated into the employment contract can restrict the employer's right to terminate an employee." *Fisk v. Mid Coast Presbyterian Church*, No. 2:16-cv-00490-JDL, 2017 U.S. Dist. LEXIS 68177, at *25 (D. Me. May 4, 2017). Furthermore, "terms and conditions presented in connection with an offer of employment may be enforceable as part of an employment contract." *Id.* at *26.

Applying standard Maine law, the Court concludes that whether the Wyman Employee Manual set forth enforceable terms of employment is a jury question. In *Taliento*, then Justice Lipez wrote in dissent:

> Whether a contract may be implied from an employee handbook or other documents, oral promises, the conduct of the parties, and other circumstances is a question of fact for a jury to decide.

705 A.2d at 705 (citing cases). Here, the jury issues arise from the ambiguous terms of the employee manual in this case and the interaction between HR and Mr. Jones at the time of his entering into employment.

Maine law has long adopted a rule of contract construction that provides that "ambiguities in a contract are to be interpreted against the drafter." *Barrett v. McDonald Invs., Inc.*, 2005 ME 43, ¶ 15, 870 A.2d 146; *see Dairy Farm Leasing Co. v. Hartley*, 395 A.2d 1135, 1139 n.3 (Me. 1978) ("where a standard-form, printed

94

contract is submitted to the other [party] on a 'take it or leave it' basis, upon equitable principles the provisions of the contract are generally construed to meet the reasonable expectations of the party in the inferior bargaining position, because the parties are in vastly unequal bargaining positions").  Here, the Wyman Employee Manual has clauses that appear like the terms of an employment agreement and yet has other clauses that maintain the detailed terms are not part of an employment agreement.  In the Court's view, under Maine law, a jury must resolve this inherent contradiction.

To explain, here, as in *Snow*, the employee acknowledgement form and disclaimers are in tension with the rest of the Manual, because the Manual set the terms for when Wyman would reimburse mileage, and precisely what an employee must do to be eligible, but also allowed Wyman to alter those terms at any time without notice to the employee.  As a result, a jury could find that Wyman was trying to "have its cake and eat it too" by using the Manual to set explicit expectations and requirements for its employees without allowing employees to similarly hold Wyman to their expectations based upon the Manual's express terms.

The Manual, which HR reviewed with Mr. Jones upon his promotion to full time employee status, demands that each employee acknowledge that "the purpose of this Manual is to inform me about the Company's policies and rules, and that I am responsible for learning and complying with the policies and rules contained in this Handbook and that violation of company policies may result in discipline up to and including termination of employment" and "that this manual supersedes any previous

95

oral or written policies, statements, understandings or agreements concerning the terms and conditions of employment at Jasper Wyman & Son." PSAMF ¶¶ 1-4, 10, 15; DRPSAMF ¶¶ 1-4, 10, 15. It also provides that "No agent, employee, or representative of Jasper Wyman & Son has the authority to make any promise or agreement contrary to the Employee Manual, unless it is in writing and signed by the President of the Company." PSAMF ¶¶ 10, 15; DRPSAMF ¶¶ 10, 15. These provisions support Mr. Jones' asserted understanding, regardless of what Mr. Fickett told him, that he could expect Wyman to reimburse him for work approved travel in his personal vehicle, because the Manual expressly sets such reimbursement as a term of employment. *See Barerra* 139 F. Supp. 2d at 141-42 (observing that the employee was given a copy of the personnel policy when he was hired, that its terms "deal[t] with all aspects of employment including benefits, promotions, suspensions, discharges, work-related travel, and grievance procedures," and moreover explicitly promised that "[n]o employee will be discharged without good and sufficient cause").

Alternatively, however, the Manual says that it was "designed to provide [employees] with a better understanding of the terms and conditions of [their] employment" but later states that it is "for informational purposes only, and does not constitute a contract . . . and should not be construed as such" and it "may be changed or amended at any time." PSAMF ¶ 9; DRPSAMF ¶ 9. The import of the Manual's multiple disclaimers stating that it is not a contract and reserving Wyman's right to amend it without notice is a question for the jury. PSAMF ¶¶ 10, 15; DRPSAMF ¶¶ 10, 15; DSMF ¶ 99; PRDMSF ¶ 99. In *Libby v. Calais Regional Hospital*, 554 A.2d

1181 (Me. 1989), the Law Court concluded a disclaimer clause was not dispositive of whether a contract existed.  *Id.* at 1183 (the employer "contends that the disclaimer establishes conclusively that the handbook does not form a contract . . . . Even *if we assume that the terms of the handbook comprised a contract* with [the employee], the handbook merely provides a method of discharge and implies that discharge will be for cause only") (emphasis added).

Summary judgment is inappropriate as to whether the Employee Manual's explicit terms, Wyman's communications, and Mr. Jones' conduct created an enforceable unilateral contract, as the parties offer conflicting interpretations of the November 2014 emails and Employee Manual provisions.  The record supports Mr. Jones' point that he never explicitly agreed not to be paid.  A reasonable jury could discount Wyman's reliance on Mr. Jones' personal reasons for wanting to work in PEI and find that it improperly denied him reimbursement.  *See Def.'s Mot.* at 4.

Wyman reasons that even if the Manual's mileage policy can be construed as a contract, Mr. Jones cannot hold it to that promise because he did not submit mileage reimbursement requests at the time after traveling to PEI between 2014 and 2017. "In order to be eligible to receive such reimbursement," the Manual directed employees to "submit to the accounting department an expense account form or other documentation signed by your supervisor indicating his or her approval of the trip, the date, the purpose of the trip and the total miles driven." *R.* ¶ 16.  It instructed employees to "see your supervisor for the current rate of mileage reimbursement." *R.* ¶ 16.  Wyman is correct that from some point in 2014 until May 2017, Mr. Jones'

97

expense reports did not contain requests for mileage reimbursement or indicate the mileage he travelled, DSMF ¶ 38; PRDSMF ¶ 38, but that changed once Mr. Jones prompted HR to intervene in May 2017, after which Mr. Fickett gave him the green light to submit requests going forward.  *R.* ¶ 23.

Viewing the record in the light most favorable to Mr. Jones, a jury could find that Mr. Jones initially submitted a reimbursement form to Mr. Fickett in 2014 after his first PEI trips, but that Mr. Fickett told Mr. Jones that he did not qualify for mileage reimbursement and to redo the expense form without the request for mileage. PSAMF ¶ 33; DRPSAMF ¶ 33.  A jury could conclude that Mr. Jones would have continued to prepare and submit official mileage expense requests, pursuant to the Manual's terms, if his supervisor had not told him he was ineligible and to stop. Furthermore, a jury could also interpret the Manual's terms and Mr. Fickett's communications, purporting to make himself the arbiter of reimbursement matters as Mr. Jones' supervisor, and credit Mr. Jones' explanation for why he stopped submitting reimbursement requests until Mr. Fickett told him that Wyman would begin reimbursing him in May of 2017, and find that did not render his expectation of payment unreasonable.

Wyman is not entitled to summary judgment on Mr. Jones' contract claim.

### 2.    Quantum Meruit

Wyman argues that Mr. Jones' mileage reimbursement claim is not a claim for payment of services rendered, and thus does not meet the elements of a quantum meruit claim under Maine law.  *Def.'s Mot.* at 7-8.  Wyman also says Mr. Jones cannot

prevail under this theory because, based on his November 2014 emails with Mr. Fickett, any expectation of payment is unreasonable. *Id.* Wyman insists that Mr. Jones "knew his supervisor had told him that he would not be reimbursed for mileage to PEI unless it was in excess of the cumulative mileage for his ordinary commute when travelling to and from his home and the Cherryfield facility." *Def.'s Mot.* at 8. Mr. Jones stakes his quantum meruit claim in a contract inferred from his job description, the Manual policies, and from Wyman's communications about mileage reimbursement rates, and argues that Mr. Fickett's refusal to approve his request does not make his expectation of payment unreasonable. *Pl.'s Opp'n* at 6-7.

### a.   Legal Standard

Quantum meruit claims permit "recovery for services . . . provided under an implied contract, which is a contract inferred from the conduct of the parties." *Runnells v. Quinn*, 2006 ME 7, ¶ 10, 890 A.2d 713. A quantum meruit claim has three elements: "that (1) services be rendered to the defendant by the plaintiff; (2) with the knowledge and consent of the defendant; and (3) under circumstances that make it reasonable for the plaintiff to expect payment." *Id.* "The prevailing plaintiff is entitled to 'the reasonable value of the services provided.'" *Dinan v. Alpha Networks, Inc.*, 2013 ME 22, ¶ 20, 60 A.3d 792 (quoting *Jenkins, Inc. v. Walsh Bros., Inc.*, 2001 ME 98, ¶ 17, 776 A.2d 1229). "Quantum meruit is a legal, not an equitable, remedy and thus is distinct from the theory of unjust enrichment." *Id.* Under a quantum meruit theory, "damages are not measured by the benefit realized and retained by the defendant, but rather are based on the value of the services provided

by the plaintiff." *Paffhausen v. Balano*, 1998 ME 47, ¶ 7, 708 A.2d 269; *see Dinan v. Alpha Networks Inc.*, 857 F. Supp. 2d 162, 168.

### b.   Analysis

First, Wyman raises the threshold issue of whether quantum meruit recovery for "services rendered" extends to mileage reimbursement. *Id.* at 7. Wyman paid Mr. Jones a salary for his work in PEI but he is now "seeking expense reimbursement, which is not payment for services rendered—a necessary element of a quantum meruit claim." *Id.*

In *Paffhausen v. Balano*, the Law Court examined quantum meruit theory in detail before remanding the case for an assessment of the reasonable value of the plaintiff's labor and his expenses. 1998 ME 47, ¶¶ 9-13, 708 A.2d 269. The Law Court did not limit recovery to just unpaid labor or a certain promised salary. *See id.* In *Dinan v. Alpha Networks, Inc.*, the Law Court distinguished between the salary owed to an employee and their separate "recovery for services or materials provided under an implied contract." 2013 ME 22, ¶ 19, 60 A.3d 792 ("Because the measure of damages in quantum meruit—the value of materials and services rendered—is not necessarily coextensive with the measure of damages for an employee who has not been paid"). Wyman's position that payment "in exchange for services rendered" includes wages but not work travel mileage reimbursement is inconsistent with the Law Court's view of quantum meruit damages as including "materials provided," in this case an employee's personal automobile, and further its caveat that an employee's damages are "not necessarily coextensive" with wages owed.

Mr. Jones traveled to PEI on authorized work assignments, in order to render service to Wyman. Any additional personal reasons for wanting to be in Canada are beside the point. Under the Law Court's broad characterization of damages under a quantum meruit theory, Mr. Jones' quantum meruit claim for expenses and services associated with Wyman-related travel could include mileage reimbursement. *See Paffhausen*, 1998 ME 47, ¶ 11, 708 A.2d 269 ("labor <u>and expenses</u>").

Next, although Wyman insists that a reasonable jury could not infer a contract from the conduct and communications of the parties, the Law Court has explained that "[q]uantum meruit may lie when there [i]s not a clear accession on both sides to one and the same terms, if services are provided under circumstances that negative the idea that the services were gratuitous." *Id.* at ¶ 9 (internal quotation marks and citation omitted). It held that a claimant did not need to prove the defendant's "*intention* to compensate [the employee] fully for all of his labor and expenses" because "[a]ll that the law of quantum meruit requires [the plaintiff] to prove . . . is that he had a reasonable expectation that his work was not gratuitous and that [the defendant] *by her words or conduct* justified this expectation." *Id.* (emphasis in original).

Here, particularly as the Law Court has made clear that the issue does not turn on the *employer's* intent, a reasonable jury could discount Wyman's rationalizations that it was accommodating Mr. Jones, *see Def.'s Mot.* at 4, and could instead find that he did have a reasonable expectation of payment based on his job description, the Manual terms, and Wyman's communications about mileage rates.

*Pl.'s Opp'n* at 6-7.  Furthermore, the parties offer conflicting interpretations of the November 2014 email exchange between Mr. Fickett and Mr. Jones, which must be resolved by a jury.  Whether Mr. Jones "had a reasonable expectation that his work was not gratuitous and that [Wyman] *by* [its] *words or conduct* justified this expectation," *Paffhausen*, 1998 ME 47 ¶ 9, 708 A.2d 269, depends on how a factfinder interprets Mr. Jones' words, Mr. Fickett's dominant position as Mr. Jones' supervisor in this exchange, the fact that the supposed arrangement was counter to Wyman's established policy and later recognized by HR as an inconsistency, and the fact that Mr. Fickett still tried to revert back to discounting Mr. Jones' mileage after HR stepped in to change how Wyman handled Mr. Jones' travel.  The Court concludes that these genuine issues of material fact preclude summary judgment for Wyman on the quantum meruit count.

### 3.    Unjust Enrichment

Citing Mr. Jones' unique circumstances and November 2014 email exchange, Wyman insists that it did not inequitably withhold mileage reimbursement, and moreover, that Mr. Jones was not disadvantaged, but in fact benefitted, from his PEI travel and thus cannot recover retroactive payments on an unjust enrichment theory. *Def.'s Mot.* at 8-9.  Mr. Jones argues that Wyman should have reimbursed him as it did other employees, without regard to his personal reasons to want to spend time in Canada, his normal Maine commute, or his disputed arrangement with Mr. Fickett, and instead benefited inequitably from his driving thousands of miles that should have been Wyman's business expense.  *Pl.'s Opp'n* at 8.

### a.   Legal Standard

"Unjust enrichment describes recovery for the value of the benefit retained when there is no contractual relationship, but when, on the grounds of fairness and justice, the law compels performance of a legal and moral duty to pay." *A.F.A.B., Inc. v. Town of Old Orchard Beach*, 639 A.2d 103, 105 n.3 (Me. 1994).

To allege a prima facie case of unjust enrichment under Maine law, "a claimant must establish that: (1) it conferred a benefit on the other party; (2) the other party had appreciation or knowledge of the benefit; and (3) the acceptance or retention of the benefit was under such circumstances as to make it inequitable for it to retain the benefit without payment of its value." *Tucci v. City of Biddeford*, 2005 ME 7, ¶ 14, 864 A.2d 185.

Because "[r]ecovery under the doctrine of unjust enrichment is measured by the value of the benefits that the plaintiff proves are actually received and retained by the defendant," the Law Court has held that "a *blanket exclusion* of a plaintiff's overhead, costs, and profits is improper unless the court determines that they have no meaningful relationship to the value of the benefit conferred and the extent to which a defendant has been enriched." *A.F.A.B., Inc.*, 639 A.2d at 106 (emphasis in original).

### b.   Analysis

Wyman admits that it received and appreciated a benefit from Mr. Jones to satisfy the first two elements. *Def.'s Mot.* at 11. The Court thus considers if there is a genuine dispute of material fact as to whether Wyman benefited from Mr. Jones'

travel to PEI "under such circumstances as to make it inequitable for it to retain the benefit without" reimbursing him for his mileage. *Tucci*, 2005 ME 7, ¶ 14, 864 A.2d 185.

In its motion, Wyman points to the fact that Mr. Fickett could have made Mr. Jones use a company car (although it admits he never did) and emphasizes Mr. Jones' personal reasons for wanting to be in Canada. Both facts, in the Court's view, are beside the point. Wyman's reliance on non-monetary reasons to insist that Mr. Jones was not disadvantaged does not entitle it to summary judgment on this claim. No such personal or "normal commute" criteria was imposed on other employees, and disputes of material fact persist as to the nature and meaning of any unique arrangement between Mr. Fickett and Mr. Jones.

Viewing the record in the light most favorable to Mr. Jones, he has made a showing that he was disadvantaged because of car wear and tear and expenses, and that he expressed his frustration at Wyman, specifically because he felt they were unfairly barring him from collecting mileage reimbursement. PSAMF ¶¶ 22-37, 53. His evidence on this point admittedly contradicts the tone and content of his mileage discussions in the November 2014 emails, but that issue must be tested and resolved by a factfinder at trial, not by this Court on summary judgment.

Again, the parties vigorously dispute whether Mr. Jones and Mr. Fickett had an arrangement based on their 2014 email exchange. This unresolved issue goes to the heart of Mr. Jones' expectations. A reasonable jury could discredit Wyman's fairness argument based on Mr. Jones' personal reasons for wanting to travel to

Canada and instead credit his communications at the time about car repairs and find that if he "agreed" to anything it was at the suggestion of his supervisor. There is no evidence in this record that Mr. Jones expressly agreed not to be paid mileage, and Wyman's intent and motivations are disputed. The jury could reasonably conclude that Wyman cannot rely on the purported personal benefits to Mr. Jones as its fairness rationalization.

Furthermore, when Wyman finally did start reimbursing Mr. Jones in May 2017, Mr. Fickett says he only made the change because Jones was a "valued employee," not because it was unfair; however, a jury could disagree with this assessment, especially given Ms. Norton's perception that it was unfair. *See A.F.A.B., Inc.*, 639 A.2d at 105 ("When one party unjustly benefits from labor and materials rendered by another with the expectation of payment, the law may impose a promise on the part of the recipient to pay the value of the benefit conferred").

There is a disputed question of material fact concerning Mr. Jones' expectations regarding reimbursement, whether his failure to submit mileage requests between 2014 and 2017 undermines those expectations, and the parties' understanding of the November 2014 email exchange as establishing a formal "agreement" that Mr. Fickett and Mr. Jones both considered fair. Wyman insists that it did not inequitably deny Mr. Jones reimbursement on the basis of the purported agreement; Mr. Jones denies making any such agreement and insists that he reasonably expected to be reimbursed. Even if the jury finds that the Employee Manual is not a contract, and that there was no implied contract between Mr. Jones

and Wyman, to the extent that equity requires reimbursement of some kind, a question remains as to whether the circumstances made it inequitable for Wyman to retain the benefit of Mr. Jones' work travel to PEI without paying him for his mileage. Thus, Wyman is not entitled to summary judgment on Mr. Jones' unjust enrichment claim.

### B.     The § 1981 Discrimination Claim

Mr. Jones alleges discrimination and retaliation in his compensation and in Wyman's denial of mileage reimbursement under the Civil Rights Act of 1866, which established that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C.§ 1981. The Court applies the standards of Title VII of the Civil Rights Act of 1964 (Title VII) to claims of employment discrimination brought under Section 1981. *See Bhatti v. Trs. of Bos. Univ.*, 659 F.3d 64, 70 (1st Cir. 2011). As Mr. Jones lacks direct evidence of discrimination, the three-stage, burden-shifting framework articulated in *McDonnell Douglas* applies. *See id.* (applying the *McDonnell Douglas* framework to Section 1981 claims).

### 1.     Legal Standard

At step one of the *McDonnell Douglas* burden-shifting framework, Mr. Jones has the burden of establishing a prima facie case of racial discrimination by a preponderance of the evidence "by showing: (1) membership in a protected class; (2) he met his employer's expectations; (3) he suffered an adverse employment action; and (4) evidence of a causal connection between his membership in a protected class

and the adverse employment action." *Joseph v. Lincare, Inc.*, 989 F.3d 147, 158 (1st Cir. 2021). The First Circuit has characterized the "prima facie case as a small showing . . . that is not onerous . . . and is easily made." *Kosereis v. Rhode Island*, 331 F.3d 207, 213 (1st Cir. 2003) (internal citations and quotation marks omitted).

Once a prima facie case is made, the burden shifts to Wyman to articulate legitimate, nondiscriminatory reasons for its allegedly discriminatory actions. *Taite v. Bridgewater State Univ., Bd. of Trs.*, 999 F.3d 86, 93-94 (1st Cir. 2021) ("If [Wyman] articulates such a reason, 'the *McDonnell Douglas* framework disappears and the sole remaining issue is discrimination vel non'" (quoting *Brader v. Biogen Inc.*, 983 F.3d 39, 55 (1st Cir. 2020))).

At step three, the burden shifts back to Mr. Jones to show that Wyman's articulated reasons are pretextual and that the actual reason is discriminatory. *Id.* at 94. He can "'establish pretext by showing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons such that a factfinder could' rationally find them unworthy of credence and hence 'infer that the employer did not act for the asserted [nondiscriminatory reasons].'" *Id.* at 94 (alterations in *Taite*) (quoting *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 56 (1st Cir. 2000)). Compared to the plaintiff's prima facie showing, "[t]he pretext analysis . . . is more demanding" and requires greater specificity. *Kosereis*, 331 F.3d at 213 (citing *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 255 (1981)).

"Ultimately, to survive summary judgment, [Mr. Jones] does not need to prove [his] case, but instead, viewing the aggregate package of proof [he] offered," *Taite*, 999 F.3d at 94, he "need only show that his ability to meet his burden turns on a genuine issue of material fact." *Soto-Feliciano v. Villa Cofresí Hotels, Inc.*, 779 F.3d 19, 23 (1st Cir. 2015).

### a.     Kenneth Jones' Comparator Evidence

As a threshold matter, the parties dispute whether Mr. Jones must show that similarly situated employees outside his protected class received more favorable treatment as part of his prima facie case or at the pretext stage. *Def.'s Mot.* at 10; *Pl.'s Opp'n* at 10-11.

Mr. Jones cites *Kosereis v. Rhode Island* to argue that "in disparate treatment cases, comparative evidence is to be treated as part of the pretext analysis and not part of the plaintiff's prima facie case." *Pl.'s Opp'n* at 11 (quoting *Kosereis*, 331 F.3d at 213). According to Mr. Jones, his prima facie burden demands only "some evidence of a causal connection between [plaintiff's] membership in a protected class and the adverse employment action, e.g., in the case of a firing, that the position was filled by someone with similar qualifications." *Id.* at 10 (alteration in *Pl.'s Opp'n*) (quoting *Bhatti v. Trs. of Bos. Univ.*, 659 F.3d 64, 70 (1st Cir. 2011)). Alternatively, Wyman asserts that Mr. Jones must identify similarly situated comparators, and show how he was treated less favorably, at the prima facie stage. *Def.'s Mot.* at 11. Wyman reasons that because Mr. Jones "alleges discrimination in terms of his compensation, the *Prescott* [*v. Higgins*, 538 F.3d 32 (1st Cir. 2008)] prima facie test applies." *Def.'s*

108

*Reply* at 4; *see Prescott*, 538 F.3d at 40 ("For [plaintiff] to survive the motion for summary judgment, then, he needed to present evidence that showed that [his comparator's] qualifications were similar to his own").

Mr. Jones has the better argument. *See Conward v. Cambridge Sch. Comm.*, 171 F.3d 12, 19 (1st Cir. 1999) ("The time to consider comparative evidence in a disparate treatment case is at the third step of the burden-shifting ritual"); *Fernandes v. Costa Bros. Masonry, Inc.*, 199 F.3d 572, 581 (1st Cir. 1999) ("[A] plaintiff need not show as part of his prima facie case that the employer either recalled similarly situated non-minority employees or otherwise treated employees of different ethnic backgrounds more favorably"). Regardless, "courts frequently assume, favorably to plaintiffs, that a prima facie case of discrimination has been established and move on to remaining steps of the *McDonnell Douglas* framework." *Joseph*, 989 F.3d at 158 n.5 (citing *Rodríguez-Cardi v. MMM Holdings, Inc.*, 936 F.3d 40, 47 (1st Cir. 2019) (sanctioning the practice of assuming the plaintiff has established a prima facie case and moving on to the remaining steps of the *McDonnell Douglas* framework)); *see also Fennell v. First Step Designs, Ltd.*, 83 F.3d 526, 535 (1st Cir. 1996) ("On summary judgment, the need to order the presentation of proof is largely obviated, and a court may often dispense with strict attention to the burden-shifting framework, focusing instead on whether the evidence as a whole is sufficient to make out a jury question as to pretext and discriminatory animus"). This is, moreover, consistent with the First Circuit's directive that a plaintiff's prima facie burden is light.

### 2. Prima Facie Case

First, Mr. Jones must establish a prima facie case of discrimination on the basis of race. As Wyman does not dispute that Mr. Jones is a member of a protected class who met its employment expectations, the Court proceeds to the third and fourth prongs of the *McDonnell Douglas* burden-shifting framework. *See Def.'s Mot.* at 10. Wyman urges the Court to grant its motion for summary judgment because Mr. Jones has not made a prima facie showing that he suffered an adverse employment action nor established a causal connection between his race and the adverse employment action. *Id.* at 1-2. The Court rejects Wyman's arguments as there are disputed issues of material fact that preclude summary judgment.

### a.   Whether Kenneth Jones Suffered an Adverse Action

Mr. Jones asserts that Wyman's decision to not pay him mileage reimbursement and to deny him equal annual compensation inflicted "direct economic harm" constituting adverse action. *Pl.'s Opp'n* at 10 (citing *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).

An alleged adverse action "must be cast in objective terms" as "the mere fact than an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action." *Blackie v. State of Maine*, 75 F.3d 716, 725 (1st Cir. 1996). It "typically involves discrete changes in the terms of employment, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Morales-Vallellanes v. Potter*, 605 F.3d 27, 35 (1st Cir. 2010) (internal

quotation marks omitted).  In general, "[d]etermining whether an action is materially adverse necessarily requires a case-by-case inquiry."  *Blackie*, 75 F.3d at 725.

An employer's taking of "something of consequence from the employee, say, by discharging or demoting her, reducing her salary, or divesting her of significant responsibilities" or its decision to "withhold from the employee an accouterment of the employment relationship, say, by failing to follow a customary practice" have been found to constitute adverse actions.  *Id.* (citations omitted).  On summary judgment, there is a disputed question of material fact as to whether Mr. Jones suffered direct economic harm from Wyman's denial of mileage reimbursement.  The record indicates that Mr. Jones drove thousands of miles between 2014 and 2017 for his PEI assignments without reimbursement.  *See* PSAMF ¶ 53.  Before he reached out to HR regarding reimbursement, Mr. Jones attributed his car troubles and expenses to Wyman's denial of reimbursement in his complaint to his Wyman coworker.  PSAMF ¶ 54.  He also presented evidence that Wyman diverted from customary practice—as set out in the Employee Manual and employee communications (and from the terms of his job description, which was drafted uniquely for him)—in denying reimbursement and using his personal commute and interest in PEI assignments as a basis to do so.  PSAMF ¶¶ 46-48, 65, 66, 70; DRPSAMF ¶¶ 46-48, 65, 66, 70.  Viewing the record in the light most favorable to Mr. Jones, a jury could reasonably conclude that Wyman "withheld an accouterment of the employment relationship" when it reimbursed other employees for mileage but not Mr. Jones.  Nor was the total amount of contested mileage reimbursement trivial.  Mr. Jones' total mileage claim

111

was $11,941.37 and, even after his 2015 promotion, Mr. Jones was earning an annual salary of $47,956.48.  PSAMF ¶¶ 53, 104.  A total of nearly $12,000 in unreimbursed mileage accumulated over time represents a substantial sum to a person earning less than $50,000 per year.

A jury could also reasonably conclude that granting of different "standard" pay increases to his two supervisees and reassignment of Mr. Jones in June 2018 constituted adverse actions.  *See* PSAMF ¶¶ 106, 107.  Furthermore, regarding Mr. Fickett's compensation decisions, a reasonable jury could find that Mr. Jones suffered an adverse action when Mr. Fickett gave Mr. Jones a lower standard percentage compensation increase than Mr. Alley and a lower bonus for what could be considered comparable performance evaluations.

Finally, Mr. Jones also says that Mr. Fickett stripped him of his PEI workplace safety responsibilities (making it impossible to effectively complete his PEI safety project) and "functionally demoted [him] by giving him assignments outside his job description," which he says meets the First Circuit standard for adverse actions.  *Pl.'s Opp'n* at 24.  The Court concludes that there is a dispute of material fact as to whether Mr. Jones was functionally demoted or stripped of his job responsibilities.

An employee transfer may be an adverse action "if it materially changes the plaintiff's conditions of employment in a manner that is more disruptive than a mere inconvenience or an alteration of job responsibilities" or if it "involve[s] a demotion in form or substance."  *Caraballo-Caraballo v. Corr. Admin.*, 892 F.3d 53, 61 (1st Cir. 2018) (internal citations and quotation marks omitted); *see also Burns v. Johnson*,

112

829 F.3d 1, 10 (1st Cir. 2016) ("[R]eassignment with significantly different responsibilities may be actionable" (quotation marks omitted)).

Here, a jury could find that Mr. Jones' reassignment to the Cherryfield facility "materially change[d] the conditions of [Mr. Jones'] employ," *Gu v. Bos. Police Dep't*, 312 F.3d 6, 14 (1st Cir. 2002), and were "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Burns v. Johnson*, 829 F.3d 1, 10 (1st Cir. 2016) (internal quotation omitted).  As Mr. Jones understood it, he was not only downgraded to a janitorial role but could no longer perform his longstanding PEI responsibilities without a physical presence there.  A reasonable jury could conclude that Mr. Fickett's transfer of Mr. Jones to the Cherryfield "line" and Mr. Fickett's handling of his race-based complaint and concerns about other employees' attempts to order him around after his reassignment support a finding that Mr. Jones suffered adverse action under Mr. Fickett's supervision.  *See* PSAMF ¶¶ 42, 43, 116, 117, 120; DRPSAMF ¶¶ 42, 43, 116, 117, 120; *Rivera-Rivera*, 898 F.3d at 94 (stating that adverse employment actions may "include, for example, demotions, disadvantageous transfers or assignments . . . and toleration of harassment by other employees" (internal quotation marks omitted)).

### b.    Causal Connection Between the Adverse Action and Race

#### i.    Mileage Reimbursement

Here, a jury could reasonably conclude that there is a causal connection between adverse action and race because Mr. Jones was the only employee Wyman denied mileage reimbursement for approved business travel to PEI while it paid

mileage reimbursement to all white employees who used personal vehicles for business travel in the same time period.  PSAMF ¶ 66; DRPSAMF ¶ 66.  Mr. Jones was also the only Wyman employee for whom Wyman reduced mileage reimbursement by deducting the number of miles for the employee's regular home-to-work commute.  PSAMF ¶ 65; DRPSAMF ¶ 65.  Because Mr. Jones was the only employee subject to these differences and because he was the only one or one of very few (usually two) Black full-time employees at Wyman, a reasonable jury could conclude that it was due to his race.  Setting aside Wyman's insistence that Mr. Jones had no similarly situated comparator, based on the facts specific to Wyman's handling of his work travel, Mr. Jones has met his minimal prima facie burden to identify a causal connection between his race and being denied mileage.

### ii.    Kenneth Jones' Compensation

Regarding his discrimination in compensation claims, Mr. Jones points to Mr. Fickett's "differential treatment of his two supervisees" in annual earned compensation increases as prima facie "evidence of a causal connection between [Mr. Jones'] membership in a protected class and the adverse employment action."  *See Pl.'s Opp'n* at 12-13 (quoting *Bhatti*, 659 F.3d at 70).

The record on summary judgment reflects that in some years Mr. Fickett gave Mr. Jones, who is Black, and Mr. Alley, who is white, unequal percentage increases for the "standard increase" and in other years gave them unequal percentage compensation increases for the same or similar performance rankings.  *See* PSAMF ¶¶ 100-01, 106-07, 109-10.  For example, in June 2014, Mr. Fickett deemed both Mr.

Jones and Mr. Alley's work performance "above average" but gave Mr. Alley a 4.5% increase and Mr. Jones a 3.5% increase, and in June 2016, Mr. Fickett gave his supervisees different "standard" annual increases.  PSAMF ¶¶ 100-01; *R.* ¶¶ 28, 32. Where genuine issues of material fact persist as to whether bonuses and yearly salary percentage increases at Wyman are purely performance based or have a "standard" component and as to Mr. Fickett's motivation in giving different amounts to his supervisees, particularly when he ranked their performance the same, a reasonable jury could find a causal connection between Mr. Jones' race and his compensation.

### 3.    Wyman's Non-Discriminatory Justifications

"If a plaintiff establishes a prima facie case of discrimination," at step two "the burden of production shifts to the employer to come forward with a legitimate, nondiscriminatory reason for its action."  *Gomez-Gonzalez v. Rural Opportunities, Inc.*, 626 F.3d 654, 662 (1st Cir. 2010).  Finding that Mr. Jones has met his admittedly minor burden of establishing a prima facie case of disparate treatment, the Court turns to Wyman's proffered legitimate, nondiscriminatory justifications for its actions.

### a.    Mileage Reimbursement

In denying Mr. Jones' mileage reimbursement between 2014 and 2017, Wyman submits that it acted in a nondiscriminatory manner (1) pursuant to the alleged November 2014 "agreement," and (2) because Mr. Fickett and other Wyman decisionmakers established a mileage reimbursement arrangement that accounted for "(i) his extensive commute to Wyman's Cherryfield facility, (ii) his preference to

use his personal vehicle instead of a company vehicle to travel on company business, (iii) the frequency with which it was being proposed he travel to PEI, and (iv) and the benefits he received by traveling to PEI for personal as well as professional reasons." *Def.'s Mot.* at 12.

Wyman has presented evidence of a potential agreement or understanding between Mr. Fickett and Mr. Jones to support its justification that Wyman was "accommodating" Mr. Jones' unique situation, and not discriminating against him in denying his mileage reimbursement. *See* DSMF ¶¶ 14, 18-19. Although the parties dispute whether Mr. Jones tried to initially claim reimbursement in 2014 and whether Mr. Fickett rejected his form saying he "didn't qualify," Wyman has also shown that Mr. Jones never submitted reimbursement requests or mileage logs until it started reimbursing him in May of 2017, and that it paid for other food and lodging expenses associated with his PEI travel during that time. *See* DSMF ¶¶ 38-39. The Court therefore concludes that Wyman has shown a non-discriminatory reason for not paying Mr. Jones mileage reimbursement.

### b.   Kenneth Jones' Compensation

Wyman submits that Mr. Jones' and Mr. Alley's respective performance and contributions merited different raises in different years, and also notes that Mr. Jones still received increases that were equal to or greater than what most other employees received. It presented evidence that Mr. Fickett considered his individual supervisee's duties, expectations, and performance in setting their compensation. DSMF ¶¶ 52-62, 76; PRDSMF ¶¶ 52-62, 76. The record also supports that Wyman

managers have discretion to allocate their annual pool percentage between supervisees "to reward one person over another if they saw fit," including by giving employees unequal "standard" compensation increases. PSAMF ¶ 93, 94; DRPSAMF ¶ 93, 94; PRDSMF ¶ 52. Wyman points to Mr. Fickett's exercise of that discretion as reflected in his 2018 email to CEO Shurman, in which he said he "didn't want to take from [Mr. Jones] in order to recognize" Mr. Alley with a larger percent increase for "ris[ing] to the occasion." DSMF ¶ 63. Wyman has also shown that it allowed managers to give individual employees more or less than the COLA increase, depending on their performance that year. *See* DSMF ¶¶ 58, 59, 74, 76. It asserts that there were "legitimate, non-discriminatory reasons" pursuant to Wyman's practices and policies in setting compensation, for why Mr. Jones' percentage pay increases varied from what other employees received. *Def.'s Mot.* at 18-19.

The Court concludes that Wyman has met its burden of producing legitimate, non-discriminatory reasons for how it set Mr. Jones' compensation and handled his mileage reimbursement.

### 4. Pretext

If the employer provides a non-discriminatory justification, the burden at step three "shifts back to the plaintiff, who must then show, by a preponderance of the evidence that the employer's articulated reason for the adverse employment action is pretextual and that the true reason for the adverse action is discriminatory." *Gomez-Gonzales*, 626 F.3d at 662 (quoting *Lockridge v. Univ. of Me. Sys.*, 597 F.3d 464, 470 (1st Cir. 2010)). "There are many veins of circumstantial evidence that may be

mined" to establish pretext, as "courts will look at evidence of discrimination not in splendid isolation, but as part of an aggregate package of proof offered by the plaintiff." *Mesnick v. Gen. Elec.*, 950 F.2d 816, 824 (1st Cir. 1991).

Mr. Jones contends that the record evidence, when viewed in a light most favorable to him, and discounting Wyman's conclusory and self-serving statements, compels a finding that Wyman has not articulated legitimate, nondiscriminatory reasons for its handling of his mileage reimbursement and compensation.

### a.   Diversity and Discrimination at Wyman

The First Circuit has acknowledged "that probing an employer's rationale can be difficult." *Ray*, 799 F.3d at 116.   It takes "particular caution when considering an employer's motion for summary judgment raising issues of pretext, motive, and intent." *Id.* (citation and internal quotation marks omitted).   In assessing whether the defendant's reasons are pretextual, district courts may consider "evidence of a company's general atmosphere of discrimination" or use of "after-the-fact justifications." *Santiago-Ramos*, 217 F.3d at 55-56.

The Court considers Mr. Jones' pretext evidence in the context of the overall racial divide at Wyman.   "The Supreme Court has long recognized that unlawful discrimination can stem from stereotypes and other types of cognitive biases, as well as from unconscious animus." *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 59 (1st Cir. 1999).   Relevant here, "First Circuit precedent confirms that 'the tendency of "unique" employees (that is, single employees belonging to a protected class, such as a single female or single minority in the pool of employees) to be evaluated more

harshly in a subjective evaluation process' may support a reasonable inference of discrimination." *Ako-Annan v. E. Me. Med. Ctr.*, No. 1:19-cv-00544, 2021 U.S. Dist. LEXIS 157866, at *83 (D. Me. Aug. 20, 2021) (quoting *Thomas*, 183 F.3d at 61). However, "statistical evidence of a company's general hiring patterns" is only helpful "if it tends to prove the discriminatory intent of the decision makers involved." *Ray*, 799 F.3d at 116 (first quoting *LeBlanc*, 6 F.3d at 848; and then quoting *Hillstrom v. Best W. TLC Hotel*, 354 F.3d 27, 32 (1st Cir. 2003)).

Mr. Jones was the only or one very few (usually two) Black, African Americans employed by Wyman as full-time employees. PSAMF ¶ 23; DRPSAMF ¶ 23. The vast majority of Wyman's seasonal workforce are persons of color. DSMF ¶ 100; PRDSMF ¶ 100. Wyman's workforce is racially mixed as well as stratified, with white employees holding higher level non-harvest work positions, and most minorities holding laborer and operative positions. DSMF ¶ 100; PRDSMF ¶ 100; PSAMF ¶ 25; DRPSAMF ¶ 25.

As noted above, the fact that Mr. Jones was the only, or one very few, Black, full-time Wyman employees, and that almost all non-white employees at Wyman are operatives or laborers, provides important context for his claim of discrimination in compensation. *See* PSAMF ¶¶ 23, 27-31; DRPSAMF ¶¶ 23, 27-31. The record contains multiple statements about Mr. Jones "benefiting" or "making out good" where Mr. Fickett seems to express that Mr. Jones was getting more from Wyman than he deserved, even after Wyman HR began reimbursing him in recognition that Mr. Fickett's handling of the issue was inconsistent with Wyman policy, the issue

119

remains for the factfinder as to whether Mr. Fickett was acting on a biased belief that Mr. Jones, as a Black man, was entitled to less compensation than white employees. *See Pl.'s Opp'n* at 20; PSAMF ¶¶ 127, 130.  A reasonable jury could find that, even without evidence of direct animosity, Wyman management's assessment of what was "fair," or what compensation Mr. Jones "deserved," was influenced by the racial divide between Wyman's two categories of workers.  *See Kosereis*, 331 F.3d at 214 ("Evidence that the employer's stated reasons for its actions are pretextual can be sufficient to show improper motive, and hence, allow the plaintiff to survive summary judgment").

### b.   Kenneth Jones' Comparator Evidence

As previously discussed, at the pretext stage the Court considers whether Wyman treated Mr. Jones differently than similarly situated employees outside of his protected class in assessing whether a jury could find Wyman's justifications are pretextual.  "In evaluating whether employees . . . are similarly situated, the First Circuit Court of Appeals has considered differences and similarities in the employees' work experience, technical skills, . . . job title, disciplinary record, and work-place conduct."  *Lopez-Rosario v. Programa Seasonal Head Start/Early Head Start de la Diocesis de Mayaguez, Inc.*, 245 F. Supp. 3d 360, 377 (D.P.R. 2017).  "The comparison cases need not be perfect replicas" if a "'prudent person, looking objectively . . . would think them roughly equivalent.'"  *Rodríguez-Cuervos v. Wal-Mart Stores, Inc.*, 181 F.3d 15, 21 (1st Cir. 1999) (quoting *Dartmouth Rev. v. Dartmouth Coll.*, 889 F.2d 13, 19 (1st Cir. 1989)).  Mr. Jones "bears the burden of showing that the individuals with whom he seeks to be compared 'have been subject to the same standards and have

120

engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Id.* (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).

### i.      Pretext in Compensation

Mr. Jones points to Mr. Fickett's only other direct report, Mr. Alley, a white male Cherryfield employee, as his comparator for his compensation claims. *R.* ¶¶ 9-10, 13. Wyman contends that Mr. Jones "cannot have it both ways" with his comparator evidence. *Def.'s Reply* at 6 n.6. If he "wants the Court to adopt a global perspective, then it is determinative that [Mr. Jones] received compensation increases equal to or greater than most other white employees" and if he "wants to limit the comparison to Fickett's direct reports, he must acknowledge there is no way to extrapolate from a sample of two that race was a factor." *Id.*

In the Court's view, the fact that Mr. Jones' compensation was generally consistent with that of most other white employees does not rule out that Wyman could have discriminated against him, nor automatically render Mr. Alley an invalid comparator. The white employees Wyman references could have been in different job positions with incomparable responsibilities. Under Wyman's logic, a hypothetical Black CEO, for example, could not possibly be discriminated against so long as they make more than their white employees. So long as that were true, the Black CEO would have no recourse if, at just the executive level, the company's white CFO were making twice as much.

Because Mr. Jones' discrimination in compensation claim centers on Mr. Fickett's discretionary determination of annual pay increases and bonuses, it is appropriate here to focus the inquiry on Mr. Fickett's two supervisees.

The Court agrees with Mr. Jones that "the fact that [Mr.] Alley had somewhat different job duties is not dispositive of the question of whether the pay increases were discriminatory" under Mr. Fickett's allocation of performance-based and standard increases from his annual "pool" of funds for his supervisees. *Pl.'s Opp'n* at 14; *see also* DSMF ¶ 69; PSAMF ¶ 93. Although Mr. Alley had been at the company longer than Mr. Jones, when Mr. Jones started at Wyman, he and Mr. Alley had comparable hourly wages, and in fact, Mr. Jones initially made more per hour than Mr. Alley. DSMF ¶ 7; PRDSMF ¶ 7; *R.* ¶¶ 24-31. Like Mr. Jones, Mr. Alley was assigned primarily to Cherryfield and he performed some of the same duties as Mr. Jones in his work on QA and Workplace Safety matters, including working on internal food safety audits and employee training. PSAMF ¶¶ 82, 85; DRPSAMF ¶¶ 82, 85. Even after Mr. Alley was promoted in October 2014 to be Cherryfield's Quality Assurance Manager, his work centered on food safety and QA compliance and internal audits. PSAMF ¶ 83; DRPSAMF ¶ 83.

In *González-Bermúdez v. Abbott Laboratories P.R. Inc.*, 990 F.3d 37 (1st Cir. 2021), the First Circuit held that two employees who "occupied lower positions, performed different duties, and reported to different supervisors" were not similarly situated to the plaintiff. *Id.* at 44 (1st Cir. 2021) (citing *García v. Bristol-Myers Squibb Co.*, 535 F.3d 23, 32-33 (1st Cir. 2008) (finding two employees not similarly

situated where they held different positions and had different responsibilities));
*Rodríguez-Cuervos*, 181 F.3d at 20-21 (finding two employees not similarly situated
where the employees had different supervisors, worked under different
circumstances, and received different performance ratings covering different periods
of time).

Although Mr. Jones and Mr. Alley had distinct titles and roles, the entire time
that Mr. Jones was at Wyman their duties overlapped, and they were both supervised
by Mr. Fickett, as his only two direct reports, between whom he split his annual "pool"
money, for the entire period at issue.  PSAMF ¶ 82; DRPSAMF ¶ 82.  Moreover, a
reasonable jury could conclude that Mr. Jones and Mr. Alley received comparable
yearly performance evaluations from Mr. Fickett.  *See* PSAMF ¶¶ 98-101.  In sum, "a
prudent person, looking objectively" could find Mr. Alley and Mr. Jones "similarly
situated," and infer discrimination from Mr. Fickett's different treatment of them.
*Fincher v. Town of Brookline*,  26 F.4th 479, 487 (1st Cir. 2022) (quoting *Mulero-
Carrillo v. Román-Hernández*, 790 F.3d 99, 106 (1st Cir. 2015)).

Overall, Mr. Jones says that summary judgment is inappropriate because Mr.
Fickett's thought process in making compensation decisions can be rebutted by
circumstantial evidence and involves disputes of material fact.  *See Pl.'s Opp'n* at 15;
PRDSMF ¶¶ 58-61.  "The law . . . allows a plaintiff to prove a claim of race
discrimination with circumstantial evidence, including reasonable inferences that
might be drawn from that evidence."  *Joseph*, 989 F.3d at 159.  Mr. Jones "may 'use
the same evidence to show both pretext and discriminatory motive, provided that the

evidence is adequate to enable a rational factfinder reasonably to infer that unlawful discrimination was a determinative factor in the adverse employment action.'" *Id.* (quoting *Pina v. Child.'s Place*, 740 F.3d 785, 797 (1st Cir. 2014)).

The record presents several instances from Mr. Fickett's supervision of Mr. Jones from which a jury could find pretext and discriminatory motive. *See Lincare*, 989 F.3d at 159.  In particular, Mr. Fickett's failure to report Mr. Jones' complaint to him about other Wyman workers singling him out with a race-based comment, after he told Mr. Jones he would handle it, and Mr. Fickett's response when Mr. Jones came to him to complain about Mr. Alley, who was not Mr. Jones' supervisor at any time, talking down to him and ordering him around.  The incidents with Mr. Alley came after his 2018 reassignment to the Cherryfield cleaning line, which Mr. Jones already felt was a retaliatory demotion.  *See* PSAMF ¶¶ 120-122.

Viewing the annual compensation data and performance reports in the light most favorable to Mr. Jones, a jury could conclude that Mr. Jones was racially discriminated against in his earned compensation.  Up until June 5, 2014, Mr. Jones was earning slightly more per hour than Mr. Alley, until Mr. Fickett increased Mr. Jones' wage to $20.96 an hour and Mr. Alley's to $21.05 an hour, by giving Mr. Jones a 3.5% compensation increase and Mr. Alley a 4.5% increase, even though he gave them both an "above-average" performance ranking.  *R.* ¶ 26; PSAMF ¶¶ 98-101; DRPSAMF ¶¶ 101; DSMF ¶ 7; PRDSMF ¶ 7.  There is a genuine issue of material fact as to whether raises at Wyman are indeed based solely on individual performance.  Like other Wyman managers, Mr. Fickett used the COLA term, and

yet set different "standard" raise amounts for his supervisees.  PSAMF ¶ 88.  There is also a genuine issue of material fact as to whether Mr. Fickett acted in a discriminatory manner in not giving both of his supervisees the same standard percentage increase in 2016 or in giving Mr. Jones lower performance increase percentages in 2014 and 2018 when he gave Mr. Alley and Mr. Jones the same performance review ranking.

Accepting Wyman's explanation that Mr. Fickett had full discretion in allocating his annual COLA or pool budget between his supervisees, he could have given Mr. Alley and Mr. Jones different, entirely performance-attributed, increases on their performance review forms.  Instead, from 2016 on, Mr. Fickett specifically set out separate standard increases and performance increases for his supervisees. PSAMF ¶ 90.  A reasonable jury could find that Mr. Fickett's actions undermine Wyman's assertion that all annual pay increases at Wyman are performance based. Summary judgment is improper because Wyman identified no record evidence that would definitively resolve these factual questions in its favor.  As a result, this a disputed material fact resolvable only by a jury at a trial.

### ii.     Pretext in Mileage Reimbursement

Wyman insists that Mr. Jones cannot identify any similarly situated employees who could serve as comparators on the issue of mileage reimbursement because he "has no knowledge of any Wyman employee with a commute of 50 miles o[r] more, and [he] cannot identify any other Wyman employee with similar travel responsibilities and similar personal reasons to want to travel to Canada." *Def.'s Mot.*

at 13.  Reasoning that it acted fairly pursuant to Mr. Jones' and Mr. Fickett's alleged agreement, Wyman submits that Mr. Jones "was in a very unique situation because of (i) his extensive commute to Wyman's Cherryfield facility, (ii) his preference to use his personal vehicle instead of a company vehicle to travel on company business, (iii) the frequency with which it was being proposed he travel to PEI and (iv) [] the benefits he received by traveling to PEI for personal as well as professional reasons." *Id.* at 12 (citing DSMF ¶¶ 18, 40-43).

Mr. Jones says his relevant comparators are "those employees outside of Jones' protected class . . . who engaged [in] approved business travel." *Pl.'s Opp'n* at 11.  He argues that Wyman's reliance on his "very unique situation" and alleged "mileage reimbursement arrangement" rests on multiple "disputed facts and pretextual claims." *Id.* at 11 n.6.  On this issue, "[r]easonableness is the touchstone." *Conward*, 171 F.3d at 20.  Mr. Jones' work travel situation and the comparison cases of other Wyman employees who were reimbursed for their mileage "need not be perfect replicas" but "must closely resemble one another in respect to relevant facts and circumstances." *Id.*

Wyman admits that none of its employees had to exhaust a company vehicle option in order to qualify for reimbursement.  DRPSAMF ¶¶ 17-18.  Mr. Jones also alleges he was the only Wyman employee for whom Wyman reduced mileage reimbursement by deducting his regular home-to-work commute.  PSAMF ¶ 65; DRPSAMF ¶ 65.  Mr. Jones was the only Wyman employee who travelled to PEI on approved business travel, to whom Wyman did not pay mileage reimbursement for

that travel.  PSAMF ¶ 66; DRPSAMF ¶ 66.  Mr. Fickett approved mileage reimbursement for Wayne Alley for round-trip mileage of eighteen miles between Wyman's Cherryfield and Deblois facilities in 2011 and 2012 with no offset for his commute or personal circumstances.  PSAMF ¶ 63; DRPSAMF ¶ 63.  Mr. Fickett did not reduce his own requests for mileage reimbursement by the mileage of his regular home-to-work commute.  PSAMF ¶ 64; DRPSAMF ¶ 64.

When Mr. Jones became a full time Wyman employee, he met with HR to learn about Wyman policies and benefits that applied to him (and to other full-time comparator employees), which included reimbursement for approved business travel. PSAMF ¶¶ 1, 2, 4; DRPSAMF ¶¶ 1, 2, 4.  The Employee Manual said nothing about deducting the length of an employee's regular home-to-work commute from mileage reimbursement, had no provision allowing Wyman to reduce mileage reimbursement because of an employee's personal relationship with another person, and had no provision allowing Wyman to deny  mileage reimbursement because of an employee's activities outside of work.  *See* PSAMF ¶¶ 19-21; DRPSAMF ¶ 19-21.  Finally, Mr. Jones presented evidence that a Wyman communication showing that white employees were receiving mileage reimbursement is what spurred him to take action by contacting HR in May 2017, once he realized that, as the only Black employee, he was not getting mileage reimbursement for business travel.  PSAMF ¶ 70; DRPSAMF ¶ 70.

On the summary judgment record, a reasonable jury could find that Wyman's stated reasons for denying Mr. Jones reimbursement are pretextual because Mr.

Jones has presented evidence that "others similarly situated to him in all relevant respects were treated differently by the employer." *Conward*, 171 F.3d at 20; *see Santiago-Ramos*, 217 F.3d at 56. The fact that Wyman provided an SUV rental and auto allowance for a Black sales employee, who drove Wyman customers back and forth to Canada, DRPSAMF ¶ 61, does not resolve the issue nor refute the fact that Mr. Jones was the only employee who sought mileage reimbursement for his trips to PEI when Wyman assigned him to work there and was denied.

In defense of its handling of the reimbursement issue, Wyman relies on its perception of Mr. Jones' preferences and the personal benefits he enjoyed while working in Canada, as well as its general preference that employees use company vehicles. *Def.'s Mot.* at 12-13. That does not change the reality that other employees were reimbursed for using their own vehicles and were not subjected to "unique" personal standards in order to qualify for mileage reimbursement. *See* PSAMF ¶ 60; DRPSAMF ¶ 60. The question remains for the jury as to whether the nature and frequency of Mr. Jones' travel to PEI and, as well as the significance of his November 2014 email exchange with Mr. Fickett, which specifically addressed his unusually long commute in relation to mileage reimbursement, were sufficient to put Mr. Jones "in a very unique situation" and render Wyman's irregular handling of his travel expenses nondiscriminatory.

Wyman characterizes Mr. Jones' reply email as expressing his agreement to the alleged "arrangement" to "expense the difference," as proposed by Mr. Fickett, however a jury could also interpret this as Mr. Jones acquiescing to pressure from his

direct supervisor, who had already turned down his attempt to claim reimbursement after his first trips to PEI.  *See* DSMF ¶ 22; PRDSMF ¶ 22.  A jury could alternatively interpret Mr. Jones' reference to his long regular commute in that email as an attempt to communicate to Mr. Fickett that he would rarely ever qualify for reimbursement under Mr. Fickett's personalized criteria, which differed from what Wyman otherwise represented as its mileage reimbursement policy.[98]  Whether there was any agreement not to be paid, and if so, if it was for mutual "convenience," or because Mr. Fickett told Mr. Jones that he "did not qualify" for mileage reimbursement, turns on a factfinder's resolution of Mr. Fickett and Mr. Jones' contradictory testimony.  *See* PSAMF ¶¶ 37-38.

Wyman's policy and practice did not require that employees exhaust a company vehicle option, and explicitly provided that work travel would be reimbursed, without reference to the employee's personal commute situation or any personal advantages or preferences associated with such travel.  Although Wyman insists that it acted to accommodate Mr. Jones' unique situation in a non-discriminatory manner, "a jury could nevertheless conclude that [Wyman]'s explanation for the deviation from policy was pretextual."  *Noonan v. Staples, Inc.*, 556 F.3d 20, 30 (1st Cir. 2009) (citing *Brennan v. GTE Gov't Sys. Corp.*, 150 F.3d 21, 29 (1st Cir. 1998) (noting, in a discrimination case, that "[d]eviation from established

---

[98]    Mr. Jones testified that he "didn't acquiesce to" Mr. Fickett's proposal, explaining "I was angry and I told him right there, I said, I doubt that the mileage would be more than 140 miles per day. I commute back and forth to this facility.  He knew that.  He knew that the mileage would be different, it wouldn't exceed that.  And I basically didn't keep track because I was told I did not qualify for mileage, period."  JR 18.

policy or practice may be evidence of pretext"); *see Pennington v. Hannaford Bros. Co., LLC*, No. 2:17-cv-00053-JDL, 2018 U.S. Dist. LEXIS 95732, at *9-11 (D. Me. June 7, 2018) (denying summary judgment on a showing of "possible procedural irregularities and differential treatment" including the employer's "fail[ure] to obtain a written statement from [plaintiff] in violation of company practice" prior to firing him, as the employer's "deviation from its established policy or practice is evidence of pretext").

Mr. Jones and Mr. Fickett's affidavits and deposition testimony present direct contradictions for a fact finder, not this Court, to resolve.  For example, Mr. Fickett flatly denies that he told Mr. Jones that he "did not qualify" for mileage reimbursement while Mr. Jones denies that he made an agreement not to be paid mileage reimbursement.  Furthermore, Ms. Norton denies Mr. Jones' assertion that she told him that it was only fair that he be reimbursed mileage for business travel. "[S]hould the jury reject [Wyman's] explanation[s], such conclusion might lend further support to an inference of malicious intent."  *Noonan*, 556 F.3d at 30 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) (noting, in the discrimination context, that "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive")).  Here, "[c]onsidering the conflicting explanations evinced by the record, it is properly for the jury to decide whether to credit [Wyman's] explanation or instead to draw the competing inferences advanced by [Mr. Jones]."  *Id.*

In cases where "motive and intent play a leading role, summary judgment should not be granted" if the nonmovant "presented evidence beyond conclusory allegations or mere speculation." *Id.* at 31 (citing *Barss v. Tosches*, 785 F.2d 20, 22 (1st Cir. 1986)) (affirming summary judgment where the plaintiff rested on "the mere allegation of an illegal motive found in the complaint, and reiterated in an affidavit"); *Aponte-Santiago v. Lopez-Rivera*, 957 F.2d 40, 41 (1st Cir. 1992) ("The summary judgment standard remains particularly rigorous when the disputed issue turns on a question of motive or intent")). The Court concludes that Mr. Jones' evidence at this third step is sufficient to show that Wyman's stated reason for denying him mileage reimbursement masked a racially discriminatory animus and there are disputed material facts as to Wyman and Mr. Fickett's underlying motives and explanations. "Of course, 'after the full presentation of the evidence at trial, a factfinder might very well decide differently,' but [here, Mr. Jones] 'has raised a genuine issue of material fact as to the actual reason' for [his reassignment/denial of back reimbursement/lower pay increase] sufficient to defeat summary judgment." *Noonan*, 556 F.2d at 31 (quoting *Santiago-Ramos*, 217 F.3d at 57).

## C.   The Retaliation Claims

The Court turns next to Mr. Jones' claims of retaliation for opposition to unequal treatment in violation of 42 U.S.C. § 1981. *Compl.* ¶¶ 70-77. First, Wyman contends it is entitled to summary judgment because no reasonable jury could conclude Mr. Jones engaged in protected activity in making inquiries and expressing dissatisfaction regarding his mileage arrangement and that, even if he could identify

protected activity, Mr. Jones has not proffered sufficient evidence that such opposition was the reason for any changes to his duties or reassignment. *Def.'s Mot.* at 19-20. Wyman further challenges that Mr. Jones suffered a "functional demotion" because there is no evidence that Mr. Jones spending more time in Maine was anything other than consistent with the job he was originally hired to do. *Id.* at 17.

### 1.   Legal Standard

To prevail on his retaliation claim, Mr. Jones "must show that [his] employer took some objectively and materially adverse action against [him] because [he] opposed a practice forbidden by Title VII, such as race discrimination." *Bhatti*, 659 F.3d at 73. As with Mr. Jones' other Section 1981 claims, the Court applies the *McDonnell Douglas* burden-shifting framework to his claim of retaliation. *See id.* at 70.

In order to establish a prima facie case of retaliation, Mr. Jones must show "that (1) [he] had engaged in protected conduct (such as complaining of unlawful discrimination); (2) [he] suffered an adverse employment action (such as a material alteration of [his] conditions of employment); and (3) there was a causal connection between the protected conduct and the adverse employment action." *Lima v. City of E. Providence*, 17 F.4th 202, 209 (1st Cir. 2021). The Court applies an objective standard to the proffered adverse employment action, and "[a]n employee's subjective reaction to the claimed act of retaliation is not determinative." *Id.*

If Mr. Jones can meet his initial burden, "[t]he next step in the *McDonnell Douglas* framework requires the defendant[] to 'articulat[e] a legitimate, nondiscriminatory reason for the adverse employment decision[s].'" *Id.*

## 2.     Prima Facie Case of Retaliation

The Court first considers whether Mr. Jones sufficiently alleged a prima facie case of retaliation.  Mr. Jones says that the change in his job duties to spend more time in Maine constituted a "functional demotion" in retaliation for communicating his dissatisfaction with his travel arrangement and seeking reimbursement.  He also contends that Wyman denied him a performance increase in pay in 2017 on this basis.

### a.     Protected Conduct

Wyman insists that Mr. Jones "did not engage in protected conduct pursuant to Section 1981 because [he] did not report to [Wyman] that he felt he was being treated differently on the basis of his race or color." *Def.'s Reply* at 7.  It urges the Court that retaliation liability cannot be based on Mr. Jones' "unspoken thoughts and beliefs that he was being subjected to discriminatory treatment." *Id.*

Mr. Jones says that "even if [he] did not explicitly assert race-based discrimination," he opposed unequal treatment by purposive conduct when he asked April Norton, Wyman's HR Director, in May of 2017 why he did not "qualify" for mileage reimbursement. *Pl.'s Opp'n* at 23-24.  Arguing that a jury could interpret his May 2017 email as amounting to protected conduct when placed in its full context, Mr. Jones links his HR complaint to his "suspicion that [Mr.] Fickett was wrongly singling him out for unfair treatment" ever since Mr. Fickett rejected his initial

request for reimbursement in 2014. *Id.* at 24. Mr. Jones emphasizes that he first complained to Bob Woodward and Wyman Canada managers about his mileage reimbursement, before escalating the issue with a direct inquiry to HR. *See id.*; PSAMF ¶¶ 40-41.

In his opposition and at oral argument, Mr. Jones cited *Pippin v. Boulevard Motel Corp.*, 835 F.3d 180 (1st Cir. 2016), for the proposition that "opposition to unlawful activity may take forms other than express statements of opposition." *Pl.'s Opp'n* at 23 (quoting *Pippin*, 835 F.3d at 185). In *Pippin*, however, the employees' communication through "purposive conduct" still centered around the Title VII matter of the employer's handling of unlawful sexual harassment.

However, neither Mr. Jones' May 2017 email nor his prior conduct make even a passing intimation that he was claiming that Wyman's denial of mileage reimbursement was race-based. Thus, although Mr. Jones is correct that he could have engaged in protected conduct even without explicitly accusing Wyman of racial discrimination, his May 9, 2017 email to Ms. Norton does not express opposition to discriminatory treatment or otherwise relate in any way to race-based discrimination. *Kenneth Jones Email to April Norton* (May 9, 2017) ("is there a reason why I do not qualify for milage [sic] when traveling to PEI?"); DSMF ¶ 26; PRDSMF ¶ 26; PSAMF ¶ 72; DRPSAMF ¶ 72. Nor did Mr. Jones assert race-based discrimination in his related prior complaints to Mr. Woodward and other Wyman Canada managers. PSAMF ¶¶ 40-41.

In a similar Title VII retaliation case in which an employee claimed she was subjected to sexual harassment and then terminated in retaliation for reporting the harassment, the First Circuit declined to consider the employee's email to an individual at Human Resources to be protected conduct. *Ponte v. Steelcase, Inc.*, 741 F.3d 310, 322 n.10 (1st Cir. 2014). The First Circuit observed that the email did not qualify as protected conduct because it "[did] not complain of sexual harassment at all." *Id.* Here, like the employee in *Ponte*, in his May 9, 2017, email to HR, Mr. Jones made no reference at all to conduct prohibited by § 1981a.

In another Title VII retaliation case, in which an employee claimed she lost out on a promotion, was threatened and intimidated in staff meetings, and was constructively discharged after she spoke out about racial discrimination and potential workplace violations of federal regulations, the District Court for the District of Massachusetts concluded that even though the employee complained about unequal pay in an internal email, and her "dissatisfaction with her own salary is certainly evident going back to 2009," there was "no evidence in the record that the plaintiff believed racial discrimination played a role" in the pay disparity. *Persson v. Boston Univ.*, No, 15-14037-JGD, 2019 U.S. Dist. LEXIS 29111, at *39-41 (D. Mass. Feb. 25, 2019) ("The plaintiff's email . . . mentions the need for 'equity' . . . but makes no mention of race"). The *Persson* Court noted that "[t]he only sworn statement in the record to support the plaintiff's claim that she voiced concern about racial discrimination . . . is her own deposition testimony" before concluding that the

135

plaintiff could not establish that she engaged in protected conduct with her email complaint.  *Id.* at *40-42.

In *Blow v. Virginia College*, 619 Fed. Appx. 859 (11th Cir. 2015), the plaintiff similarly relied on email communications with her supervisors, in which she complained about overtime policies, her performance rating, and her supervisor's handling of overtime pay, as protected conduct.  *Id.* at 863-64.  In one email she "expressed 'a general concern . . . about being singled out/treated different' in her job and said she felt 'as though the rules of the company are only directed to certain people.'"  *Id.* at 863.  As she "made no mention of race," the Eleventh Circuit declined to "require an employer to discern meaning from such vague references to different treatment."[99]  *Id.*

Here, as in *Blow*, although Mr. Jones insists that his "belief that [he] was the victim of racial discrimination was reasonable and in good faith," his email complaints "make[] clear that [Mr. Jones] did not tell [his] supervisors that [he] felt [he] was the victim of discrimination on the basis of [his] race."  *Id.* at 864; *see* DSMF ¶¶ 46, 84, 85; PRDSMF ¶¶ 46, 84, 85 (Mr. Jones never told "anyone at Wyman that he thought he was being discriminated against with regard to travel reimbursement on the basis of his race or color[,]" "never made a report to anyone at Wyman that he thought he was being retaliated against for reporting discriminatory acts[,]" and "never made a complaint to anyone in Wyman Human Resources or management that

---

[99]    Even though *Blow* is an Eleventh Circuit case and not binding on this Court, the facts in *Blow* are sufficiently like the facts here—and its analysis consistent with the First Circuit's approach in other cases—to warrant a brief discussion.

he thought he was being functionally demoted"). Accepting Mr. Jones' characterization of his complaints to Mr. Woodward and other Wyman managers and finally to HR as all part of an effort to address his sincere, long-standing suspicion that Mr. Fickett had been wrongfully singling him out for unfair treatment since 2014, without evidence that Wyman knew that he believed he was the victim of racial discrimination, Mr. Jones cannot demonstrate that he engaged in statutorily protected conduct in order to make out a prima facie case of retaliation. *See Ponte*, 741 F.3d at 323 n.11 ("The retaliating party must be aware of the protected activity that [it] is believed to be retaliating against"); *see also Blow,* 619 Fed. Appx. at 863-64.

Because Mr. Jones admits that he never told Ms. Norton or anyone at Wyman that he believed he was being discriminated against because of his race and admits that he never reported that he believed he was being retaliated against for making such a report, there is no dispute of material fact and Wyman is entitled to judgment in its favor on Mr. Jones' retaliation claim. *Bailey v. Pricewaterhousecoopers*, 653 F. App'x 770, 770 (1st Cir. 2016) ("[T]here was insufficient record evidence to support the conclusion that . . . the sole alleged retaliator in this case[] was aware of plaintiff's protected activity when he engaged in the allegedly retaliatory conduct").

### D.    Punitive Damages

Mr. Jones is entitled to punitive damages on his surviving § 1981 claim if he can show Wyman "engaged in a discriminatory practice . . . with malice or with reckless indifference to [his] . . . rights." *Burnett v. Ocean Props., Ltd.*, 987 F.3d 57,

137

69 (1st Cir. 2021) (alterations in *Burnett*) (citing 42 U.S.C. § 1981a(b)(1); 5 M.R.S. § 4613(2)(B)(8)(c)).  "[M]alice and reckless indifference concern, not the employer's awareness that it is discriminating, but the employer's knowledge that it is acting in violation of federal law."  *Id.* (alteration in *Burnett*) (quoting *McDonough v. City of Quincy*, 452 F.3d 8, 24 (1st Cir. 2006)).

Wyman argues that Mr. Jones cannot meet the "clear and convincing evidence" standard under Maine law.  *Def.'s Mot.* at 22 (citing *Batchelder v. Realty Res. Hosp., LLC*, 2007 ME 17, ¶¶ 21-22, 914 A.2d 1116).  It asserts that "[b]ecause Plaintiff benefitted from the mileage reimbursement arrangement and remained an employee in good standing after he raised the issue about how his reimbursement was handled, there is no *genuine* disputed material fact" precluding summary judgment on this issue.  *Id.* at 23 (emphasis in original).

Mr. Jones responds that summary judgment is inappropriate on this issue because "[a] reasonable jury could infer that Norton, Shurman and Fickett's decisions to deny Jones request for payment of mileage reimbursement in 2018 were taken with malice or reckless disregard to Jones' rights to equal treatment in matters of contract, and with the knowledge that they were acting in violation of federal law."  *Pl.'s Opp'n* at 28.

First, the Court clarifies the federal standard and burden of proof for a punitive damages claim under § 1981a(b)(1).  As the First Circuit explained in *Burnett*, to obtain punitive damages under § 1981a(b)(1), a plaintiff must demonstrate by a preponderance of the evidence that the defendant "engaged in a discriminatory

practice . . . with malice or with reckless indifference to [his] . . . rights." 987 F.3d at 69 (quoting 42 U.S.C. § 1981a(b)(1)). The *Burnett* Court observed that the Maine standard for punitive damages is similar and, in fact, the Maine Human Rights Act's (MHRA) "language is borrowed directly from federal law." *Id.* (quoting *Kopenga v. Davric Me. Corp.*, 1999 ME 65, 727 A.2d 906, 910 (Me. 1999)).

There is a significant difference between federal and Maine law in terms of the burden of proof for a punitive damages claim. Under § 1981a(b)(1), the burden of proof is by a preponderance of the evidence, and under the MHRA, the burden is by clear and convincing evidence. *See Burnett*, 987 F.3d at 69; *Batchelder*, 2007 ME 17, ¶¶ 21-22. The Court firmly rejects Wyman's unsupported claim that Mr. Jones' § 1981a punitive damages claim is subject to the higher clear and convincing standard under Maine law.

Based on this record, the Court cannot conclude that there are no facts from which a reasonable jury could determine that Wyman acted with malice or reckless indifference. There are disputes of material fact as to Mr. Fickett's motivation, and the record supports that Wyman's handling of Mr. Jones' mileage reimbursement was contrary to its usual policy, and that management and HR failed to consider whether its resolution of Mr. Jones' claim for reimbursement was in keeping with Wyman's anti-discrimination policies. *See Pl.'s Opp'n* at 15. Rather, this issue can only be resolved by a factfinder who is able to make the necessary credibility determinations regarding what motivated the Wyman decisionmakers who oversaw Mr. Jones' mileage reimbursement, compensation decisions, and change in assignment to work

primarily in Maine.  To be clear, on the record presented, it is equally plausible that a reasonable factfinder might conclude that Wyman made a good faith effort to prevent discrimination but in the summary judgment context, the Court must view contested evidence in the light most favorable to the non-movant.

## VI.   CONCLUSION

The Court GRANTS in part and DENIES in part Wyman's Motion for Summary Judgment (ECF No. 44).  The Court GRANTS judgment for Wyman on Count V, Kenneth Jones' claim for retaliation for opposition to unequal treatment in violation of 42 U.S.C. § 1981.

SO ORDERED.

<u>/s/ John A. Woodcock, Jr.</u>
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 18th day of July, 2022